UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BABCOCK BORSIG POWER GmbH, <br><br> Plaintiff, <br><br> v. <br><br> BABCOCK POWER, INC., <br><br> Defendant, <br><br> BABCOCK POWER, INC., <br><br> Third-Party Plaintiff, <br><br> v. <br><br> BABCOCK BORSIG, AG <br><br> Third-Party Defendant. | CIVIL ACTION <br> NO. 04-10825 (RWZ) |

**BABCOCK POWER, INC.'S COUNTERCLAIMS,
THIRD-PARTY COMPLAINT AND JURY DEMAND**

Defendant Babcock Power, Inc. ("Babcock Power"), through its undersigned counsel, brings the following counterclaims and third-party complaint:

**Introduction**

1. Plaintiff Babcock Power, Inc. ("Babcock Power") paid millions of dollars to a conglomerate of related German business entities -- all operating under the umbrella organization of third-party defendant Babcock Borsig AG ("BBX") -- for all of the Germans' American operations that were involved in boiler, environmental, heat exchanger and power plant services designed for and used in fossil-fired, nuclear powered, and waste-to-energy power plants

("Environmental, Service and Heat Exchanger Businesses"). Central to the purchase was a non-competition agreement. A number of disputes have arisen relative to this transaction.

2. The parties agreed to personal jurisdiction in Massachusetts state and federal courts for disputes arising from their agreement or related transactions. Babcock Power brings these counterclaims and third-party claims to resolve these disputes.

3. All of BBX's entities -- including without limitation all successors, assigns and any entity acquiring all or substantially all of the assets of any BBX related entity -- agreed to be bound, and not to compete, directly or indirectly, with the business entities purchased by Babcock Power, for a period of three years in the Environmental, Service and Heat Exchanger Businesses in the United States or Canada. The application of this obligation to all BBX entities, successors and acquirers of substantial BBX assets is stated in the very terms of the agreement. The inclusion of such entities is eminently sensible, as any non-competition agreement would be worthless if BBX and its subsidiary, plaintiff Babcock Borsig Power GmbH ("BBP"), could -- as they continually have sought to do -- simply evade its terms by transferring competing assets to affiliates and then have those affiliates transfer the assets to third parties, without any restriction whatsoever.

4. Within days of entering their non-competition agreement with Babcock Power, BBX and BBP breached this agreement by allowing a BBX affiliate, BBP Service Ratingen GmbH f/k/a Balcke-Dürr Service GmbH ("BBP Service Ratingen"), to transfer assets to a third party, Balcke-Dürr GmbH ("Balcke-Dürr"), with virtually no limitation on competition with Babcock Power. Six months later, BBP Service Ratingen and Balcke-Dürr amended their agreement in response to Babcock Power pointing out their non-compete obligations. But BBX and its affiliate still did not bind Balcke-Dürr's parent or any of Balcke-Dürr's affiliates to

2

adhere to Balcke-Dürr's obligations to Babcock Power. Moreover, BBX continues to sell or attempt to sell assets without the appropriate non-competition agreements required by its obligation to Babcock Power, such as the proposed sale of assets from a BBX affiliate to Mitsui Babcock as identified in the complaint.

5. Babcock Power brings this action to seek a declaration that the terms of the non-compete agreement between Babcock Power and BBP are binding not only on BBX and all BBP affiliates, but also that its terms bind all successors of any BBX entity or any acquirer of assets of any BBX entity, to the extent that such acquirer cannot use assets obtained from any BBX entity in a way prohibited by the non-compete agreement. Babcock Power also seeks damages from BBX and BBP for their attempt to eviscerate the terms of the agreement between the parties.

6. In addition to the foregoing relative to the German entities' non-compete obligations, the German entities have failed to pay Babcock Power over $1.7 million in post-closing adjustments arising from workers' compensation payments paid by American entities on behalf of the German entities under the agreement to purchase the American assets. Babcock Power seeks a declaration that BBP and BBX are liable for these amounts.

## Parties

7. Plaintiff Babcock Power, Inc. (f/k/a Hudson Investment Group, Inc.) ("Babcock Power") is a Delaware corporation with a principal place of business at 82 Cambridge Street, Burlington, Massachusetts. Babcock Power is a leading supplier of technology, equipment and services to the power generation industry.

