UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BABCOCK BORSIG POWER GmbH, <br> Plaintiff, | ) <br> ) <br> ) <br> ) | |
| v. | ) <br> ) | C.A. No. 04 CV 10825-RWZ |
| BABCOCK POWER, INC., <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

### Introduction

1.      In this action, Babcock Borsig Power GmbH ("Babcock") seeks a declaratory

judgment concerning the scope and application of a limited, regional, and industry-specific Non-

Competition Agreement between it and Babcock Power, Inc. ("BPI"). An actual controversy

necessitating a declaratory judgment exists because BPI already has interfered with the sale by

Babcock's corporate parent, Babcock Borsig AG ("BBX") of one of its lines of business to

Babcock Hitachi K.K. ("Hitachi"), and BPI's stated interpretation of the NCA is likely to

interfere with Babcock's or BBX's sale of other business lines in the future.

2.      There is no good faith basis for BPI's position. The plain language of the Non-

Competition Agreement (hereafter, the "NCA") makes clear that it only applies to Babcock and

"its direct or indirect Subsidiaries, Affiliates or successors or assigns." (Emphasis added). The

NCA, by its express terms, does not apply to the purchaser (i.e., successor) of an entity affiliated

with Babcock (e.g., another subsidiary of BBX, such as the one Hitachi bought). Indeed, there is

no mention in the NCA of "successors of Affiliates" or "Affiliates' successors." The parties to

the NCA (Babcock and BPI), both of which were represented by counsel, certainly could have drafted language to cover affiliates' successors if they mutually had intended the covenant to apply to such entities. However, if BPI had proposed such a broad application of the restrictive covenant during the negotiation of the NCA, Babcock would have rejected it summarily, as Babcock is a very large, multi-national corporation with several hundred affiliates, including dozens of companies in the United States and Canada. A restrictive covenant as broad as the interpretation that BPI now advances would have been totally unacceptable to Babcock, as it would have hampered Babcock's separate, existing lines of business in the defined "Restricted Territory", and would have hindered Babcock's sale of such other business lines. These basic realities were extensively discussed and then resolved during the negotiations between Babcock and BPI concerning the scope of the NCA. BPI's assertion now that the NCA would apply to an unaffiliated, non-party corporation that proposes to purchase an entity or business line indirectly related to Babcock, therefore, is unfounded and suggests an ulterior, anticompetitive motive.

3.      Similarly, BPI's interference with the Babcock – Hitachi transaction was unjustifiable, coercive, and in bad faith. Babcock and BPI mutually agreed, prior to the execution of the NCA many months ago, that the NCA between them would not prohibit a third-party competitor that was already operating competitive businesses in the Restricted Territory from continuing those existing operations. Despite that agreement, BPI took the position that Hitachi would be indirectly required by the NCA to cease its preexisting operations in the energy-generation products, environmental products and service business in the United States and Canada if it went forward with the purchase of BBX assets (in other words, if Hitachi became a successor of a Babcock Affiliate, then it would have to cease existing operations in the Restricted Territory). BPI's assertion of this position was a transparent attempt to exact

substantial financial concessions from Babcock and Hitachi on the eve of the closing of the

BBX-Hitachi transaction.

4.      As a result of BPI's coercive tactics and opportunism, Babcock and Hitachi were

jointly forced to pay BPI Seven and a Half Million Dollars ($7,500,000.00), which now Babcock

seeks to recover from BPI in this action.

5.      BPI's unreasonable and revisionist interpretation of the NCA has caused an

"actual controversy" necessitating a declaratory judgment.  If BPI interferes with Babcock's and

BBX's current efforts to sell their other business lines, there is a very real risk that BBX, which

filed for Bankruptcy in a German court, will have difficulty in liquidating other assets, to the

detriment of the corporation and its creditors.

6.      Babcock also seeks monetary damages for BPI's breach of its obligation to make

payments of interest and principal on two Promissory Notes that it executed at the same time that

it signed the Non-Competition Agreement, one in the amount of $1,900,000.00 (the "$1.9M

Promissory Note") and the other in the amount of $5,000,000.00 (the "$5.0M Promissory Note")

BPI has defaulted on its obligations with respect to both Promissory Notes, and Babcock

provided notice of such default.  BPI thereafter failed to pay the interest due as well as the

principal on the Notes.   The default not having been cured, Babcock exercised its right to

accelerate payment.  The entire principal amount, remaining interest, and all costs of collection,

are due to Babcock immediately.

