# EXHIBIT 1

# STOCK PURCHASE AGREEMENT

Between

**BABCOCK BORSIG POWER GmbH**

and

**HUDSON INVESTMENT GROUP, INC.**

As of November 13, 2002

# TABLE OF CONTENTS

Page

## ARTICLE 1

## DEFINITIONS

SECTION 1.01. Certain Defined Terms ........................................................................ 1
SECTION 1.02. Interpretation and Rules of Construction .................................................. 4

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01. Purchase and Sale of the Shares ............................................................. 5
SECTION 2.02. Purchase Price of the Shares ................................................................. 5
SECTION 2.03. Closing .......................................................................................... 5
SECTION 2.04. Closing Deliveries by the Seller ............................................................ 5
SECTION 2.05. Closing Deliveries by the Purchaser ....................................................... 6

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

SECTION 3.01. Organization and Authority of the Seller .................................................. 6
SECTION 3.02. Organization, Authority and Qualification of the Company ............................ 7
SECTION 3.03. Capitalization .................................................................................. 7
SECTION 3.04. The Subsidiaries .............................................................................. 8
SECTION 3.05. The Shares ..................................................................................... 9
SECTION 3.06. Intercompany Accounts ...................................................................... 9

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
## OF THE PURCHASER

SECTION 4.01. Organization and Authority of the Purchaser ............................................. 9
SECTION 4.02. Investment Purpose .......................................................................... 10
SECTION 4.03. Experience; Advice; No Warranties as to Projections, etc. ............................. 10
SECTION 4.04. No Other Representations and Warranties of Sellers .................................... 10
SECTION 4.05. Financing ...................................................................................... 10

i

# ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01. Conduct of Business Prior to the Closing ............................................... 10
SECTION 5.02. Investigation ............................................................................................ 11
SECTION 5.03. Access to Information ............................................................................. 12
SECTION 5.04. Confidentiality ........................................................................................ 12
SECTION 5.05. Regulatory and Other Authorizations; Notices and Consents ............... 13
SECTION 5.06. Intercompany Accounts ......................................................................... 13
SECTION 5.07. Amendments, Termination and New Agreements ................................. 13
SECTION 5.08. Seller Retained Marks ............................................................................ 15
SECTION 5.09. Currency ................................................................................................. 16
SECTION 5.10. Further Action ........................................................................................ 16

# ARTICLE VI

## TAX MATTERS

SECTION 6.01. Tax Indemnities ...................................................................................... 16
SECTION 6.02. Refunds and Tax Benefits ...................................................................... 17
SECTION 6.03. Contests .................................................................................................. 18
SECTION 6.04. Preparation of Tax Returns .................................................................... 18
SECTION 6.05. Cooperation and Exchange of Information ........................................... 19
SECTION 6.06. Conveyance Taxes .................................................................................. 19
SECTION 6.07. Miscellaneous ........................................................................................ 20

# ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.01. Conditions to the Obligations of the Seller .......................................... 20
SECTION 7.02. Conditions to the Obligations of the Purchaser .................................... 21

# ARTICLE VIII

## INDEMNIFICATION

SECTION 8.01. Survival of Representations and Warranties .......................................... 23
SECTION 8.02. Indemnification by the Seller ................................................................. 23
SECTION 8.03. Indemnification by the Purchaser .......................................................... 24
SECTION 8.04. Indemnification Procedures ................................................................... 24
SECTION 8.05. Limits on Indemnification ...................................................................... 25
SECTION 8.06. Set Off .................................................................................................... 26
SECTION 8.07. Exclusive Remedies ............................................................................... 26

# ARTICLE IX

## TERMINATION, AMENDMENT AND WAIVER

SECTION 9.01. Termination ........................................................................................ 26
SECTION 9.02. Effect of Termination......................................................................... 27
SECTION 9.03. Amendment ......................................................................................... 27
SECTION 9.04. Waiver ................................................................................................. 27

# ARTICLE X

## GENERAL PROVISIONS

SECTION 10.01. Expenses............................................................................................. 27
SECTION 10.02. Notices............................................................................................... 27
SECTION 10.03. Public Announcements...................................................................... 28
SECTION 10.04. Severability........................................................................................ 29
SECTION 10.05. Entire Agreement ............................................................................. 29
SECTION 10.06. Assignment ....................................................................................... 29
SECTION 10.07. No Third Party Beneficiaries .......................................................... 29
SECTION 10.08. Governing Law ................................................................................. 29
SECTION 10.09. Counterparts...................................................................................... 29
SECTION 10.10. Interpretation..................................................................................... 29

iii

# STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "Agreement") is entered into as of November 13, 2002, by and between Hudson Investment Group, Inc., a Delaware corporation, or its designated Affiliate (the "Purchaser"), and Babcock Borsig Power GmbH, a German corporation (the "Seller").

## RECITALS

**WHEREAS**, the Seller is the owner of all of the issued and outstanding shares of capital stock (the "Shares") of BBCC Holding Co., Inc., a Delaware corporation (the "Company"); and

**WHEREAS**, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Shares, all upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the premises, and the covenants, agreements, representations, and warranties herein contained, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

<u>SECTION 1.01. Certain Defined Terms</u>. For purposes of this Agreement:

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Bankruptcy Approval</u>" shall mean all orders and approvals necessary or required under the bankruptcy proceedings relating to the Company's parent company, Babcock Borsig Power GmbH to permit any and all of the transactions contemplated hereby to be consummated without condition or opportunity for interference therewith post-Closing.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Boston, Massachusetts.

"<u>Closing</u>" has the meaning set forth in Section 2.05.

"<u>Closing Date</u>" has the meaning set forth in Section 2.05.

"<u>Contest</u>" has the meaning set forth in Section 6.03(b).

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Current Bankruptcy" means any bankruptcy (or similar) proceedings now extant in any jurisdiction with respect to Babcock Borsig AG or its Affiliates, any ancillary proceedings related to or arising therefrom now of in the future, and any impact any such proceedings may have on Seller or its Subsidiaries.

"Encumbrance" means any security interest, pledge, hypothecation, charge, mortgage, lien or other encumbrance or any agreement to grant or give any of the foregoing.

"Environment GmbH" has the meaning set forth in Section 5.07.

"Existing Stock" has the meaning set forth in Section 5.08.

"Governmental Authority" means any federal, national, supranational, state, provincial, county, city, local, or similar government, governmental, regulatory or administrative authority, agency or commission of competent jurisdiction or any court, tribunal, or judicial or arbitral body of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Indemnified Party" has the meaning set forth in Section 8.04.

"Indemnifying Party" has the meaning set forth in Section 8.04.

"Intercompany Accounts" has the meaning set forth in Section 3.06.

"Law" means any federal, national, supranational, state, provincial, county, city, local or similar constitution, statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including, without limitation, common law).

"Letters of Credit" means those outstanding letters of credit for which Babcock Borsig Capital Corporation is obligated as listed on Schedule 1.01 hereto.

"Liabilities" means any and all claims, debts, liabilities and obligations, whether asserted or unasserted, accrued or fixed, absolute or contingent, matured or unmatured, or determined or determinable, including, without limitation, those arising under any applicable Law (including, without limitation, any applicable Environmental Law), Action or Governmental Order and those arising under any contract, agreement, commitment or undertaking.

"License Agreement" has the meaning set forth in Section 5.07.

2

"Loss" has the meaning set forth in Section 8.02.

"Material Adverse Effect" means any circumstance, change in or effect that is materially adverse to the results of operations or the financial condition of the business of the Company or any of the Subscribers, taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, circumstance, change or effect arising out of or attributable to (i) events, circumstances, changes or effects that generally affect the industries in which the business operates (including legal and regulatory changes), (ii) general economic or political conditions or events, circumstances, changes or effects affecting the securities markets generally, or (iii) changes caused by a material worsening of current conditions caused by acts of terrorism or war (whether or not declared) occurring after the date hereof.

"Note" has the meaning set forth in Section 2.03.

"Novation Agreement" means that certain Novation and Indemnification Agreement, dated as of August 1, 2001, between Babcock Borsig Machinery, Inc. and Babcock Borsig Capital Corporation.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the U.S. Securities Exchange Act of 1934, as amended.