8. Defendant Babcock Borsig Power GmbH ("BBP") is a German corporation with its principal place of business at 375 Duisburger Street, Oberhausen, Germany. BBP is a subsidiary of BBX.

LIBA/1413479.1

9. Defendant Babcock Borsig AG ("BBX") is a German corporation with a principal place of business at 375 Duisburger Street, Oberhausen, Germany. BBX is the parent corporation of BBP.

### Jurisdiction

10. This Court has jurisdiction pursuant to the agreement of the parties consenting to such jurisdiction in the event of a dispute arising from the parties' contractual agreement and pursuant to the Massachusetts Long Arm statute, M.G.L. c. 233A, §3.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, as there is complete diversity between plaintiff and defendants and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

12. Venue is proper in this district pursuant to 28 U.S.C. §1391.

### Facts

**A. BBX Files For Insolvency**

13. On or about July 4, 2002, BBX filed for insolvency in the District Court, Duisberg, Germany. On information and belief, numerous German subsidiaries of BBX also filed for insolvency on or about July 4, 2002, including BBP.

14. As of July 4, 2002, BBX was the parent corporation to numerous subsidiaries. One group of subsidiaries, the "power engineering" companies, were involved in supplying technology, equipment and services to the power generation industry. Within the "power engineering group," BBX owned BBP.

15. At the time of BBX's filing for insolvency, the United States power equipment and service operations of BBP were handled through BBP's subsidiary, BBCC Holding Co., Inc. ("BBCC Holding"), and its main operational holding unit, Babcock Borsig Capital Corporation ("BBCC").

4

16.   As of July 4, 2002, and continuing to today, BBCC's subsidiaries and affiliates are involved in supplying technology, equipment and services to the power generation industry, which includes, among other products, boilers, boiler parts and services, environmental equipment, heat recovery steam generators, condensers, pulverizers, feedwater heaters and moisture separator reheaters.

17.   BBCC's subsidiaries (some of which are now affiliates) have been, and continue to be, located throughout the United States, in cities such as Worcester, Massachusetts; Los Angeles, California; Louisville, Kentucky; Tampa, Florida; Lyman, South Carolina; Joplin, Missouri; Sapulpa, Oklahoma; Pittsburgh, Kansas; and Erie, Pennsylvania.

18.   BBCC's subsidiaries and affiliates have historically sold products or services throughout the United States and in Canada, a geographic territory still fully served by these entities today.

19.   As of July 4, 2002, BBCC's subsidiaries competed vigorously with numerous other companies in the United States and Canada, with such competition continuing through today.

**B.   Babcock Power Purchases the United States Assets of BBP**

20.   In November 2002, Babcock Power, then doing business as Hudson Investment Group, Inc., entered into an agreement to purchase all of the issued and outstanding shares of stock of BBCC Holding from BBP.

21.   At the time that Babcock Power purchased all of the shares of BBCC Holding, BBCC was the exclusive provider in the United States and Canada of BBX's Environmental, Service and Heat Exchanger Businesses.

22.   Babcock Power was not interested in purchasing the shares of BBCC Holding unless it could be assured that BBCC Holding's operating entities would continue to enjoy their

5

status as the exclusive providers in the United States and Canada of BBX's Environmental, Service and Heat Exchanger Businesses for a period of no less than three years.

23. The parties conditioned the sale of BBCC Holding upon the execution of a non-competition agreement.

24. Babcock Power would not have purchased BBCC Holding and its subsidiaries had it not been for this commitment not to compete.

25. Thus, in significant part, Babcock Power's payment for BBCC Holding was provided not just for the company's assets, but also for the protections afforded by an agreement from BBP and BBX that neither BBP nor any of its affiliates, parents, subsidiaries -- nor any acquirers of assets of such entities -- would compete with Babcock Power in the United States and Canada, in the Environmental, Service and Heat Exchanger Businesses, for three years after the transaction. Otherwise stated, the payment was in recognition of the value of the goodwill that needed to be protected.