**The Parties**

7.      Babcock is an insolvent German corporation which was, up to the sale of BBCC

to BPI, active in the power-generation products, environmental and services industry.  Babcock

and its ultimate parent company, BBX, transact business throughout the United States, including the Commonwealth of Massachusetts

8.      BPI is a Delaware corporation, headquartered in Boston, Suffolk County, Massachusetts. BPI transacts business throughout the United States, including the Commonwealth of Massachusetts. BPI is registered to do business in Massachusetts and has a designated Massachusetts agent for the service of process.

## Jurisdiction and Venue

9.      Under the NCA, Babcock and BPI agreed that any dispute between them concerning the NCA would be resolved in a court within the Commonwealth of Massachusetts.

10.      The Court has personal jurisdiction over the parties pursuant to the Massachusetts Long Arm statute, M.G.L. c. 223A §3.

11.      This Court possesses original jurisdiction over this civil action pursuant to 28 U.S.C., § 1332(a). Plaintiff is a foreign corporation with a principal place of business in Germany. Defendant is a Delaware corporation with a principal place of business in Danvers, Massachusetts. Plaintiff and Defendant, therefore, have complete diversity of citizenship. The controversy between the parties exceeds the sum or value of $75,000, exclusive or interest and costs.

12.      Venue in this District is proper pursuant to 28 U.S.C. § 1441(b) and 28 U.S.C. § 1391(b).

**Background Facts**

13.    Babcock's ultimate corporate parent, BBX, filed for bankruptcy in a German court on July 4, 2002. In connection with BBX's reorganization, several of BBX's subsidiaries, including Babcock, have liquidated their assets and/or sold some or all of their stock.

14.    As part of this process, on November 29, 2002, Babcock sold its U.S.-based power-generation, environmental and services business, to Hudson Investment Group, Inc. (which was later renamed Babcock Power, Inc., i.e., "BPI").

**The Babcock – BPI NCA**

15.    At the time that of the Babcock – BPI transaction, the parties executed both a Stock Purchase Agreement and a limited, regional, industry-specific NCA, true and accurate copies of which are attached hereto respectively as Exhibits A and B. This NCA was heavily negotiated – both as to its scope and effect. In essence, Babcock agreed not to compete with BPI in three of its business lines (Environmental, Service, and Heat Exchanger) in the United States or Canada for a period of three years.

**Scope of the Covenant**

16.    Because it was critically important to Babcock and BBX that they each retain the ability to sell their remaining business lines to other entities, including major, multi-national players already operating in the energy-generation products and services sector, the negotiations that occurred between Babcock and BPI concerning the NCA (which took place principally in Boston, Massachusetts and in numerous phone conferences) focused at length on the scope of the proposed restriction. Babcock proposed, and BPI agreed, that the restrictive covenant would

only apply to Babcock and its subsidiaries. The clear intent was only to prohibit Babcock and its subsidiaries from re-entering the prohibited business in the Restricted Territory (i.e., the United States and Canada) through another corporate entity that was not presently doing business in the Restricted Territory.

17.    Later in the negotiations, BBX and Babcock voluntarily disclosed to BPI their previously publicized creation of a "rescue company" called Babcock Borsig Power Systems GmbH ("Power Systems"). This corporation was intended as a vessel into which some of BBX's and Babcock's core assets were supposed to be transferred to establish a kind of "Mini-BBX", which could then be sold after some restructuring in due course. BPI raised a concern that the NCA should reach Power Systems, as well, in order to ensure that some other related business did not perform an "end run" around the NCA. To this end, BPI proposed – and Babcock eventually accepted, after tough negotiations – the inclusion of new language extending the NCA to Babcock's "Affiliates".

18.    The Stock Purchase Agreement between Babcock and BPI defines "Affiliate" as "…any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person." This definition underscores that the term "Affiliate" in the NCA was not intended to reach third parties outside of BBX's corporate umbrella.