"Post-Closing Date Tax Benefit" has the meaning set forth in Section 6.02(b).

"Power, Inc." has the meaning set forth in Section 5.07.

"Purchase Price" has the meaning set forth in Section 2.02.

"Purchaser" has the meaning set forth in the preamble hereof.

"Purchaser Indemnified Party" has the meaning set forth in Section 8.02.

"Required Approvals" shall have the meaning set forth in Section 5.05.

"Seller" has the meaning set forth in the preamble hereof.

"Seller Indemnified Party" has the meaning set forth in Section 8.03.

"Seller Retained Marks" means the portions of any trademarks, service marks, domain names, logos, trade names, corporate names, and other identifiers of source or goodwill, including registrations and applications for registration thereof, using the names "Borsig" and "NEM"; provided, however, that "Seller's Retained Marks" shall not, in any event, include the portions of such trademarks, service marks, domain names, trade dress, logos, trade names, corporate names, and other identifiers of source or goodwill, including registrations and applications for registration thereof, using names other than "Borsig" or "NEM".

"Shares" has the meaning set forth in the recitals hereof.

3

"Subsidiaries" has the meaning set forth in Section 3.04.

"Tax" or "Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority, including, without limitation, taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs' duties, tariffs, and similar charges.

"Tax Returns" means any and all returns, reports and forms (including elections, declarations, amendments, schedules, information returns or attachments thereto) required to be filed with a Governmental Authority with respect to Taxes.

"Third Party Claims" has the meaning set forth in Section 8.04.

SECTION 1.02. Interpretation and Rules of Construction. In this Agreement, except to the extent that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include", "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    references to a Person are also to its permitted successors and assigns.

## ARTICLE II

## PURCHASE OF SHARES; TRANSITION SERVICES; NON-COMPETITION

SECTION 2.01. Purchase and Sale of the Shares. Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell, assign, transfer and deliver the Shares to the Purchaser, and the Purchaser shall purchase the Shares from the Seller.

SECTION 2.02. Purchase Price of the Shares. The aggregate purchase price for the Shares shall be $9,500,000 (the "Purchase Price") and shall be paid by the Purchaser to the Seller upon the assignment, transfer and delivery of the Shares to the Purchaser at Closing in cash by wire transfer of immediately available funds to a bank account designated by the Seller in a written notice to the Purchaser prior to the Closing.

SECTION 2.03. Payment Under Transition Consulting Services Agreement. Purchaser shall deliver at Closing its Promissory Note for $2,500,000 (the "Transition Services Consideration") in the form attached hereto as Exhibit A in exchange for Seller's execution at Closing of the two-year Transition Consulting Services Agreement (the "Transition Consulting Services Agreement") described in Section 5.07(k), which shall provide for the payment of $250,000 in the first year and $2,250,000 in the second year, payable in equal quarterly installments in each year.

SECTION 2.04. Payment for Non-Competition Agreement. Purchaser shall deliver at Closing its Promissory Note for $5,000,000 (the "Non-Competition Consideration") in exchange for Seller's execution at Closing of the Non-Competition Agreement (the "Non-Competition Agreement") described in Section 5.07(l), which shall provide that during the period commencing on the Closing Date and ending on the third (3rd) anniversary of the Closing Date, neither the Seller nor any of its Affiliates or successors will, whether for their own account or for that of any other Person, and whether as a shareholder, partner or investor controlling any Person, or as principal, agent, representative, employee, proprietor, or partner, or in any other capacity, either directly or indirectly, conduct or engage in the Restricted Business as that term is defined therein.

SECTION 2.05. Closing. Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Nixon Peabody LLP located at 101 Federal Street, Boston, Massachusetts 02110 at 2:00 PM on the later to occur of (a) November 22, 2002 or (b) the third Business Day following the satisfaction or waiver of all conditions to the obligations of the parties set forth in Article VII at such other place or at such other time or on such other date as the Seller and the Purchaser may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date").

SECTION 2.06. Closing Deliveries by the Seller. At the Closing, the Seller shall deliver or cause to be delivered to the Purchaser:

(a)    stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank, in form satisfactory to the Purchaser;

5

(b)    the resignations, effective as of the Closing, of all of the directors and officers of the Company, except for such persons as shall have been designated in writing prior to the Closing by the Purchaser to the Seller; and

(c)    the agreements, certificates and other documents required to be delivered pursuant to Section 7.02.

SECTION 2.07.  Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver to the Seller:

(a)    the Purchase Price by wire transfer as set forth in Section 2.02;

(b)    the Transition Consulting Services Consideration as set forth in Section 2.03;

(c)    the Non-Competition Consideration as set forth in Section 2.04; and

(d)    the agreements, certificates and other documents required to be delivered pursuant to Section 7.01.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

As an inducement to the Purchaser to enter into this Agreement, the Seller hereby represents and warrants to the Purchaser as follows:

SECTION 3.01.  Organization and Authority of the Seller.

(a)    The Seller is a corporation duly organized, validly existing and in corporate good standing under the laws of Germany and has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated by this Agreement.  Subject to the Bankruptcy Approval (which will be obtained prior to Closing), the execution and delivery of this Agreement by the Seller, the performance by the Seller of its obligations hereunder and the consummation by the Seller of the transactions contemplated by this Agreement have been duly authorized by all requisite action on the part of the Seller.  This Agreement has been duly executed and delivered by the Seller, and (assuming due authorization, execution and delivery by the Purchaser) this Agreement is legal and constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), but excluding, however, the Current Bankruptcy.

(b)    Neither the execution nor delivery of this Agreement by the Seller nor the consummation of the transactions contemplated hereby will:

6

(i)    violate or conflict with any provision of any organization document of the Seller, the Company or any Subsidiary;

(ii)    subject to the Bankruptcy Approval, violate or conflict with any provision of any Law or Governmental Order applicable to the Seller, the Company or any Subsidiary or by which any of their assets or properties are bound;

(iii)    result in a material breach of, or constitute a default under or (with giving of notice or lapse of time or both) result in a material breach of or constitute a default under, or otherwise give any person the right to terminate or accelerate performance under, any material lease license, mortgage, indenture, indebtedness, contract or other agreement or instrument to which the Seller, the Company or any Subsidiary is a party or by which any of their assets or properties are bound; or

(iv)    result in or require the creation or imposition of any Encumbrance or Liability upon or with respect to any material assets or properties of the Seller, the Company or any Subsidiary.

SECTION 3.02.  Organization, Authority and Qualification of the Company.  The Company: (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted; (ii) has all licenses, certificates, permits, franchises and other governmental authorizations which are required for the operation of its business, except where the failure to have such licenses, certificates, permits, franchises and other governmental authorizations, in the aggregate for all such failures, could not reasonably be expected to have a Material Adverse Effect; and (iii) has duly qualified or has been duly licensed, and is authorized to do business and is in good standing, as a foreign corporation in each state in the United States of America and in each other jurisdiction where it is required to do so, except where the failure to be so qualified or licensed and authorized and in good standing, in the aggregate for all such failures, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.03.  Capitalization.  The authorized capital stock of the Company consists of 1,000 shares of common stock, $.01 par value per share, of which 1,000 shares are issued and outstanding as of the date hereof.  The Shares consist of all of the issued and outstanding equity securities of the Company and upon consummation if the transactions contemplated hereby, Purchaser shall own all right, title and interest to all equity and other securities of the Company free and clear of Encumbrances.  As of the date hereof, Schedule 3.03 sets forth:

(a)    the authorized and outstanding shares of the capital stock and other securities of the Company and each Subsidiary (specifying the type, class or series of all such capital stock and other securities and whether such capital stock and other securities are voting or non-voting);

(b)    the name of each record holder of each share of the Company's and each Subsidiary's capital stock and other securities, the number of shares of each class of such capital

7

stock and other securities held by such holder and the percentage of the shares of each class so held; and

(c)    all obligations (contingent or otherwise) of the Company or any Subsidiary to repurchase or otherwise acquire or retire any shares of its capital stock or other securities (or options to purchase the same) thereof.