26. In addition to Babcock Power's cash payments to BBP, Babcock Power also executed a promissory note with a face amount of $5 million (the "Non-Compete Note") as part of the consideration for the non-compete agreement. By its terms, the principal of the Non-Compete Note is due three years from November 29, 2002, with interest payments prior to maturity. In addition to the Non-Compete Note, Babcock Power entered into a separate $1.9 million promissory note on November 29, 2002 for transition consulting services (the "Consulting Services Note," collectively, the "Notes").

C. **As an Essential Component of Its Acquisition, Babcock Power Enters a Non-Competition Agreement with the German Entities**

27. Entering a non-competition agreement was contemplated by -- and was an essential element of -- the November 13, 2002 agreement between Babcock Power and BBP for

the sale of BBCC Holding's stock (the "Stock Purchase Agreement"). Thus, Babcock Power entered into a non-competition agreement with the German entities on November 29, 2002 ("Non-Competition Agreement").

28. The Non-Competition Agreement was an important component of, and was ancillary to, the sale of BBCC Holding's stock. The intent of the Non-Competition Agreement was to assure that Babcock Power received the benefit of its bargain, to ensure that BBCC Holding's operating entities enjoyed the same position in their markets after the sale of BBCC Holding as they had enjoyed prior to such sale, particularly in light of BBX's, and its affiliated entities', activities in the Environmental, Service and Heat Exchanger Businesses in Europe and other parts of the world.

29. The terms of the Non-Competition Agreement were the subject of intense negotiation due to their importance to the respective parties.

30. Consistent with the understanding of Babcock Power that BBCC Holding would remain as the exclusive provider in the United States and Canada of BBX's Environmental, Service and Heat Exchanger Businesses, the Non-Competition Agreement contains the following introductory language:

> As a condition to the Sale, and to preserve the value of the business being acquired by [Babcock Power] after the Sale, the Purchase Agreement contemplates, among other things, that in consideration of the Non-Compete Payment (as defined herein), [BBP, its parent and affiliates] shall enter into this Agreement as of the date hereof.

31. BBP, its parent and affiliates understood the importance of the Non-Competition Agreement to Babcock Power. As the agreement states:

> [BBP, its parent and affiliates] acknowledges that the goodwill associated with the existing business, customers and assets of [BBCC Holding] and its Subsidiaries prior to the sale are an integral component of the value of [BBCC Holding] to [Babcock Power] and is reflected in the Non-Compete Payment and the

7

consideration in the sale . . . and [BBP, its parent and affiliates]'s agreement as set forth herein is necessary to preserve the value of [BBCC Holding] and its Subsidiaries for [Babcock Power] following the Sale.

32. The Non-Competition Agreement prohibited BBP, or any of its direct or indirect subsidiaries, affiliates, successors or assigns from offering products or services related to the Environmental, Service and Heat Exchanger Businesses in the United States or Canada.

33. Specifically, the Non-Competition Agreement prohibited any BBP affiliate from engaging directly or indirectly in the following activities:

> (i) within the customer market composed of fossil-fired and waste-to-energy power plants located in [United States and Canada], all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance and sale of new equipment or replacement parts for selective catalytic reduction and flue gas desulfurization equipment for the reduction of nitrous oxide or sulphur dioxide emissions (the *"Environmental Business"*); (ii) within the customer market composed of fossil-fired (including but not limited to combined cycle) or nuclear power plants located in the [United States and Canada], all activities associated with the provision of the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of boiler components and pressure parts, power plan construction-related services, boiler rebuilds and retrofits, engineered replacement parts or field services (the *"Service Business"*); and (iii) within the customer market composed of fossil-fired (including but not limited to combined cycle) and nuclear power plants located in the [United States and Canada], all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of condensers, feedwater heaters and moisture separator repeaters (the *"Heat Exchanger Business"*).

34. The Non-Competition Agreement barred the BBX entities from engaging in the prohibited businesses in the United States and Canada for a period of three years from November 29, 2002. This is the same time period for payment of principal under the accompanying Non-Compete Note.

8

LIBA/1413479.1

35. Because BBP's parent, BBX, controls a number of different corporations -- some of which engage in Environmental, Service and Heat Exchanger Businesses in geographic locations other than the United States and Canada -- Babcock Power and BBP included language to assure that no BBX entity could deprive Babcock Power of the benefit of its bargain.