19.    BPI also proposed extending the NCA to Babcock's "successors and assigns." However, BPI never requested that the non-competition covenant also apply the successors and assigns of BBX or of other entities affiliated with Babcock, nor would Babcock or BBX have assented to such a broad covenant.

6

20.     Before agreeing that its successor and assigns would be bound, Babcock requested – and received – BPI's confirmation that the inclusion of Babcock's "successors and assigns" would in no way constrain Babcock's ability (or the ability of any affiliated entity) to sell its remaining lines of business to large, multinational players who already were operating in the power-generation products and services industry in the United States and Canada.

21.     BPI acknowledged and agreed that the NCA would <u>not</u> apply to any "current competitor" within the Restricted Territory, meaning any prospective purchaser of Babcock's assets or business lines that was already operating in this industry in the United States or Canada.

### Discussions concerning the "GE Example"

22.     To emphasize and illustrate the parties' mutual understanding of the scope of the Covenant, representatives of Babcock and BBX, including Ludger Kramer and Dr. Georg-Peter Kraenzlin, discussed the hypothetical example of a company like General Electric Corporation ("GE") purchasing the remaining portions of the business of Babcock or BBX.

23.     BPI's representatives agreed that the existing, already competing business of GE would <u>not</u> be bound by the NCA, nor would GE be expected to cease its existing operations in the Restricted Territory if it purchased one or more of Babcock's lines of business. More specifically, this view was expressed by Mr. Nathan Hevrony, Mr. James Wood (Chief Executive Officer), and others. Indeed, Mr. Hevrony said words to the effect of *"we cannot prohibit any current competitor from continuing competition with BBCC."* The term "BBCC" refers to the power-generation services business that Babcock sold to BPI in November 2002.

## BPI's Bad Faith Interference with the Hitachi Deal

24.     Following the transaction between Babcock and BPI, Babcock and its parent, BBX, sought to sell several of their remaining lines of business. In particular, commencing in approximately mid-December 2002, BBX began discussions with Hitachi concerning the latter's potential purchase of BBX's subsidiary Power Systems, which engineers equipment for gas-fired, fossil-fired, nuclear and waste-to-energy power plants.

25.     The news of the pending sale of Power Systems to Hitachi was public and well known to BPI, and representatives of BBX and BPI had many communications about this subject.

26.     In response to the news of this pending deal, BPI all of a sudden expressed its view that BBX's sale of Power Systems to Hitachi would implicate the NCA. Specifically, BPI stated to various representatives of Babcock, BBX, and Hitachi that, in its view, Hitachi would fall within the definition of "*Seller*" in the NCA, which includes <u>Babcock</u> and "any of *its* direct or indirect Subsidiaries, Affiliates or successors or assigns". (Emphasis added).

27.     Even though Hitachi is not a party to the NCA, is not a "successor" of Babcock, and has been independently operating in the energy-generation products and services industry in the United States and Canada for decades, BPI essentially took the position that, if Hitachi purchased Power Systems, then Hitachi would have to cease its existing operations in the power-generation products industry in the United States and Canada.

28.     In taking this position, BPI ignored not only the expressed intent of the parties but also the plain language of the NCA, which includes <u>Babcock's</u> successors, assigns, and

"affiliates" but does <u>not</u> include the successors or assigns of those Babcock affiliates. Again, Power Systems is an "Affiliate" of Babcock, but by the plain language of the NCA, Hitachi is neither an "Affiliate" nor a successor of Babcock. By purchasing Power Systems, Hitachi, at most, became a successor <u>of BBX</u>, Babcock's ultimate corporate parent. Hitachi, therefore, does not fall within the definition of "Seller" in the NCA and is not bound by the Covenant.

29.     In asserting that Hitachi somehow fits within the definition of "Seller," BPI also reneged on its previous agreement that the NCA would not be deemed to apply to "current competitors" within the Restricted Territory, such as GE. Indeed, Hitachi fits perfectly the GE example discussed and agreed upon by Babcock and BPI prior to executing the NCA.