The Shares and all issued and outstanding shares of capital stock of the Company's Subsidiaries (the "Subsidiaries' Shares") are duly authorized, validly issued, fully paid and non-assessable and not subject to any Encumbrance, preemptive rights created by statute, the certificate of incorporation or bylaws of the Company or Subsidiaries (as applicable), or any agreement to which the Company or any Subsidiary is a party or by which it is bound, and have been issued in compliance with federal and state securities laws. Neither the Company nor any of its Subsidiaries are nor have they been party to any voting trust or shareholders' agreement affecting the Shares or the Subsidiaries Shares.

Except as provided in Schedule 3.03, the Company and each Subsidiary:

(a)    has no issued or outstanding shares of capital stock;

(b)    has not granted any options, warrants, calls, or other rights to purchase any shares of its capital stock or issued any securities convertible into, or exchangeable for, shares of its capital stock; nor are there any preemptive or other contractual rights or commitments of any kind to acquire, repurchase or redeem shares of its capital stock;

(c)    has no outstanding or authorized stock appreciation, phantom stock, profit participation, or other similar rights with respect to the Company or any Subsidiaries. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting stock of the Company or any Subsidiary.

SECTION 3.04.   The Subsidiaries.

(a)    Schedule 3.03 sets forth a list of the Company's wholly or partially-owned, direct and indirect subsidiaries (collectively, the "Subsidiaries" and individually, a "Subsidiary"), including its name and the jurisdiction of its incorporation or organization, and Schedule 3.04 sets forth a graphic representation of the relationships among certain of the Subsidiaries. Other than the Subsidiaries, there are no other corporations, partnerships, joint ventures, associations or other entities in which the Company owns, of record or beneficially, either any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

(b)    Each of the Subsidiaries (with the exceptions of TEI Japan Co., Ltd., and BDT do Brasil): (i) is duly organized and validly existing under the laws of its jurisdiction of incorporation, (ii) has all necessary power and authority to own, operate or lease the properties and assets owned, operated or leased by it and to carry on its business in all material respects as it is currently conducted, (iii) has all licenses, certificates, permits, franchises and other governmental authorizations which are required for the operation of its business, except where the failure to have such licenses, certificates, permits, franchises and other governmental authorizations, in the aggregate for all such failures, could not reasonably be expected to have a

8

Material Adverse Effect; and (iv) has duly qualified or has been duly licensed, and is authorized to do business and is in good standing, as a foreign corporation in each state in the United States of America and in each other jurisdiction where it is required to do so, except where the failure to be so qualified or licensed and authorized and in good standing, in the aggregate for all such failures, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.05. The Shares. The Seller is the true and lawful owner of, and has good and valid title to the Shares, free and clear of all Encumbrances; and upon delivery of certificates representing the Shares, together with appropriate executed instruments of transfer at the Closing, the Purchaser shall acquire good, valid and marketable title to all the Shares, free and clear of all Encumbrances.

SECTION 3.06. Intercompany Accounts. The accounts receivable and accounts payable of the Seller, the Company and their respective Subsidiaries and other Affiliates listed on Schedule 3.06 and dated as of October 31, 2002 represent a true, correct and complete listing as of the date set forth on such Schedule of all receivables, "due to/froms", obligations, payables and the like by and among the Seller, the Company and their respective Subsidiaries and Affiliates. Between October 31, 2002 until the Closing Date, the accounts listed in Schedule 3.06 shall be adjusted only in the ordinary course of business of the Company and its Subsidiaries. The accounts listed on Schedule 3.06 are referred to herein as the "Intercompany Accounts".

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

As an inducement to the Seller to enter into this Agreement, the Purchaser hereby represents and warrants to the Seller as follows:

SECTION 4.01. Organization and Authority of the Purchaser. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by the Purchaser, the performance by the Purchaser of its obligations hereunder and the consummation by the Purchaser of the transactions contemplated by this Agreement have been duly authorized by all requisite corporate action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the Seller) this Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

9

SECTION 4.02. Investment Purpose. The Purchaser is acquiring the Shares solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof.

SECTION 4.03. Experience; Advice; No Warranties as to Projections, etc. The Purchaser: (a) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment in the Shares; (b) has received all the information it has requested from the Seller that it considers necessary or appropriate for deciding whether to acquire the Shares; (c) has the ability to bear the economic risks of its prospective investment; (d) is able, without materially impairing its financial condition, to hold the Shares acquired by it hereunder for an indefinite period of time and to suffer a complete loss on its investment; and (e) acknowledges that any estimates, projections, or other forecasts for the Company and/or the Subsidiaries that the Purchaser has received from the Seller or its agents or representatives are inherently uncertain and unreliable, that the Purchaser has taken full responsibility for making its own evaluation of all estimates, projections and forecasts so furnished to it and that no representations or warranties, express or implied, have been made by the Seller with respect thereto or with respect to any matters not specifically set forth in this Agreement.

SECTION 4.04. No Other Representations and Warranties of Sellers. With respect to the purchase of the Shares, the Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by the Seller or any agent, employee, attorney or other representative of Seller, the Company or any of the Subsidiaries, or by any person representing or purporting to represent Seller, the Company or any of the Subsidiaries, that are not expressly set forth in this Agreement (including the schedules and exhibits hereto), whether or not any such representations, warranties or statements were made in writing or orally. It is hereby agreed by the Purchaser that, except as otherwise expressly provided herein and therein, the Seller does not make any other representations or warranties with respect to the Company or any of the Subsidiaries.

SECTION 4.05. Financing. The Purchaser has, and at the Closing will have, all funds necessary to consummate all the transactions contemplated by this Agreement. Upon the consummation of the transactions contemplated by this Agreement, (a) the Purchaser will not be insolvent, (b) the Purchaser will not be left with unreasonably small capital, (c) the Purchaser will not have incurred debts beyond its ability to pay such debts as they mature and (d) the capital of the Purchaser will not be impaired.

ARTICLE V

ADDITIONAL AGREEMENTS

SECTION 5.01. Conduct of Business Prior to the Closing

(a)    The Seller covenants and agrees that except as specifically provided herein, between the date hereof and the time of the Closing, it shall not permit the Company or any of

10

the Subsidiaries to conduct its business other than in the ordinary course in all material respects and consistent with the prior practice of the Company or the Subsidiary.

(b)    Without limiting the generality of the foregoing, except as specifically provided herein, prior to the Closing, the Seller shall cause the Company and each Subsidiary to (i) continue advertising and promotional activities, and pricing and purchasing policies, in accordance with past practice, (ii) not materially shorten or lengthen the customary payment cycles for any of its payables or receivables, and (iii) use its reasonable efforts to (A) preserve intact in all material respects the business organization of its business, (B) continue in full force and effect without material modification all existing and material policies or binders of insurance currently maintained in respect of the Company or the Subsidiary, (C) to preserve its current relationships with its material customers, suppliers and other persons with which it has significant business relationships and (D) not engage in any practice, take any action, fail to take any action or enter into any transaction which could cause any representation or warranty of the Seller to be untrue or result in a breach of any covenant made by the Seller in this Agreement.

(c)    Without the prior written consent of the Purchaser, except as specifically provided herein, or as set forth on Schedule 5.01(c) the Seller shall not permit the Company or any of the Subsidiaries, prior to the Closing, to (i) amend its certificate of incorporation or by-laws (or similar organizational documents) or merge or consolidate, or obligate itself to do so, with or into any other entity, (ii) materially change its accounting methods, principles or practices, (iii) declare, set aside or pay any dividends or other distribution (whether in cash, stock, property or any combination thereof) in respect of its equity securities or redeem, repurchase or otherwise acquire any equity securities issued by the Company or any Subsidiary, (iv) revalue any of its assets, including, without limitation, writing down the value of inventory or writing off notes or accounts receivable, other than in the ordinary course of business, (v) materially increase the compensation payable or to become payable to any officers or key employees of the Company or any Subsidiary, except in the ordinary course of business consistent with past practice or as may be required by law or applicable collective bargaining agreements, (vi) issue, grant or sell any securities, stock, options, phantom or stock appreciation right or any other capital stock or instruments convertible into any security of the Company or any Subsidiary, (vii) enter into any employment or severance agreement with any of its employees or establish, adopt, enter into or amend any collective bargaining agreement, or (viii) or enter into any agreement to do any of the foregoing.