36. Specifically, the parties prohibited any of BBP's "Affiliates" from engaging in Environmental, Service and Heat Exchanger Businesses in the United States or Canada for three years. The definition of "Affiliate" in the Non-Competition Agreement -- taken from the related Stock Purchase Agreement -- broadly includes any other corporation or other entity "that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with" BBP. Thus, BBX and BBP Service Ratingen, among others, are contemplated as -- and come within the definition of -- affiliated entities that are bound by the terms of the Non-Compete Agreement.

37. The parties also expressly provided that the obligation to refrain from certain competition not only applied to Affiliates, as that term is broadly defined, but also to any "successors and assigns."

38. The Non-Competition Agreement also contemplated that entities not affiliated with BBX might purchase all or substantially all of the assets of any BBX affiliate during the three year life of the agreement, and specifically bound all successors "including, without limitation, by sale or transfer of all or substantially all assets."

39. Not only does the Non-Competition Agreement state that the terms contained therein were an essential condition to the Stock Purchase Agreement, but it also states that a violation of its terms would cause irreparable harm to Babcock Power. The agreement allows an

9

aggrieved party to seek a preliminary injunction to enforce its terms in a court of competent jurisdiction within the Commonwealth of Massachusetts:

> It is accordingly agreed that the parties shall be entitled to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or other interim or conservatory relief (as necessary) to prevent breaches of [the Non-Competition Agreement] and to enforce specifically the terms and provisions of [the Non-Competition Agreement] in any court of the United States located in the Commonwealth of Massachusetts or in a Massachusetts state court, this being in addition to any other remedy to which they are entitled at law or in equity.

40. The Non-Competition Agreement further provided that the prevailing party in any action "to enforce or interpret the terms" of the agreement is entitled to "reasonable attorney fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled."

41. Both the Stock Purchase Agreement and the Non-Competition Agreement were approved in accordance with the applicable bankruptcy laws of Germany by Dr. Helmut Schmitz, the duly authorized representatives of the court appointed custodian of BBX, BBP, and their related, bankrupt entities.

42. After the sale of BBCC Holding to Babcock Power, Babcock Power believed that it and its subsidiaries' status as the exclusive provider in the United States of BBX's Environmental, Service and Heat Exchanger Businesses remained unchanged.

43. This continued status as the exclusive provider in the United States and Canada of its products and services, without any overlapping competition from its former German parent and affiliates for the initial non-competition period, was expected to lead to further advantageous business relationships for Babcock Power.

### D. BBX Sells Additional Assets to Balcke-Dürr Days After the Non-Compete Agreement was Entered with No Protection for Babcock Power

44. As part of BBX's reorganization effort, at about the same time Babcock Power purchased BBCC Holding from BBP, BBX entities were separately negotiating with Balcke-Dürr for the sale of other BBX assets. Specifically, BBX was discussing with Balcke-Dürr the purchase of BBP Service Ratingen's assets and operations.

45. Like BBP, BBP Service Ratingen was part of BBX's power engineering group. BBP Service Ratingen engaged in, among other activities, the Service Business and Heat Exchanger Business, as those terms are defined in the Non-Competition Agreement (the "Service and Heat Exchanger Businesses").

46. Balcke-Dürr informed its business associates in the United States by letter dated Monday, December 2, 2002 -- *the first business day after Babcock Power entered the Non-Competition Agreement on Friday, November 29, 2002* -- that it had obtained parts of the operative business of BBP Service Ratigen and could offer BBP Service Ratigen's products and services, including products and services from BBP Service Ratigen's Service and Heat Exchanger Businesses.

47. Specifically, in its December 2, 2002 letter -- signed by Balcke-Dürr Chairman, Martin Kienböck, and a manager of Balcke-Dürr's Service Division, Harold Sassman -- Balcke-Dürr stated that as a result of its purchase of assets from BBP Service Ratingen, it could offer "heat exchangers," "boiler spare parts and accessories," and "services relating to [Balcke-Dürr's] entire products portfolio."