30.     BPI's assertions regarding the Babcock-Hitachi transaction cannot be squared with Section 1(d) of the NCA, which reflects the *legitimate* purpose of the NCA, namely to protect the "goodwill associated with *existing business, customers and assets of the Company and its Subsidiaries prior to the sale*". BPI asserted, without any explanation, that it has a goodwill interest in Hitachi's existing business, customers and assets. To the contrary, because Hitachi already exists, and has its own customers, goodwill, and confidential information, there cannot be any legitimate business interest necessitating the enforcement of the NCA in a manner that would impact Hitachi's existing business in the United States and Canada.

31.     BPI continued to press its interpretation of the NCA, even when Babcock and Hitachi offered written assurances that Hitachi would take additional and extensive measures to keep its existing U.S. operations and its newly acquired European operations completely separate and make sure that confidential and trade secret information regarding the latter is not communicated to the former.

### Babcock's Efforts to Avoid Litigation

32.    Babcock and Hitachi were under tremendous pressure to close their transaction. Most importantly, Power Systems (i.e., the "rescue company" established by Babcock and BBX) was close to insolvency because it had failed to obtain the necessary bonding lines of credit and, consequently, had very little cash left.  Additionally, the European Commission had refused to provide state guarantees to facilitate Power Systems' procurement of bonding from private banks.  Given these timing pressures and the enormous financial stakes of the transaction for each of them, Babcock and Hitachi attempted several times to dissuade BPI from further interference with the sale of Power Systems.

33.    Babcock sent a demand letter to BPI on March 27, 2003, insisting that BPI cease its interference with the sale of Power Systems to Hitachi and explicitly referencing potential claims of intentional interference and violation of the Massachusetts Unfair and Deceptive Trade Practices Act, M.G.L. c. 93A.

34.    BPI, by its counsel, refused to cease and desist.  In fact, BPI took the position that Babcock's or BBX's sale of other lines of business, would also implicate the NCA.

35.    Subsequently, in an effort to avoid resorting to litigation, Babcock, BBX, and Hitachi even offered written assurances that Hitachi would not attempt to market within the Restricted Territory any products acquired from BBX.  They also assured BPI that they would all take mutually agreeable measures to prevent Hitachi's use of disclosure within the Restricted Territory of confidential or proprietary information formerly belonging to BBX.

36.     Because BBX and Hitachi were under immense pressure to close their transaction so that they could jointly bid on the construction of a power plant in Germany, Babcock and Hitachi ultimately agreed to pay BPI Seven and a Half Million Dollars ($7,500,000.00). Babcock and Hitachi closed their deal and paid this sum to BPI, reserving their rights to pursue any and all claims against BPI.

**BPI Interferes with the Proposed Mitsui Deal**

37.     Following the closing of the Babcock – BPI deal, BBX and another of its many subsidiaries, Power Service, were in active discussion about the potential sale of Power Service to Mitsui Babcock ("Mitsui"). Like Hitachi, Mitsui is a large, multi-national corporation that has an established presence in the energy-generation products and services industry in the United States.

38.     As was true in the prior instance, the entity being sold is not an affiliate or successor of Babcock, which is the only party to the NCA. This time, the entity being sold is an affiliate of BBX, and Power Service is three rungs on the corporate ladder away from Babcock. Despite all this, BPI again has taken the position that Mitsui would be bound by the NCA and, thereby, precluded from continuing its existing operations in the United States following its purchase of the Power Service assets.

39.     It is clear from BPI's past and present conduct that it intends to continue interfering with Babcock's and BBX's efforts sell their remaining assets. For BBX in particular, this interference is a serious concern, as it is insolvent and is in need of additional cash.

11

40.     A declaratory judgment from this Court is necessary to resolve this actual controversy.

**The Promissory Notes Executed by BPI**

41.     At the time of the Babcock-BPI transaction, BPI executed two Promissory Notes – the $1.9M Note and the $5.0M Note, both dated November 29, 2002.  Copies of the Notes are attached hereto as Exhibit C and D respectively.  The Notes call for BPI's payment of principal and interest according to a specific schedule.

42.     Specifically, the $1.9M Noted required payment of principal of $475,000 on:

"each of the 90th, 180th, and 270th day after the first anniversary of, . . . If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Payee said second anniversary of the date hereof."