SECTION 5.02.  Investigation.  The Purchaser acknowledges and agrees that it (i) has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning, the Company and the Subsidiaries, (ii) has been furnished with or given adequate access to such information about the Company and the Subsidiaries, as it has requested, and (iii) except for representations and warranties contained herein and as provided in Article VIII below, will not assert any claim against the Seller or any of its directors, officers, employees, agents, stockholders, Affiliates, consultants, investment bankers or representatives, or hold the Seller or any such person liable, for any inaccuracies, misstatements or omissions with respect to information furnished by the Seller or such persons concerning the Seller, the Company and the Subsidiaries.

11

SECTION 5.03. Access to Information.

(a)    From the date hereof until the Closing, upon reasonable notice, the Seller shall, and shall cause the Company and each of the Subsidiaries, and each of its officers, directors, employees, agents, representatives, accountants and counsel and those of the Company and each Subsidiary to (i) afford the officers, employees and authorized agents and representatives of the Purchaser reasonable access, during normal business hours, to the offices, properties and authorized books and records of the Seller, the Company and each Subsidiary and to those officers, directors and employees of the Seller, the Company and each Subsidiary who have material knowledge relating to the Company or each of the Subsidiaries and (ii) furnish to the officers, employees, and authorized agents and representatives of the Purchaser such additional financial and operating data and other information regarding the business of the Company (or legible copies thereof) as the Purchaser may from time to time reasonably request; *provided, however*, that such investigation shall not unreasonably interfere with any of the businesses or operations of the Seller or any of its Affiliates.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by the Seller and any of its subsidiaries prior to the Closing or for any other reasonable purpose, for a period of seven years after the Closing, the Purchaser shall (i) retain the books and records relating to the Company and the Subsidiaries relating to periods prior to the Closing in a manner reasonably consistent with the prior practice of the Seller, the Company or the Subsidiaries, (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of the Seller reasonable access (including the right to make, at the Seller's expense, photocopies), during normal business hours, to such books and records, (iii) furnish to the officers, employees and authorized agents and representatives of the Seller such additional financial and other information regarding the business of the Company as the Seller may from time to time reasonably request and (iv) make available to the Seller, those officers, directors and employees of the Company and the Subsidiaries whose presence is necessary to assist the Seller in evaluating any such claims and in defending such claims, including, without limitation, the presence of such persons as witnesses in hearings or trials for such purposes; *provided, however*, that such investigation shall not unreasonably interfere with the business or operations of the Purchaser or any of its Affiliates or subsidiaries.

SECTION 5.04. Confidentiality.

(a)    The terms of the Confidentiality Agreement dated as of August 15, 2002 (the "Confidentiality Agreement") between the Seller and the Purchaser are hereby incorporated herein by reference and shall continue in full force and effect until the Closing, at which time such Confidentiality Agreement (excluding paragraph 3(vii) of the Confidentiality Agreement which shall terminate on the second anniversary of the date of the Confidentiality Agreement in accordance with the terms thereof) and the obligations of the Purchaser under this Section 5.04 shall terminate; *provided, however*, that the Confidentiality Agreement shall terminate only in respect of that portion of the confidential information exclusively relating to the transactions contemplated by this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect.

(b)    Nothing provided to the Purchaser pursuant to Section 5.03(a) shall in any way amend or diminish the Purchaser's obligations under the Confidentiality Agreement. The Purchaser acknowledges and agrees that any confidential information provided to the Purchaser pursuant to Section 5.03(a) or otherwise by the Seller, the Company, or the Subsidiary or any officer, director, employee, agent, representative, accountant or counsel of any of them shall be subject to the terms and conditions of the Confidentiality Agreement.

SECTION 5.05.  Regulatory and Other Authorizations; Notices and Consents.

(a)    The Seller and the Purchaser shall (i) use their commercially reasonable efforts to obtain (or cause the Company or the Subsidiaries to obtain) as promptly as practicable all authorizations, consents, orders, actions and approvals of, and to make all filings with and to give all notices to, all Governmental Authorities and officials that may be or become necessary for their execution and delivery of, and the performance of their obligations pursuant to, this Agreement; provided, however, the Seller at its sole cost and expense, will use its reasonable best efforts to obtain the Bankruptcy Approval by November 22, 2002, (collectively, the "Required Approvals"), and (ii) provide such other information to any Governmental Authority or other persons as such Governmental Authority or other persons may reasonably request in connection therewith. The Purchaser and the Seller each shall be required to pay any fees or make other payments to any Governmental Authority imposed upon it in order to obtain any such authorization, consent, order or approval.

(b)    The Seller and the Purchaser shall promptly notify the other party of any communication that it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement. The Seller and the Purchaser will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods.

SECTION 5.06.  Intercompany Accounts.  At or prior to the Closing, the Intercompany Accounts shall be assigned, transferred, forgiven, written down or otherwise adjusted in a manner consistent with (as of the Closing Date) Schedule 3.06.  In each case reasonable and customary receipts, releases and other documents will be exchanged by the parties listed on Schedule 3.06 evidencing the assignment, transfer, forgiveness or other adjustment of such amounts.

SECTION 5.07.  Amendments, Termination and New Agreements.  At or prior to the Closing, Seller and Purchaser shall negotiate mutually acceptable agreements, settlements, terminations, or amendments to existing agreements, or new agreements, to be executed and delivered as follows:

(a)    License Agreement.  The License Agreement for the Marketing of Emission Control and other Selected Technologies between Power, Inc. and BBP Environment GmbH, dated as of October 1, 2001 (the "License Agreement") will be terminated.

13

(b)    New SCR License Agreement. A new five-year license agreement for the marketing of selective catalytic reduction systems between Fisia Babcock Environment GmbH ("Environment GmbH") and Power, Inc. will be agreed and shall provide amongst other matters the following:

   (i)    that the agreement shall provide SCR technology exclusively to Power, Inc. within the North American market;

   (ii)    a license fee equal to U.S. $1,250,000, plus 1.25% of the "environmental engineering and material supply revenues" of Power, Inc., if any, that are in excess of $140,000,000 during the first year subsequent to the Closing Date, which fee shall be, payable quarterly, in arrears, in the amount of U.S. $312,500 per quarter with payments thereof due on the 90th, 180th, and 270th days following the Closing Date, with an annual true-up, for the period ending on the first anniversary of the Closing Date;

   (iii)    a license fee equal to the greater of U.S. $1,250,000 or 1.25% of the "environmental engineering and material supply revenues" of Power, Inc. during the second year subsequent to the Closing Date, which fee shall be, payable quarterly, in arrears, in the amount of U.S. $312,500 per quarter with payments thereof due on the 90th, 180th, and 270th days following the first anniversary of the Closing Date, with an annual true-up, for the period ending on the second anniversary of the Closing Date;

   (iv)    during the three years following the second anniversary of the Closing, a license fee equal to 1.25% of the "environmental engineering and material supply revenue" of Power, Inc., and

   (v)    after the five year payment term, the License Agreement shall be considered to be paid up, perpetual and irrevocable;

(c)    NEM Software License Agreement. A Purchaser designee shall enter into a software license agreement with NEM, b.v. granting to Purchaser designee and its Affiliates an irrevocable, paid-up, perpetual license to use (with full access to, and the right to modify the source code, of) that certain software known as CARDS upon terms to be agreed and shall provide amongst other matters for the payment of $2,500,000 at Closing in cash by wire transfer of immediately available funds to a bank account designated by the Seller in a written notice to the Purchaser prior to the Closing.

(d)    New FGD License Agreement. A new license agreement for the exclusive marketing of wet and dry flue gas desulfurization products (in a territory to be defined in the new agreement) to include with a one and one quarter percent (1¼%) royalty of the "environment engineering and material supply revenue" shall be completed between a Purchaser designee and Environment GmbH for a five year (5) period after the Closing and after the five (5) year term, the license shall be considered perpetual, paid-up and irrevocable.  .

14

(e)     Settlement Agreement. A settlement agreement and release between Environment GmbH and Power, Inc. will be agreed in which the February 1, 2002 Technical Transfer and Services Agreement, the June 28, 1999 Teaming Agreement and the October 1, 2001 License Agreement for the Marketing of Emission Control and other Selected Technologies shall be terminated and all other matters are settled between the parties and Power, Inc. shall pay Environment GmbH $1,912,000.00.