48. Upon information and belief, this letter was sent by Balcke-Dürr to its existing and potential customers within the United States and Canada.

11

49. Babcock Power became aware in December 2002 -- when it received the December 2, 2002 announcement -- that Balcke-Dürr had engaged in Service and Heat Exchanger Businesses, through operations acquired from BBP Service Ratingen, in the United States and Canada.

50. On December 31, 2002, Babcock Power, through its Vice President and General Counsel, James S. Brantl, sent letters to BBP, Balcke-Dürr and SPX. Based on the fact that the sale of heat exchangers and boiler spare parts and accessories from an affiliate of BBP was contrary to the terms of the Non-Competition Agreement between Babcock Power and BBP, among other things, Babcock Power insisted that BBP instruct Balcke-Dürr cease and desist from offering such products in the United States and Canada, and publicly announce that it was not engaging in such activity.

51. In response to Babcock Power's demand directed to BBP, it received a copy of a response not from BBP, but from the corporate parent, BBX. BBX's response was signed by Dr. Georg-Peter Kränzlin, one of three members of its management board and its general counsel. Dr. Kränzlin was a vital participant in the negotiations leading to both the Non-Competition Agreement and the Stock Purchase Agreement, having participated in numerous meetings by telephone and in person in Massachusetts during the Fall of 2002.

E. **BBX Agrees that the Non-Competition Agreement Extends to Purchasers of Assets from BBP Affiliates**

52. In this letter, dated January 10, 2003, BBX informed Balcke-Dürr that *it agreed with Babcock Power's position*. BBX informed Balcke-Dürr that, in fact, Balcke-Dürr could not "render the services offered in the information letter of December 2, 2002." Dr. Kränzlin asked that Balcke-Dürr send a corrective letter to any recipient of the erroneous December 2, 2002 letter stating that in fact, Balcke-Dürr could not offer the services illustrated. Dr. Kränzlin's

12

January 10, 2003 letter on behalf of BBX ended by reminding Balcke-Dürr of the contractual obligations between BBP Service Ratingen and Balcke-Dürr, which contained some type of non-compete clause.

53. Whatever non-compete clause was contained in the original agreement, dated December 11, 2002, between BBP Service Ratingen and Balcke-Dürr was clearly inadequate to meet the non-compete obligation imposed on BBP Service Ratingen -- and all BBP affiliates, including BBP. BBX's subsequent actions make this clear. Six months after BBP Service Ratingen and Balcke-Dürr entered their agreement, on June 11, 2003, BBX's outside counsel in the United States forwarded a copy to Babcock Power's outside counsel a document entitled "Amendment No. 1, dated May 28, 2003, to the Acquisition Agreement dated 11 December, 2002" ("Amendment"). The Amendment purports to memorialize a subsequent agreement by Balcke-Dürr not to compete with the so-called "Sold Business" in the United States and Canada in certain markets. In believing that such Amendment was necessary, BBX necessarily believed there was a deficiency in the original December 11, 2002 agreement between BBP Service Ratingen and Balcke-Dürr

54. Despite a request from Babcock Power's outside counsel to clarify the meaning of this Amendment, BBX's counsel has not provided any written explanation of what is meant by the defined term "Sold Business." Furthermore, the Amendment states by its terms that it is specifically not applicable to Balcke-Dürr's "Affiliated Companies."

55. Thus, the narrowly worded Amendment still appears to not bind Balcke-Dürr's affiliates from using the business acquired by Balcke-Dürr in competition with Babcock Power. If so, this may detrimentally affect Babcock Power's subsidiaries' ability to pursue business in

those markets specified in the Non-Competition Agreement. This would affect a complete end-run around the obligations contained in the Non-Competition Agreement.

### F. BBP and BBX further Seek to Avoid their Obligations under the Non-Competition Agreement by Transferring Assets of an Additional BBX Entity to Mitsui Babcock

56. Moreover, as identified in BBP's complaint in this action, BBP and BBX seek to sell assets they transferred to the "rescue company" Babcock Borsig Power Systems ("BBPS") to Mitsui Babcock. They apparently seek to do so without regard to the ability of Mitsui Babcock to use those BBPS assets covered by the Non-Competition Agreement to compete in the restricted territory with Babcock Power.