43.     The $5.0M Note provides that "interest shall be due and payable monthly in arrears on the first day of each month commencing on the first day of the month next succeeding the date hereof", and that "Principal shall be due and payable on the third anniversary of the date hereof".

44.     Both Notes also provide for acceleration of the principal and interest in the event of a default.  Finally, the Notes provide that if Babcock had to make efforts to collect the sums due, then BPI would be required to reimburse Babcock's attorneys' fees and other costs of collection.

45.     Subsequent to execution of the Promissory Notes, on November 29, 2002, Babcock and BPI executed the First Amendment to Stock Purchase Agreement (the "First Amendment"), a true and accurate copy of which is attached hereto as Exhibit E.  Section 1 of

the First Amendment provides for delivery of the $1.9M Note. Section 2 of the First Amendment provides for deliver of the $5.0M Promissory Note, the latter "in exchange for the Seller's execution at Closing of the Non-Competition Agreement".

46.     Section 4 of the First Amendment, which modifies Section 8.06 of the SPA. Section 8.06 provides for certain indemnification and offset by Babcock, with such right of setoff being limited to "amounts due under the Note issues pursuant to Section 2.04 [the $5.0M Note]", and then only after "any amounts finally determined to be owed to the Purchaser . . . ". Neither the First Amendment nor any other document provides for or permits a right of set-off against the $1.9M Note.

47.     Up through October 15, 2004, BPI had not made *any* payment of interest or principal on either of the Promissory Notes, in breach thereof. Consequently, Babcock, through its counsel, notified BPI, in writing, of its failure on October 15, 2004, a true and accurate copy of which is attached hereto as Exhibit F. The Notes provide that BPI has five days to cure in the event of a failure.

48.     By letter dated October 19,2004, BPI (through counsel) notified Babcock that it intended to offset $1,747,124.00 against the $1.9M Note, even though it has not right of offset against that note.

49.     BPI did not cure its failure under either the $1.9M Note or the $5.0M Note within the five day period provided for in the notes. Consequently, by letter November 12, 2004, Babcock (through counsel) notified BPI that it was exercising its option to accelerate the payments due.

50.     BPI has failed to pay the interest and principal due under either of the Notes. Therefore, all outstanding principal and interest due, and all attorneys' fees and other costs of collection, therefore, is now owed to Babcock.

51.     The $5.0M Note also provides that "in the event that the aggregate of all contingent obligations of Maker and its subsidiaries existing, directly or indirectly, from its guaranties, sureties, or other exposures to the Contingent Risks . . . is reduced below the principal amount of this Note then outstanding, Maker shall be required to post an irrevocable, unconditional letter of credit (with an expiration date no earlier than 30 days after the maturity date of this Note) issue by a first class international bank acceptable to the Payee".  The Contingent Risks have been reduced below the principal amount of the $5.0M Note; however, no complying Letter of Credit has been obtained by BPI.

## CLAIMS FOR RELIEF

### COUNT I – Declaratory Judgment

52.     Babcock repeats and incorporates by reference the allegations stated in Paragraphs 1-51 above as if stated fully herein.

53.     Babcock and BPI are parties to the NCA.

54.     Following their entry into the NCA, Babcock and BPI have had extensive discussions concerning the applicability of the NCA to certain transactions, including, without limitation, Hitachi's prospective purchase of the Power Systems from Babcock's parent corporation, BBX.

14

55..    An actual controversy has arisen between Babcock and BPI within the meaning of 28 U.S.C., § 2201 *et seq.* and M.G.L. c. 231A, § 1 concerning the scope and application of the NCA to "current competitors" within the Restricted Territory.

56..    A declaration from this Court is necessary to resolve this controversy, and it is in the interest of justice that the Court do so, as future, multi-million Dollar transactions depend on the resolution of this dispute.

57..    The Court should also award BPI monetary damages and attorneys' fees. In order to convince BPI to cease its bad faith efforts to frustrate the BBX-Hitachi transaction, Babcock had to pay BPI the sum of Seven and a Half Million Dollars and has incurred substantial legal fees, as well.

## COUNT II – Breach of the Covenant of Good Faith and Fair Dealing

58..    Babcock repeats and incorporates by reference the allegations stated in Paragraphs 1- 57 above as if stated fully herein.