(f)     U-Fired License. A new U-Fired License for U-Fired Technology between Power, Inc. and Babcock Borsig Power Systems GmbH shall have been executed prior to the Closing.

(g)     Separation Agreement. That a Separation Agreement between Vogt-NEM, Inc. and Nem bv will be executed to provide for on going confidentiality, access or transfer of intellectual property, mutual cooperation for a 501F02 turbine dispute, disposal of past financial and commercial information regarding the other, shared employee transition assistance, support of warranty obligation and other matters with which Vogt-NEM, Inc. and Nem bv are currently interacting.

(h)     Personnel. An acceptable arrangement for the personnel assigned to Power, Inc. will be agreed by Power, Inc. and the appropriate Seller affiliate.

(i)     MPS Mills License. Power, Inc. and the appropriate Seller affiliate will become parties to a ten-year license of the MPS Mills.

(i)     Section 3.06 Legal Documentations. Acceptable documentation evidencing that the Company and its Subsidiaries are no longer liable for the certain payables and certain assignments, confirmations, forgivenesses and offsets are applicable as agreed in Section 3.06.

(k)     Transition Consulting Services Agreement. The Purchaser and Seller shall enter into the Transition Consulting Services Agreement.

(l)     Non-Competition Agreement. The Purchaser and Seller shall enter into the Non-Competition Agreement, including the Note referenced in Section 2.04.

(m)     NEM Bonds. NEM bv and Babcock Borsig Capital Corporation ("BBCC") shall become parties to a Cooperation Agreement for the projects listed on Schedule 8.06(b) (the "Projects") that provides for joint administration, cooperation, step-in and other appropriate rights to BBCC and for BBCC to provide assistance to NEM bv in the event NEM bv does not perform any Project or a surety is required to perform under a bond therefor.

SECTION 5.08. Seller Retained Marks. As between the parties, the Purchaser hereby acknowledges that all right, title and interest in and to the Seller Retained Marks are owned exclusively by and are retained by the Seller, and that, except as provided herein, the Purchaser

15



has no rights whatsoever to use the Seller Retained Marks. The Purchaser shall within six (6) months following the Closing, remove or obliterate the Seller Retained Marks from all of the existing stock of signs, letterheads, advertisements and promotional materials, and other documents and materials of the Company or the Subsidiary ("Existing Stock") or cease using such Existing Stock. Notwithstanding the foregoing, in the event that removal or obliteration of the Seller Retained Marks from certain items of Existing Stock or the cessation of the use thereof is impracticable, the Purchaser may use such items of Existing Stock, so long as a mark or some other designation identifying that the Purchaser is not affiliated with the Seller is clearly indicated on such items of Existing Stock, until such items of Existing Stock are depleted, or a period of three months after the Closing, whichever occurs first. Except as expressly provided in this Agreement, no other right to use the Seller Retained Marks is granted by the Seller to the Purchaser, whether by implication or otherwise.

SECTION 5.09. Currency. Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States dollars and all payments hereunder shall be made in United States dollars.

SECTION 5.10. Further Action. Each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

## ARTICLE VI

## TAX MATTERS

SECTION 6.01. Tax Indemnities.

(a)     The Seller agrees to indemnify the Purchaser against all Taxes imposed on or with respect to the Company or the Subsidiaries, for any taxable period or portion thereof that ends on or before the Closing Date, to the extent that such Taxes are in excess of the amount reserved for Taxes (other than deferred income tax assets and liabilities) in the consolidated balance sheet of the Company and the Subsidiaries for the fiscal year ended September 30, 2002. The Purchaser shall be responsible for Taxes and associated expenses not allocated to the Seller pursuant to the first sentence hereof and, in addition, for Taxes of the Company and its subsidiaries attributed to any transaction occurring on the Closing Date or after the Closing that are not in the ordinary course of business.

(b)     Payment by the Seller of any Taxes due under this Section 6.01 shall be made within thirty days following written notice by the Purchaser that payment of such amounts to the appropriate tax authority is due, provided that the Seller shall not be required to make any payment earlier than two days before such Taxes are due to the appropriate tax authority. In the case of any Tax that is contested in accordance with the provisions of Section 6.03, payment of such Tax to the appropriate taxing authority will be considered due no earlier than the date a

16



final determination to such effect is made by the appropriate taxing authority or a court of proper jurisdiction.

(c)    For purposes of this Agreement, (i) in the case of any Tax that is payable for a period that begins before the Closing Date and that ends after the Closing Date, the portion of any such Tax that is allocable to the portion of the period ending on the Closing Date shall be deemed equal to the amount that would be payable if the taxable year ended on the Closing Date, and (ii) in the case of any other Tax that is payable for a period that begins before the Closing Date and that ends after the Closing Date, the portion of any such Tax that is allocable to the portion of the period ending on the Closing Date shall be deemed to equal the amount of Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the portion of the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

SECTION 6.02.  Refunds and Tax Benefits.

(a)    The Purchaser shall promptly pay to the Seller any refund or credit (including any interest paid or credited with respect thereto) received by the Purchaser, the Company, any Subsidiary or any of their Affiliates of Taxes attributable to an amount paid by the Seller under Section 6.01. The Purchaser shall, if the Seller so requests and at the Seller's expense, cause the Company or any Subsidiary to file for and obtain any refund to which the Seller may be entitled under this Section 6.02. The Purchaser shall permit the Seller to control (at the Seller's expense) the prosecution of any such refund claim, and shall cause any of its Affiliates, the Company or any Subsidiary to authorize by appropriate power of attorney such persons as the Seller shall designate to represent such entity with respect to such refund claim.

(b)    Any amount otherwise payable by the Seller under Section 6.01 shall be reduced by any Tax benefit to the Seller, Purchaser, the Company, any Subsidiary or any Affiliate of the Purchaser, the Company or any Subsidiary, for a period or portion thereof beginning after the Closing Date (a "Post-Closing Date Tax Benefit") that arises in connection with any underlying adjustment that results in the obligation of the Seller to pay Taxes under Section 6.01 (such as a timing adjustment resulting in an income Tax deduction for the Company or any Subsidiary for a period after the Closing Date), or in connection with the payment of such Taxes. If a payment is made by the Seller in accordance with Section 6.01, and if in a subsequent taxable year a Post-Closing Date Tax Benefit is realized by the Purchaser, the Company, any Subsidiary or any Affiliate of the Purchaser, the Company or any Subsidiary (that was not previously taken into account to reduce an amount otherwise payable by the Seller under Section 6.01), the Purchaser shall promptly pay to the Seller, at the time of realization, the amount of such Post-Closing Date Tax Benefit to the extent that such amount would have resulted in a reduction in the obligations of the Seller under Section 6.01 if the Post-Closing Date Tax Benefit had been obtained in the year of the Seller's payment. A Post-Closing Date Tax Benefit will be considered to be realized for purposes of this Agreement at the time that it reduces Taxes or increases a refund of Taxes reflected on a Tax Return of the Purchaser, the Company, any Subsidiary or any Affiliate of the Purchaser, the Company or any Subsidiary.

SECTION 6.03.  Contests.

(a)    After the Closing Date, the Purchaser shall promptly notify the Seller upon learning of the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim on the Purchaser, the Company, any Subsidiary or any Affiliate of the Purchaser, the Company or any Subsidiary that, if determined adversely to the taxpayer or after the lapse of time, would be grounds for indemnification under Section 6.01.  Such notice shall be in writing and shall contain factual information (to the extent known to the Purchaser) describing the asserted Tax liability in reasonable detail and shall include copies of any notice or other document received from any taxing authority in respect of any such asserted Tax liability.  If the Seller is not given prompt notice of an asserted Tax liability as required by this Section 6.03, then (i) if the Seller is precluded by such failure to give prompt notice from contesting the asserted Tax liability in both the administrative and judicial forums, then the Seller shall not have any obligation to indemnify the Purchaser for any loss arising out of such asserted Tax liability and (ii) if the Seller is not so precluded from contesting but such failure to give prompt notice results in a detriment to the Seller, then any amount which the Seller is otherwise required to pay the Purchaser pursuant to Section 6.01 with respect to such liability shall be reduced by the amount of such detriment.