57. Causing such a sale to take place without the appropriate restriction would violate the Non-Competition Agreement, which, by the very terms of section 4(k), "shall be binding upon and inure to the benefit of the Seller [defined as BBP and all of its affiliates, which includes BBPS] and the Purchaser *and their respective, successors (including without limitation, by sale or transfer of all or substantially all assets . . )*" (emphasis added).

58. Moreover, such a contemplated sale would certainly frustrate the obvious intent of the parties: if BBP and BBX could circumvent their non-competition obligations merely by transferring assets to related entities and then have those entities sell such assets to third parties without any restriction, then BBP and BBX would effectively have no obligation to Babcock Power at all.

59. The uncertainty engendered by BBPS's potentially unrestricted sale of assets to Mitsui Babcock, as well as the limited terms of the obligations imposed upon Balcke-Dürr, have caused Babcock Power to incur substantial losses, costs and expenses including, but not limited to: (a) the consideration paid to BBP for the Non-Competition Agreement; (b) the consideration

paid to BBP for BBCC Holding; (c) loss of goodwill; and (d) attorneys fees, costs and disbursements incurred in enforcing the terms of the Non-Competition Agreement.

### G. BBP Fails to Pay Over $1.7 Million in Additional Workers' Compensation Premiums

60. Additionally, as part of the sale of the Environmental, Service and Heat Exchanger Businesses to Babcock Power, the German entities agreed to compensate Babcock Power for certain operating obligations the American entities purchased by Babcock Power had incurred for entities related to the selling German entities. Included in these obligations were various payments related to workers' compensation. The parties agreed that these expenses would be paid in the normal course of business.

61. As of the closing of the sale to Babcock Power on November 29, 2002, such expenses included $667,000 payable on account of workers' compensation payments for entites affiliated with the German conglomerate. By letter dated July 2, 2003, Babcock Power informed BBP that due to increased deductible payments, these ongoing workers' compensation expenses had risen to $1,731,395. BBP was asked to remit payment within 30 days of the July 2, 2003 letter. Over one year later, as of the date of this counterclaim and third-party complaint, none of the German entities have paid this outstanding amount to Babcock Power.

### COUNTERCLAIMS AND THIRD PARTY COMPLAINT

#### Count I
(Declaratory Judgment)

62. Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 61 above.

63. An actual controversy exists as to the obligations of the parties under the Non-Competition Agreement and the Amendment.

15

64. Enforcement of the Non-Competition Agreement is reasonably necessary to protect Babcock Power's legitimate business interests.

65. Babcock Power is entitled to a declaratory judgment that the obligations contained in the Non-Competition Agreement apply to (i) BBP, (ii) BBX, (iii) any of BBP or BBX's affiliates and subsidiaries, and (iv) any successor of BBP, BBX or any of BBP or BBX's affiliates or affiliates' successors (including as successors entities who purchase or receive by transfer, merger or consolidation all or substantially all of the assets of any BBX-related entity).

66. Babcock Power also is entitled to a declaratory judgment that it has been deprived the benefit of the bargain contained in the Non-Competition Agreement and thus it should be excused from any payments of interest or principal under the Notes; furthermore, BBP is enjoined from transferring or otherwise alienating the Notes.

67. The granting of the declaratory relief above will terminate the controversy amongst the parties and remove an uncertainty as to the respective parties' obligations.

### Count II
(Breach of the Covenant of Good Faith and Fair Dealing)

68. Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 67 above.

69. The Non-Competition Agreement includes, as all contracts do, an implied covenant of good faith and fair dealing.

70. BBP and BBX have breached the implied covenant of good faith and fair dealing, in (i) seeking to sell assets from BBP, BBX or any of their affiliates (including, without limitation the "rescue company," BBPS, or BBP Service Ratingen) without appropriate restrictions on the use of such assets by the acquirers of such assets, and (ii) enabling and

16

allowing Balcke-Dürr affiliates to sell BBP Service Ratingen's heat exchangers, boiler spare parts and accessories, and related services in the United States and Canada.

71. As a result of BBP and BBX's breach of their duty of good faith and fair dealing, Babcock Power has sustained, and continues to sustain, substantial damages.