59.    Implied in every Massachusetts contract is a covenant of good faith and fair dealing.

60.    BPI has breached the covenant of good faith and fair dealing in its NCA with Babcock by, among other things, reneging on its agreement that the restrictive covenant in that agreement would not apply or be deemed to apply to any "current competitor" within the Restricted Territory.

61.    As a result of BPI's breach of the covenant of good faith and fair dealing, Babcock will suffer damages.

## COUNT III – Chapter 93A

62.    Babcock repeats and incorporates by reference the allegations stated in Paragraphs 1-61 above as if stated fully herein.

63    Both Babcock and BPI are engaged in trade or commerce within the Commonwealth of Massachusetts.

64    BPI's conduct, including but not limited to: (i) reneging on its agreement that the restrictive covenants in the NCA would not apply or be deemed to apply to any "current competitor" within the Restricted Territory; (ii) attempting to exact financial concessions from Babcock in exchange for BPI's agreement not to advance its unfounded interpretation of the NCA; and (iii) taking an unfounded position on the applicability of the NCA in the hopes of interfering with the sale of Power Systems to Hitachi, with the purpose and effect of restraining trade and limiting competition, to the ultimate detriment of individual consumers, constitute unfair and deceptive trade practices and unfair competition in violation of M.G.L. c. 93A.

65.    Babcock sent BPI a demand letter on March 27, 2003, insisting that BPI cease and desist from further interference and explicitly referencing the Massachusetts Unfair and Deceptive Trade Practices Act, M.G.L. c. 93A, as well as potential claims for multiple damages and attorneys' fees.

66.    In response to the above letter, BPI did not agree to cease and desist.  Nor did BPI make any reasonable counter-proposal.  Instead, BPI has attempted to exact unreasonable financial concessions from Babcock and HITACHI.

67.    BPI's conduct was and is willful, intentional, non-privileged, oppressive, and malicious and has caused and is causing irreparable harm and monetary damages to Babcock, including lost profits, attorneys' fees, costs, and interest.

16

## Count IV - Breach of the Promissory Notes

68.    Babcock repeats and incorporates by reference the allegations stated in Paragraphs 1-67 above as if stated fully herein.

69.    At the time of the Babcock-BPI transaction, BPI executed the $1.9N Note and the $5.0M Note, both dated November 29, 2002.

70.    BPI has defaulted on its obligations under both Notes.  Babcock, through its counsel, notified BPI, in writing, of its failure on October 15, 2004.  The Notes provide that BPI has five days to cure in the event of a default.  BPI did not cure, so Babcock, through its counsel, notified BPI, in a letter dated November 12, that it was exercising its option to accelerate the payments due.

71.    BPI has failed to pay the interest and principal due under either of the Notes. Therefore, all outstanding principal and interest due, and all attorneys' fees and other costs of collection, therefore, is now owed to Babcock.

72.    BPI also has failed to secure a complying Letter of Credit, as required by the $5.0M Note.

## PRAYER FOR RELIEF

WHEREFORE, Babcock respectfully requests that this Court:

(i)    Issue an Order declaring that the NCA is inapplicable any "current competitor" within the Restricted Territory, including, without limitation, Hitachi and Mitsui;

(ii)     Declare that the NCA shall in no way constrain any current competitor's ability to continue its existing operations in the power-generation industry in the United States and Canada;

(iii)    Award Babcock monetary damages in the amount of Seven and a Half Million Dollars ($7,500,000.00);

(iv)     Award Babcock treble damages, interest, and attorneys' fees;

(v)      Award Babcock all of the principal and interest due under the Notes, as well as its attorneys' fees and other costs of collection; and

(v)      Order such other relief as is reasonable and just.

Babcock requests a trial by jury on all claims so triable.

Respectfully submitted,

BABCOCK BORSIG POWER GmbH,

By Its Attorneys,

Kenneth M. Bello, BBO # 036630
Josiah M. Black, BBO # 632690
Bello Black LLP
535 Boylston Street, Suite 1102
Boston, Massachusetts 02116
(617) 247-4100

Dated: December 20, 2004

03007580.DOC

BB Doc 01393544.2