(b)    The Seller may elect to direct, through counsel of its own choosing and at its own expense, any audit, claim for refund and administrative or judicial proceeding involving any asserted liability with respect to which indemnity may be sought under Section 6.01 (any such audit, claim for refund or proceeding relating to an asserted Tax liability is referred to herein as a "Contest").  However, the Purchaser may, at its own expense, continue to participate in the Contest.  If the Seller elects to direct a Contest, then the Seller shall, within 30 calendar days of receipt of the Purchaser's notice of asserted Tax liability, notify the Purchaser of its intent to do so, and the Purchaser shall cooperate and shall cause the Company and any Subsidiary to cooperate, at the Seller's expense, in each phase of such Contest.  If the Seller does not elect to direct the Contest or fails to notify the Purchaser of its election as herein provided, the Purchaser, the Company or any Subsidiary may pay, compromise or contest, at its own expense, such asserted Tax liability; provided that none of the Purchaser, the Company or any Subsidiary may settle or compromise any asserted Tax liability over the objection of the Seller (which consent to settlement or compromise shall not be unreasonably withheld).  In any event, the Seller may participate, at its own expense, in any Contest.  If the Seller chooses to direct the Contest, the Purchaser shall promptly empower and shall cause the Company or the Subsidiary or their respective successors promptly to empower (by power of attorney and such other documentation as may be necessary and appropriate) the designated representatives of the Seller to represent the Purchaser, the Company, or the Subsidiary in the Contest insofar as the Contest involves an asserted Tax liability for which the Seller would be liable under Section 6.01.

SECTION 6.04.  Preparation of Tax Returns.  The Seller shall prepare and file (or cause to be prepared and filed) all Tax Returns relating to the Company and the Subsidiaries for all taxes attributable to the period on or before the Closing Date, and the Purchaser shall do the same for any taxes due attributable to the period after the Closing Date.  Tax Returns filed by the Purchaser for a taxable year that includes the Closing Date shall be prepared on a basis consistent with those prepared for prior tax years (unless counsel for the Purchaser, after consultation with counsel for the Seller, determines that there is no reasonable basis in law therefor).  With respect

to any Tax Return required to be filed by the Purchaser after the Closing Date, and as to which an amount of Tax is allocable to the Seller under Section 6.01(c), or as to which a Tax refund, credit or other Tax benefit is allocable to the Seller under Section 6.02, the Purchaser shall provide the Seller with a copy of such completed return, and a statement (with which the Purchaser will make available supporting schedules and information) certifying the amount of Tax or Tax refund, credit or other benefit shown on such return that is allocable to the Seller pursuant to Section 6.01(c) or 6.02, at least 30 days prior to the due date (including any extension thereof) for the filing of such Tax Return, and the Seller shall have the right to review such return and statement prior to the filing of such return. The Purchaser agrees to consult with the Seller and to attempt in good faith to resolve any issues arising as a result of the review of such return and statement by the Seller.

SECTION 6.05. Cooperation and Exchange of Information. The Seller and the Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other (and the Purchaser shall cause the Company and the Subsidiaries to provide such cooperation and information) in filing any Tax Return, amended return or claim for refund, determining any liability for Taxes or a right to a refund of Taxes or participating in or conducting any audit or other proceeding in respect of Taxes relating to the Company or the Subsidiaries. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities. The Seller shall make itself available, and the Purchaser shall make its employees available (and shall cause the employees of the Company and the Subsidiaries to be available) on a mutually convenient basis to provide explanations of any documents or information provided hereunder. The Purchaser will retain all Tax Returns, schedules and work papers and all material records or other documents in its possession relating to Tax matters of the Company or the Subsidiaries for the taxable period first ending after the Closing Date and for all prior taxable periods until the later of (i) the expiration of the statute of limitations of the taxable periods to which such returns and other documents relate, without regard to extensions, or (ii) six years following the due date (without extension) for such Tax Returns. After such time, before the Purchaser shall dispose of any such documents, the Purchaser shall, by 90 days' prior written notice to the Seller, give the Seller the opportunity (at the Seller's expense) to remove and retain all or any part of such documents as the Seller may select. Any information obtained under this Section 6.05 shall be kept confidential, except as may be otherwise necessary in connection with the filing of returns or claims for refund or in conducting an audit or other proceeding.

SECTION 6.06. Conveyance Taxes. The Purchaser agrees to assume liability for and to pay all United States based domestic sales, use, transfer, stamp, stock transfer, real property transfer or gains and similar United States based Taxes incurred as a result of the transactions contemplated hereby. Without limiting the generality of the foregoing, the Purchaser agrees to pay directly any withholding taxes imposed by the United States on payments to Seller from Purchaser under the Transition Consulting Services Agreement and the Non-Competition Agreement prescribed by Sections 5.07(k) and (l).

19



SECTION 6.07. Miscellaneous.

(a)    To the extent permitted by Law, the parties agree to treat all payments made under this Article VI, under any other indemnity provision contained in this Agreement, and for any misrepresentations or breach of warranties or covenants, as adjustments to the Purchase Price for all Tax purposes.

(b)    This Article VI shall be the sole provision governing Tax matters and indemnities therefor under this Agreement.

(c)    For purposes of this Article VI, all references to the Purchaser, the Seller, the Company and the Subsidiaries include successors.

(d)    The obligations of the parties pursuant to this Article VI shall survive the Closing and shall terminate upon the expiration of the applicable statute of limitations with respect to the Tax liabilities in question (giving effect to extensions thereof).

## ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.01. Conditions to the Obligations of the Seller.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver, at or prior to the Closing, of each of the following conditions:

(a)    Representations, Warranties and Covenants. (i) The representations and warranties of the Purchaser contained in this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date, except to the extent such representations and warranties are specified as being made as of another date, in which case, such representations and warranties shall be true and correct in all material respects as of that date, in each case, with the same force and effect as if made as of the Closing Date, (ii) the covenants and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing Date shall have been complied with in all material respects and (iii) the Seller shall have received a certificate from the Purchaser to such effect signed by a duly authorized officer thereof;

(b)    Antitrust/Competition.  Any waiting period (and any extension thereof) under the antitrust or competition legislation of any relevant jurisdiction applicable to the purchase of the Shares contemplated by this Agreement shall have expired or shall have been terminated; and

(c)    Required Approvals; No Order.  All Required Approvals shall have been obtained or received, including without limitation, the Bankruptcy Approval and no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of such transactions; *provided, however,* that the parties hereto shall use their best efforts to have any such order or injunction vacated.

20



(d)     Certificate of the Purchaser. The Seller shall have received a certificate, validly executed by an authorized representative of the Purchaser, to the effect that, as of the Closing:

(iv)     all representations and warranties made by the Purchaser in this Agreement were true and correct in all respects on the date they were made and are true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time; and

(v)     all covenants and obligations under this Agreement to be performed by the Purchaser on or before the Closing have been so performed in all material respects.

(e)     Certificate of Secretary of Purchaser. The Seller shall have received a certificate, validly executed by the Secretary of the Purchaser, certifying as to (i) the terms and effectiveness of the organizational documents of the Purchaser, and (ii) the valid adoption of resolutions of the governing body of the Purchaser approving this Agreement and the consummation of the transactions contemplated hereby.

(f)     Certificate of Good Standing. The Seller shall have received a certificate of corporate good standing issued with respect to Purchaser dated within a reasonable period prior to Closing.

(g)     Litigation. There shall be no action, suit, claim, or proceeding of any nature pending, or overtly threatened, against Seller or Purchaser, their respective properties or any of their respective officers or directors arising out of, or in any way connected with this Agreement or the transactions contemplated by the terms of this Agreement.

(h)     Legal Opinion. Seller shall have received a legal opinion from legal counsel to the Purchaser in form and substance acceptable to Seller.

(i)     Execution and Delivery of the Non-Competition Agreement and the Transition Consulting Services Agreement. The Purchaser shall have fully executed and delivered to the Seller the Non-Competition Agreement and the Transition Services Consulting Agreement in accordance with the provisions hereof.

(j)     Execution and Delivery of Certain Licenses, Contracts and Agreements. The Licenses, Contracts and Agreements listed in Section 5.07 shall have been fully executed and delivered by all parties thereto in accordance with the provisions of Section 5.07.

(k)     Intercompany Accounts. All receipts releases and other documents prescribed by Section 5.06 shall have been delivered to the appropriate parties as listed on Schedule 3.06.