## Count III
(Breach of Contract)

72. Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 71 above.

73. BBP, BBX and their direct and indirect affiliates, parents and successors, including all purchasers of all or substantially all of BBP or BBX related entities, have contractual obligations under the Non-Competition Agreement not to engage, directly or indirectly, in the Environmental, Service and Heat Exchanger Businesses in the United States or Canada for three years beginning November 29, 2002.

74. BBP and BBX have breached these obligations by allowing affiliates of Balcke-Dürr to directly or indirectly engaged in the Service and Heat Exchanger Businesses by using operative businesses obtained by BBX affiliates which manufacture and supply heat exchanger, boiler spare parts and accessories, and related services.

75. As a result of BBP and BBX's breach of contract, Babcock Power has sustained, and continues to sustain, substantial damages.

## Count IV
(Declaratory Judgment)

76. Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 75 above.

17

77. BBP and BBX agreed as part of the sale of BBP's American assets to Babcock Power to pay to Babcock Power certain operating expenses that the American entities had paid on behalf of the German entities.

78. To date, the German entities have not paid at least $1,731,395 under this obligation, nor have they paid the applicable interest on such outstanding sums.

79. An actual controversy exists as to whether Babcock Power is entitled to $1,731,395 plus interest for the workers' compensation obligations, as adjusted after closing, related to the sale of assets to Babcock Power.

80. Babcock Power is entitled to a declaratory judgment that it is entitled to $1,731,395 plus interest for the workers' compensation obligations, as adjusted after closing, related to the sale of assets to Babcock Power.

81. The granting of the declaratory relief above will terminate the controversy amongst the parties and remove an uncertainty as to the respective parties' obligations.

WHEREFORE, Plaintiff Babcock Power prays that the Court order the following relief:

1. Enter a declaratory judgment in Babcock Power's favor under Counts I and IV, stating:

    a. The obligations contained in the Non-Competition Agreement apply to (i) BBP, (ii) BBX, (iii) any of BBP or BBX's affiliates and subsidiaries, and (iv) any successor of BBP, BBX or any of BBP or BBX's affiliates or affiliates' successors (including as successors entities who purchase or receive by transfer, merger or consolidation all or substantially all of the assets of any BBX-related entity);

    b. Babcock Power has been deprived the benefit of the bargain contained in the Non-Competition Agreement and thus it should be excused from any payments of interest or

principal under the Notes; furthermore, BBP is enjoined from transferring or otherwise alienating the Notes;

    c.    Babcock Power is entitled to $1,731,395 plus interest for the workers' compensation obligations, as adjusted after closing, related to the sale of assets to Babcock Power.

2. Award Babcock Power damages under Counts II and III;

3. Further award Babcock Power costs and attorneys' fees under Count III;

4. Further award Babcock Power $1,731,395 plus interest under Count IV; and

5. Award such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Babcock Power demands a trial by jury as to all issues so triable.

BABCOCK POWER, INC.

By its attorneys,

*/s/ Steven J. Comen*
Steven J. Comen (BBO #093320)
James O. Fleckner (BBO #641494)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

DATED: September 15, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was sent by hand delivery to counsel for plaintiff, Kenneth M. Bello, on September 15, 2004.

*/s/ James O. Fleckner*
James O. Fleckner

19

LIBA/1413479.1

**GOODWIN | PROCTER**

James O. Fleckner
617.570.1153
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

September 15, 2004

**BY HAND**

Civil Clerk's Office
United States District Court
For The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Re:   **Babcock Borsig Power GmbH v. Babcock Power, Inc.**
      **Civil Action No. 04-10825 RWZ**

Dear Sir or Madam:

Enclosed for filing and docketing in the above-referenced matter, please find an original and one copy of the Defendant Babcock Power, Inc.'s Counterclaims, Third-Party Complaint and Jury Demand.

Kindly acknowledge receipt of this filing by date-stamping the enclosed copy and returning them to our awaiting messenger.

Very truly yours,

James O. Fleckner

Enclosures

cc:   Kenneth M. Bello, Esq. *(w/encl.) (By Hand)*

LIBA/1414120.1