SECTION 7.02. Conditions to the Obligations of the Purchaser. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver, by the Purchaser at or prior to the Closing, of each of the following conditions:

(a)     Representations, Warranties and Covenants. (i) The representations and warranties of the Seller contained in this Agreement shall have been true and correct in all



material respects when made and shall be true and correct in all material respects as of the Closing Date, except to the extent such representations and warranties are specified as being made as of another date, in which case, such representations and warranties shall be true and correct in all material respects as of that date, in each case, with the same force and effect as if made as of the Closing Date, except, in each case, where the failure to be so true and correct as of such date would not have a Material Adverse Effect, (ii) the covenants and agreements contained in this Agreement to be complied with by the Seller on or before the Closing Date shall have been complied with in all material respects and (iii) the Purchaser shall have received a certificate from the Seller to such effect signed by a duly authorized officer thereof;

(b)    Antitrust/Competition.  Any waiting period (and any extension thereof) under the antitrust or competition legislation of any relevant jurisdiction applicable to the purchase of the Shares contemplated by this Agreement shall have expired or shall have been terminated; and

(c)    Required Approvals; No Order.  All Required Approvals shall have been obtained or received, including without limitation, the Bankruptcy Approval and no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of such transactions; provided, however, that the parties hereto shall use their best efforts to have any such order or injunction vacated.

(d)    Certificate of the Seller.  Purchaser shall have received a certificate, validly executed by an authorized representative of the Seller, to the effect that, as of the Closing:

(vi)    all representations and warranties made by the Seller in this Agreement were true and correct in all respects on the date they were made and are true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time; and

(vii)    all covenants and obligations under this Agreement to be performed by the Seller on or before the Closing have been so performed in all material respects.

(e)    Certificate of Secretary of Seller.  Purchaser shall have received a certificate, validly executed by the Secretary of the Seller, certifying as to (i) the terms and effectiveness of the organizational documents of the Seller, and (ii) the valid adoption of resolutions of the governing body of the Seller approving this Agreement and the consummation of the transactions contemplated hereby.

(f)    Certificate of Good Standing.  Purchaser shall have received a certificate of corporate good standing issued with respect to Seller dated within a reasonable period prior to Closing.

(g)    Litigation.  There shall be no action, suit, claim, or proceeding of any nature pending, or overtly threatened, against Seller or Purchaser, their respective properties or any of their respective officers or directors arising out of, or in any way connected with this Agreement or the transactions contemplated by the terms of this Agreement.

(b)    Third Party Consents.  Seller shall have received all necessary consents, waivers and approvals of parties to any contract, indenture, agreement, or obligation to which Seller, the Company or any of the Company's Subsidiaries are bound as are required thereunder in connection with the consummation of the transaction contemplated pursuant to this Agreement, or for any such Contract to remain in full force and effect without limitation, modification or alteration after the Closing Date.

(i)    Legal Opinion.  Purchaser shall have received a legal opinion from legal counsel to the Seller in form and substance acceptable to Purchaser, which shall be addressed to each of Purchaser and its primary stockholders, Hudson Power Ventures I, LLC and Hudson Power Ventures II, LLC.

(j)    No Material Adverse Change.  There shall not have occurred any event or condition of any character that has had or is reasonably likely to have a Material Adverse Effect on the Company or any of its Subsidiaries since October 1, 2002

(k)    Execution and Delivery of the Non-Competition Agreement and the Transition Consulting Services Agreement.  The Seller shall have, fully executed and delivered to the Purchaser the Non-Competition Agreement and the Transition Services Consulting Agreement in accordance with the provisions hereof.

(l)    Execution and Delivery of Certain Licenses, Contracts and Agreements.  The Licenses, Contracts and Agreements listed in Section 5.07 shall have been, fully executed and delivered by all parties thereto in accordance with the provisions of Section 5.07

(m)    Intercompany Accounts.  All receipts releases and other documents prescribed by Section 5.06 shall have been delivered to appropriate parties as listed in Schedule 3.06.


ARTICLE VIII

INDEMNIFICATION

SECTION 8.01.  Survival of Representations and Warranties.  The representations and warranties of the parties hereto contained in this Agreement shall survive the Closing for a period of one (1) year after the Closing Date.

SECTION 8.02.  Indemnification by the Seller.  The Seller shall indemnify and hold harmless the Purchaser and its Affiliates, officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") from and against any and all Liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including, without limitation, reasonable attorneys' and consultants' fees and expenses) actually suffered or incurred by them (hereinafter a "Loss" or "Losses"), arising out of or resulting from (a) the breach of any representation or warranty made by the Seller contained in this Agreement, (b) the breach of any covenant or agreement by the Seller contained in this Agreement or (c) either of the events set forth in Section 8.06 hereof.  Anything in Section 8.01 to the contrary notwithstanding, no claim may be asserted nor may any action be commenced against the Seller for breach of any representation or warranty contained herein, unless written notice of such claim

23



or action is received by the Seller describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or action on or prior to the date on which the representation or warranty on which such claim or action is based ceases to survive as set forth in Section 8.01, irrespective of whether the subject matter of such claim or action shall have occurred before or after such date.

SECTION 8.03. Indemnification by the Purchaser. The Purchaser shall indemnify and hold harmless the Seller and its Affiliates, officers, directors, employees, agents, successors and assigns (each a "Seller Indemnified Party") from and against any and all Losses, arising out of or resulting from (a) the breach of any representation or warranty made by the Purchaser contained in this Agreement, (b) the breach of any covenant or agreement by the Purchaser contained in this Agreement, (c) the conduct of the business of the Company by the Purchaser following the Closing or (d) any claim or cause of action by any person arising before or after the Closing Date against any Seller Indemnified Party with respect to the business or the operations of the Company or the Subsidiary, except for claims or causes of action with respect to which the Seller is obligated to indemnify the Purchaser Indemnified Parties pursuant to Section 8.02. Anything in Section 8.01 to the contrary notwithstanding, no claim may be asserted nor may any action be commenced against the Purchaser for breach of any representation or warranty contained herein, unless written notice of such claim or action is received by the Purchaser describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or action on or prior to the date on which the representation or warranty on which such claim or action is based ceases to survive as set forth in Section 8.01, irrespective of whether the subject matter of such claim or action shall have occurred before or after such date.

SECTION 8.04. Indemnification Procedures.

(a)  A Purchaser Indemnified Party or a Seller Indemnified Party, as the case may be (for purposes of this Section 8.04, an "Indemnified Party"), shall give the indemnifying party under Section 8.02 or 8.03, as applicable (for purposes of this Section 8.04, an "Indemnifying Party"), written notice of any matter which an Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement, within 10 days of such determination, stating the amount of the Loss, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises. The obligations and Liabilities of an Indemnifying Party under this Article VIII with respect to Losses arising from claims of any third party which are subject to the indemnification provided for in this Article VIII ("Third Party Claims") shall be governed by and be contingent upon the following additional terms and conditions: if an Indemnified Party shall receive notice of any Third Party Claim, the Indemnified Party shall give the Indemnifying Party notice of such Third Party Claim within 10 days of the receipt by the Indemnified Party of such notice; provided, however, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article VIII except to the extent that the Indemnifying Party is materially prejudiced by such failure and shall not relieve the Indemnifying Party from any other obligation or Liability that it may have to any Indemnified Party otherwise than under this Article VIII. If the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Losses that may result from such Third Party Claim, then the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through

24

counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within five days of the receipt of such notice from the Indemnified Party; *provided, however*, that if there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate for the same counsel to represent both the Indemnified Party and the Indemnifying Party, then the Indemnified Party shall be entitled to retain its own counsel in each jurisdiction for which the Indemnified Party reasonably determines counsel is required, at the expense of the Indemnifying Party. In the event that the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by the Indemnifying Party without the prior written consent of the Indemnified Party unless such settlement provides for a full and unconditional release of the Indemnified Party.

(b)     Upon making a payment relating to a Third Party Claim, the Indemnifying Party will, to the extent of such payment, be subrogated to all rights of the Indemnified Party against any third party in respect of the Losses to which the payment related. Without limiting the generality of any other provision hereof, the Indemnified Party and the Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above described subrogation rights.

(c)     In the event that any Losses related to a claim by the Purchaser are covered by an insurance policy, the Purchaser agrees to use commercially reasonable efforts to seek recovery under such insurance and the Purchaser shall not be entitled to recover from the Seller (and shall refund amounts received up to the amount of the indemnification actually received) with respect to such Losses to the extent, and only to the extent, the Purchaser recovers the insurance payment specified in such insurance policy.

(d)     Each party hereto agrees to use reasonable efforts to mitigate any Losses which form the basis of any claim hereunder.

SECTION 8.05.  Limits on Indemnification.  Notwithstanding anything to the contrary contained in this Agreement: (a) an Indemnifying Party shall not be liable for any claim (except for indemnification claims pursuant to representations and warranties contained in Sections 3.03 and 3.05 (for which there shall be no threshold limitation on Losses relating to such claims)), for indemnification pursuant to Section 8.02 or 8.03, unless and until the aggregate amount of indemnifiable Losses which may be recovered from the Indemnifying Party equals or exceeds $500,000, after which the Indemnifying Party shall be liable for all Losses (except as limited below) in excess of $500,000; and (b) except for indemnification arising under representations and warranties contained in Sections 3.03 and 3.05 (for which there shall be no monetary

limitation on Losses relating to such claims), the maximum amount of indemnifiable Losses which may be recovered from an Indemnifying Party arising out of or resulting from the causes set forth in Section 8.02 or 8.03, as the case may be, shall be an amount equal to $1,700,000.

SECTION 8.06.  Special Indemnification and Set Off.  In the event that (i) Babcock Borsig Machinery, Inc. commits a material breach of its obligations to the Company under the Novation Agreement or (ii) the Company or any of its Subsidiaries becomes obligated for any liabilities under letters of credit and/or guarantees and/or credit and bonding obligations and/or other contingent obligations related to any company affiliated with Seller set forth on Schedules 8.06(a) and 8.06(b) attached hereto (collectively, the "Contingent Risks"), the Purchaser has the right to withhold, set off and deduct from amounts due under the Note issued pursuant to Section 2.04 any amounts finally determined to be owed to the Purchaser pursuant to the terms of Article VIII.  To the extent that the Company (or any of its Subsidiaries) are indemnified against any of the foregoing losses pursuant to any pre-existing written agreement(s) in their favor by Senior Thermal Engineering Australia, NEM bv, BDI, Inc. or the other company affiliates of Seller identified in Schedules 8.06(a) or 8.06(b), Purchaser shall reasonably pursue such indemnity rights (which obligation shall not, however, extend to the obligation to appeal the decision of the court of primary jurisdiction) for the purpose of reducing any right to withhold, set off or deduction otherwise permitted by this Section.

SECTION 8.07.  Exclusive Remedies.  The Purchaser and the Seller acknowledge and agree that (a) following the Closing, the indemnification provisions of Sections 8.02 and 8.03 and Section 6.01 shall be the sole and exclusive remedies of the Purchaser and the Seller for any breach by the other party of the representations and warranties contained in this Agreement and for any failure by the other party to perform and comply with any covenants and agreements that, by their terms, were to have been performed or complied with by such party prior to the Closing, (b) except as provided in Article VI, the Seller shall have no liability under any provision of this Agreement for any Loss related to actions taken (or omitted to be taken) by the Purchaser, the Company or the Subsidiary after the Closing Date, (c) anything herein to the contrary notwithstanding, no breach of any representation, warranty, covenant or agreement contained herein shall give rise to any right on the part of the Purchaser or the Seller, after the consummation of the purchase and sale of the Shares contemplated by this Agreement, to rescind this Agreement or any of the transactions contemplated hereby and (d) notwithstanding anything to the contrary contained in this Agreement, no party hereto shall have any liability under any provision of this Agreement for any punitive, consequential or indirect damages.  Each party hereto shall take all reasonable steps to mitigate its Losses upon and after becoming aware of any event which could reasonably be expected to give rise to any Losses.

# ARTICLE IX

## TERMINATION, AMENDMENT AND WAIVER

SECTION 9.01.  Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)  by the mutual written consent of the Seller and the Purchaser; or



(b)   by either the Seller or the Purchaser if the Closing shall not have occurred by November 26, 2002; provided, however, that the right to terminate this Agreement under this Section 9.01(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date; or

(c)   by either the Purchaser or the Seller, in the event of the issuance of a final, nonappealable Governmental Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; or

(d)   by the Purchaser or the Seller, in the event the Seller has not received the Bankruptcy Approval by November 26, 2002.

SECTION 9.02.  Effect of Termination.  In the event of termination of this Agreement as provided in Section 9.01, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of either party hereto except (a) as set forth in Sections 5.04 and 10.01 and (b) that nothing herein shall relieve either party from liability for any breach of this Agreement.

SECTION 9.03.  Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Seller and the Purchaser or (b) by a waiver in accordance with Section 9.04.

SECTION 9.04.  Waiver.  Either party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

## ARTICLE X

## GENERAL PROVISIONS

SECTION 10.01.  Expenses.  Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.  Notwithstanding the foregoing, all such costs and expenses of the Seller and the Company shall be borne exclusively by the Seller.

SECTION 10.02.  Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed

27



to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by telecopy or registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

    (a)    if to the Seller:

    Babcock Borsig Power GmbH
    c/o Babcock Borsig AG
    Duisburger Strasse 375
    46044 Oberhausen
    Germany
    Facsimile: 011-49.208.833.4657
    Attention: General Counsel

    with a copy to:

    Nixon Peabody LLP
    101 Federal Street
    Boston, MA 02110
    Facsimile: (617) 345-1300
    Attention: Brian J. Crush, P.C.

    (b)    if to the Purchaser:

    Hudson Investment Group, Inc.
    200 East 61st Street, Suite 406
    New York, NY 10021
    Facsimile: (212) 750-5039
    Attention: Nathan Hevrony, President

    with a copy to:

    Gadsby Hannah LLP
    225 Franklin Street
    Boston, MA 02110
    Facsimile: 617.204.8011
    Attention: Jeffrey M. Stoler, Esq.

    SECTION 10.03. <u>Public Announcements</u>. Except as may be required by applicable Law, no party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement or otherwise communicate with any news media without the prior written consent of the other party, and the parties to this Agreement shall cooperate as to the timing and contents of any such press release or public announcement.

SECTION 10.04. <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

SECTION 10.05. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior discussions, agreements and undertakings, both written and oral, between the Seller and the Purchaser with respect to the subject matter hereof.

SECTION 10.06. <u>Assignment</u>. This Agreement may not be assigned by operation of law or otherwise without the express written consent of the Seller and the Purchaser (which consent may be granted or withheld in the sole discretion of the Seller or the Purchaser), except any assignment by Purchaser to any of its Affiliates, provided that, no such assignment shall relieve Purchaser from its liabilities hereunder.

SECTION 10.07. <u>No Third Party Beneficiaries</u>. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including, without limitation, any rights of employment for any specified period, under or by reason of this Agreement; provided however, that Hudson Power Ventures I, LLC and Hudson Power Ventures II, LLC, as the primary stockholders of Babcock Power Inc., shall be third party beneficiaries of the Seller's representations, warranties and covenants hereunder.

SECTION 10.08. <u>Governing Law</u>. This Agreement shall be exclusively governed by, and construed in accordance with, the laws of The Commonwealth of Massachusetts, except where mandatory provisions of other Laws are applicable to the transfer of the Shares, without giving effect to any choice of law or conflict of law provisions or rules.

SECTION 10.09. <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 10.10. <u>Interpretation</u>. The parties acknowledge and agree that (i) this Agreement is the result of negotiations between the parties and shall not be deemed or construed as having been drafted by any one party; (ii) each party and its legal, accounting and other advisors have reviewed and negotiated the terms and provisions of this Agreement (including any exhibits and schedules attached hereto) and have contributed to its revision; (iii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in that interpretation of this Agreement; and (iv) the terms and provisions of this



Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above by their duly authorized signatories.

BABCOCK BORSIG POWER GmbH

By: _____
Name: Ludger Kramer
Title: CEO

By: _____
Name: General Counsel
Title:

HUDSON INVESTMENT GROUP, INC.

By: _____
Nathan Hevrony, President