# EXHIBIT 9

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
03-5334 -*RLS*

Civil Action No. _____

|  |  |
|---|---|
| BABCOCK POWER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BABCOCK BORSIG POWER GmbH, | ) |
| BABCOCK BORSIG AG, DR. HELMUT | ) |
| SCHMITZ, in his capacity as Custodian | ) |
| of BABCOCK BORSIG POWER GmbH | ) |
| and BABCOCK BORSIG AG, | ) |
| BALCKE-DÜRR GmbH, SPX | ) |
| CORPORATION, and JOHN DOES 1-5, | ) |
| | ) |
| Defendants. | ) |

**RECEIVED**

NOV 10 2003

SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
FOR CIVIL BUSINESS

**COMPLAINT**

**Introduction**

1.    Plaintiff Babcock Power, Inc. ("Babcock Power") paid millions of dollars to a conglomerate of related German business entities -- all operating under the umbrella organization of defendant Babcock Borsig AG ("BBAG") -- for all of the Germans' American operations that were involved in boiler, environmental, heat exchanger and power plant services designed for and used in fossil-fired, nuclear powered, and waste-to-energy power plants ("Environmental, Service and Heat Exchanger Businesses"). Central to the purchase was a non-competition agreement. A number of disputes have arisen relative to this transaction.

2.     The parties agreed to personal jurisdiction in Massachusetts state and federal courts for disputes arising from their agreement or related transactions. Babcock Power brings this action to resolve these disputes.

3.     Principally, all of BBAG's entities -- including without limitation all successors, assigns and any entity purchasing all or substantially all of the assets of any BBAG related entity -- agreed to be bound, and not to compete, directly or indirectly, in the United States or Canada with the business entities purchased by Babcock Power, for a period of three years. Balcke-Dürr GmbH ("Balcke-Dürr"), a subsequent purchaser of other assets from the BBAG controlled entities, entered into a separate agreement with the German conglomerate under which Balcke-Dürr purchased substantially all of the assets of BBAG affiliate BBP Service Ratingen GmbH f/k/a Balcke-Dürr Service GmbH ("BBP Service Ratingen"), thereby committing itself to abide by BBAG's agreement with Babcock Power. BBP Service Ratingen did not reduce Balcke-Dürr's assumption of this obligation to writing for over 6 months after selling to it business entities competing with Babcock Power. On May 28, 2003, after Babcock Power filed its first complaint relating to the facts giving rise to this action, BBP Service Ratingen amended its agreement to bind Balcke-Dürr to the terms of the BBAG entities' non-compete agreement with Babcock Power.

4.     However, BBP Service Ratingen did not bind Balcke-Dürr's parent, defendant SPX Corporation ("SPX"), or any of Balcke-Dürr's affiliates to adhere to Balcke-Dürr's obligations to Babcock Power. To fully comply with Babcock Power's non-compete agreement with the BBAG entities, SPX and all of its subsidiaries and affiliates should have been bound by Balcke-Dürr's agreement. Babcock Power brings this action to seek a declaration that SPX, its subsidiaries and all of Balcke-Dürr's affiliates are bound by the terms of the non-compete

2

agreement between Babcock Power and defendant Babcock Borsig Power GmbH ("BBP"). Babcock Power also seeks damages and restitution from all defendants other than SPX and Balcke-Dürr for their attempt to eviscerate the terms of the agreement between Babcock Power and BBP.

5.    In addition to the foregoing relative to the German entities' non-compete obligations, the German entities have failed to pay Babcock Power over $1.7 million in post-closing adjustments arising from workers' compensation payments paid by American entities on behalf of the Germans under the agreement to purchase the American assets. Babcock Power seeks a declaration that BBP, BBAG and Dr. Schmitz are liable for these amounts.

## Parties

6.    Plaintiff Babcock Power, Inc. (f/k/a Hudson Investment Group, Inc.) ("Babcock Power") is a Delaware corporation with a principal place of business at 82 Cambridge Street, Burlington, Massachusetts. Babcock Power is a leading supplier of technology, equipment and services to the power generation industry.

7.    Defendant Babcock Borsig Power GmbH ("BBP") is a German corporation with its principal place of business at 375 Duisburger Street, Oberhausen, Germany. BBP is a subsidiary of BBAG.

8.    Defendant Babcock Borsig AG ("BBAG") is a German corporation with a principal place of business at 375 Duisburger Street, Oberhausen, Germany. BBAG is the parent corporation of BBP.

9.    Dr. Helmut Schmitz ("Schmitz") is the court appointed Custodian under German law for BBAG, BBP and numerous other insolvent BBAG entities. BBAG and its related insolvent subsidiaries continue their operations as they attempt to reorganize or liquidate certain business operations.

3

10.    Upon information and belief, defendant Balcke-Dürr GmbH ("Balcke-Dürr") is a German corporation with its principal place of business at 2 Homburger Street, Ratingen, Germany.  Balcke-Dürr is a subsidiary of SPX Corporation.

11.    The names and addresses of defendants John Does 1-5 are not presently known to Babcock Power.

12.    Defendant SPX Corporation ("SPX") is a Delaware corporation with its principal place of business at 13515 Ballantyne Corp. Place, Charlotte, North Carolina.  SPX provides technical products and systems, industrial products and services, flow technology and service solutions.

### Jurisdiction

13.    This Court has jurisdiction pursuant to the agreement of the parties consenting to such jurisdiction in the event of a dispute arising from the parties' contractual agreement.

14.    Venue is proper pursuant to G. L. c. 223, §8 because plaintiff Babcock Power maintains a usual place of business in Burlington, Massachusetts, within Middlesex County. Pursuant to Administrative Directive No. 03-1, Superior Court Business Litigation Session Extension and Expanded Venue, this action may be brought in Suffolk County in the Business Litigation Session.

## Facts

A.    BBAG Files For Insolvency

15.    On or about July 4, 2002, BBAG filed for insolvency in the District Court, Duisberg, Germany.  On information and belief, numerous German subsidiaries of BBAG also filed for insolvency on or about July 4, 2002, including BBP.  Schmitz has been appointed the Custodian of BBAG, BBP and other affiliates pursuant to German bankruptcy laws.

16.    As of July 4, 2002, BBAG was the parent corporation to numerous subsidiaries. One group of subsidiaries, the "power engineering" companies, were involved in supplying technology, equipment and services to the power generation industry.  Within the "power engineering group," BBAG owned BBP.

17.    At the time of BBAG's filing for insolvency, the United States power equipment and service operations of BBP were handled through BBP's subsidiary, BBCC Holding Co., Inc. ("BBCC Holding"), and its main operational holding unit, Babcock Borsig Capital Corporation ("BBCC").

18.    As of July 4, 2002, and continuing to today, BBCC's subsidiaries and affiliates are involved in supplying technology, equipment and services to the power generation industry, which includes, among other products, boilers, boiler parts and services, environmental equipment, heat recovery steam generators, condensers, pulverizers, feedwater heaters and moisture separator reheaters.  BBCC's subsidiaries (some of which are now affiliates) have been, and continue to be, located throughout the United States, in cities such as Worcester, Massachusetts; Los Angeles, California; Louisville, Kentucky; Tampa, Florida; Lyman, South Carolina; Joplin, Missouri; Sapulpa, Oklahoma; Pittsburgh, Kansas; and Erie, Pennsylvania. BBCC's subsidiaries and affiliates have historically sold products or services throughout the United States and in Canada, a geographic territory still fully served by these entities today.

5

19.    As of July 4, 2002, BBCC's subsidiaries competed vigorously with numerous other companies in the United States and Canada, with such competition continuing through today.

B.    Babcock Power Purchases the United States Assets of BBP

20.    On November 13, 2002, Babcock Power, then doing business as Hudson Investment Group, Inc., entered into an agreement to purchase all of the issued and outstanding shares of stock of BBCC Holding from BBP.

21.    At the time that Babcock Power purchased all of the shares of BBCC Holding, BBCC was the exclusive provider in the United States and Canada of BBAG's Environmental, Service and Heat Exchanger Businesses.

22.    Babcock Power was not interested in purchasing the shares of BBCC Holding unless it could be assured that BBCC Holding's operating entities would continue to enjoy their status as the exclusive providers in the United States and Canada of BBAG's Environmental, Service and Heat Exchanger Businesses for a period of no less than three years.

23.    Babcock Power would not have purchased BBCC Holding and its subsidiaries had it not been for this commitment not to compete.

24.    Thus, in significant part, Babcock Power's payment for BBCC Holding was provided not just for the company's assets, but also for the protections afforded by an agreement from BBP that neither BBP nor any of its affiliates, parents or subsidiaries would compete with Babcock Power in the United States and Canada, in the Environmental, Service and Heat Exchanger Businesses, for three years after the transaction. Otherwise stated, the payment was in recognition of the value of the goodwill that needed to be protected.

25.    In addition to Babcock Power's cash payments to BBP, Babcock Power also executed a promissory note with a face amount of $5 million (the "Non-Compete Note") as part

6

of the consideration for the non-compete agreement. By its terms, the principal of the Non-Compete Note is due three years from November 29, 2002, with interest payments prior to maturity. In addition to the Non-Compete Note, Babcock Power entered into a separate $1.9 million promissory note on November 29, 2002 for transition consulting services (the "Consulting Services Note," collectively, the "Notes").

26.    The parties conditioned the sale of BBCC Holding upon the execution of a non-competition agreement.

C.    Babcock Power and BBP Enter a Non-Competition Agreement

27.    Babcock Power and BBP entered into a non-competition agreement on November 29, 2002 ("Non-Competition Agreement").

28.    Entering the Non-Competition Agreement was contemplated by -- and was an essential element of -- the November 13, 2002 agreement between Babcock Power and BBP for the sale of BBCC Holding's stock (the "Stock Purchase Agreement"). The Non-Competition Agreement thus was an important component of, and was ancillary to, the sale of BBCC Holding's stock. The intent of the Non-Competition Agreement was to assure that Babcock Power received the benefit of its bargain, to ensure that BBCC Holding's operating entities enjoyed the same position in their markets after the sale of BBCC Holding as they had enjoyed prior to such sale, particularly in light of BBAG's, and its affiliated entities', activities in the Environmental, Service and Heat Exchanger Businesses in Europe and other parts of the world.

29.    The terms of the Non-Competition Agreement were the subject of intense negotiation due to their importance to the respective parties.

30.    Consistent with the understanding of Babcock Power that BBCC Holding would remain as the exclusive provider in the United States and Canada of BBAG's Environmental,

7

Service and Heat Exchanger Businesses, the Non-Competition Agreement contains the following

introductory language:

> As a condition to the Sale, and to preserve the value of the business
> being acquired by [Babcock Power] after the Sale, the Purchase
> Agreement contemplates, among other things, that in consideration
> of the Non-Compete Payment (as defined herein), [BBP, its parent
> and affiliates] shall enter into this Agreement as of the date hereof.

31.     BBP, its parent and affiliates understood the importance of the Non-Competition

Agreement to Babcock Power.  As the agreement states:

> [BBP, its parent and affiliates] acknowledges that the goodwill
> associated with the existing business, customers and assets of
> [BBCC Holding] and its Subsidiaries prior to the sale are an
> integral component of the value of [BBCC Holding] to [Babcock
> Power] and is reflected in the Non-Compete Payment and the
> consideration in the sale . . . and [BBP, its parent and affiliates]'s
> agreement as set forth herein is necessary to preserve the value of
> [BBCC Holding] and its Subsidiaries for [Babcock Power]
> following the Sale.

32.     The Non-Competition Agreement prohibited BBP, or any of its direct or indirect

subsidiaries, affiliates, successors or assigns from offering products or services related to the

Environmental, Service and Heat Exchanger Businesses in the United States or Canada.

33.     Specifically, the Non-Competition Agreement prohibited any BBP affiliate from

engaging directly or indirectly in the following activities:

> (i) within the customer market composed of fossil-fired and waste-
> to-energy power plants located in [United States and Canada], all
> activities associated with the design, engineering, manufacture,
> fabrication, installation, servicing, maintenance and sale of new
> equipment or replacement parts for selective catalytic reduction
> and flue gas desulfurization equipment for the reduction of nitrous
> oxide or sulphur dioxide emissions (the *"Environmental
> Business"*); (ii) within the customer market composed of fossil-
> fired (including but not limited to combined cycle) or nuclear
> power plants located in the [United States and Canada], all
> activities associated with the provision of the design, engineering,
> manufacture, fabrication, installation, servicing, maintenance or
> sale of boiler components and pressure parts, power plan

8

construction-related services, boiler rebuilds and retrofits, *engineered replacement parts or field services* (the *"Service Business"*); and (iii) within the customer market composed of fossil-fired (including but not limited to combined cycle) and nuclear power plants located in the [United States and Canada], all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of condensers, feedwater heaters and moisture separator repeaters (the *"Heat Exchanger Business"*).

34.    The Non-Competition Agreement barred the BBAG entities from engaging in the prohibited businesses in the United States and Canada for a period of three years from November 29, 2002. This is the same time period for payment of principal under the accompanying Non-Compete Note.

35.    Because BBP's parent, BBAG, controls a number of different corporations -- some of which engage in Environmental, Service and Heat Exchanger Businesses in geographic locations other than the United States and Canada -- Babcock Power and BBP included language to assure that no BBAG entity could deprive Babcock Power of the benefit of its bargain.

36.    Specifically, the parties prohibited any of BBP's "Affiliates" from engaging in Environmental, Service and Heat Exchanger Businesses in the United States or Canada for three years. The definition of "Affiliate" in the Non-Competition Agreement -- taken from the related Stock Purchase Agreement -- broadly includes any other corporation or other entity "that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with" BBP. Thus, BBAG and BBP Service Ratingen are contemplated as -- and come within the definition of -- affiliated entities that are bound by the terms of the Non-Compete Agreement.

37.    The parties also expressly provided that the obligation to refrain from certain competition not only applied to Affiliates, as that term is broadly defined, but also to any "successors and assigns."

9

38.    The Non-Competition Agreement also contemplated that entities not affiliated with BBAG might purchase all or substantially all of the assets of any BBAG affiliate during the three year life of the agreement, and specifically bound all successors "including, without limitation, by sale or transfer of all or substantially all assets."

39.    Not only does the Non-Competition Agreement state that the terms contained therein were an essential condition to the Stock Purchase Agreement, but it also states that a violation of its terms would cause irreparable harm to Babcock Power. The agreement allows an aggrieved party to seek a preliminary injunction to enforce its terms in a court of competent jurisdiction within the Commonwealth of Massachusetts:

> It is accordingly agreed that the parties shall be entitled to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or other interim or conservatory relief (as necessary) to prevent breaches of [the Non-Competition Agreement] and to enforce specifically the terms and provisions of [the Non-Competition Agreement] in any court of the United States located in the Commonwealth of Massachusetts or in a Massachusetts state court, this being in addition to any other remedy to which they are entitled at law or in equity.

40.    The Non-Competition Agreement further provided that the prevailing party in any action "to enforce or interpret the terms" of the agreement is entitled to "reasonable attorney fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled."

41.    Both the Stock Purchase Agreement and the Non-Competition Agreement between BBP and Babcock Power were approved, in accordance with the applicable bankruptcy laws of Germany, by Schmitz' duly authorized representatives.

42.    After the sale of BBCC Holding to Babcock Power, Babcock Power believed that it and its subsidiaries' status as the exclusive provider in the United States of BBAG's Environmental, Service and Heat Exchanger Businesses remained unchanged.

10

43.    Babcock Power and its subsidiaries and affiliates have existing contracts with customers in the Environmental, Service and Heat Exchanger Businesses. Babcock Power, through those same subsidiaries, also has relationships with existing and potential customers, which, based on its status as the exclusive provider in the United States and Canada of its products and services, without any overlapping competition from its former German parent and affiliates for the initial non-competition period, were expected to lead to further advantageous business relationships.

D.    BBAG Representatives Negotiate with Balcke-Dürr to Sell Additional BBAG Assets

44.    As part of BBAG's reorganization effort, at about the same time Babcock Power purchased BBCC Holding from BBP, BBAG entities were negotiating with Balcke-Dürr for the sale of other BBAG assets. Specifically, BBAG was discussing with Balcke-Dürr the purchase of BBP Service Ratingen's assets and operations.

45.    Like BBP, BBP Service Ratingen was part of BBAG's power engineering group. BBP Service Ratingen engaged in, among other activities, the Service Business and Heat Exchanger Business, as those terms are defined in the Non-Competition Agreement (the "Service and Heat Exchanger Businesses").

46.    John Does 1-5 are individuals who negotiated on behalf of the BBAG entities in the discussions leading to the December 11, 2002 agreement between BBP Service Ratingen and Balcke-Dürr.

47.    John Does 1-5 knew about the terms of the Non-Competition Agreement. Nonetheless, John Does 1-5 either misrepresented the contractual obligations that would be assumed by purchasers of all or substantially all of the assets of any BBAG subsidiary or affiliate, such as BBP Service Ratingen, or they concealed the Non-Competition Agreement and the requirements it imposed.

11

48.    Had John Does 1-5 fully disclosed the nature of the Non-Competition Agreement to SPX, Balcke-Dürr or any other entity negotiating with John Does 1-5 and the BBAG entities, the sale price for the BBP Service Ratingen assets would have been millions of dollars less than what was actually paid to the BBAG entities.

49.    Upon information and belief, John Does 1-5 personally received bonuses, commissions or other remuneration due to their misrepresentations or omissions. BBAG related entities also received greater consideration from SPX related entities than otherwise would have been paid had SPX or its related entities understood fully that they became bound by the Non-Competition Agreement upon purchasing all or substantially all of BBP Service Ratingen's assets.

E.    Balcke-Dürr Offers BBP Service Ratingen Products and Services in the U.S. and Canada

50.    Upon information and belief, Balcke-Dürr did not formally obtain rights in BBP Service Ratingen until December 11. Nonetheless, Balcke-Dürr informed its business associates in the United States by letter dated December 2, 2002 -- only three days after Babcock Power purchased BBCC Holding -- that it had obtained parts of the operative business of BBP Service Ratigen and could offer BBP Service Ratigen's products and services, including products and services from BBP Service Ratigen's Service and Heat Exchanger Businesses.

51.    Specifically, in its December 2, 2002 letter -- signed by Balcke-Dürr Chairman, Martin Kienböck, and a manager of Balcke-Dürr's Service Division, Harold Sassman -- Balcke-Dürr stated that as a result of its purchase of assets from BBP Service Ratingen, it could offer "heat exchangers," "boiler spare parts and accessories," and "services relating to [Balcke-Dürr's] entire products portfolio."

52.    By announcing to Babcock Power's American and Canadian customers that it was offering BBP Service Ratigen's heat exchangers, boiler spare parts and accessories, and services

relating to such products, Balcke-Dürr was interfering with the relationship Babcock Power had with existing customers of Babcock Power's operating entities.

53.    Notwithstanding that Balcke-Dürr had begun to tout its ability to sell products and services from BBP Service Ratingen's Service and Heat Exchanger Businesses, in competition with identical products and services formerly offered in the United States and Canada by BBP, on December 11, 2002, BBP Service Ratingen entered into an acquisition agreement with Balcke-Dürr whereby Balcke-Dürr purchased all or substantially all of the assets of BBP Service Ratingen.

F.    SPX Refuses to Abide by the Non-Competition Agreement

54.    Babcock Power became aware in December 2002 -- when it received the December 2, 2002 announcement -- that Balcke-Dürr had engaged in Service and Heat Exchanger Businesses, through operations acquired from BBP Service Ratingen, in the United States and Canada.

55.    On December 31, 2002, Babcock Power, through its Vice President and General Counsel, James S. Brantl, sent letters to BBP, Balcke-Dürr and SPX. Based on the fact that the sale of heat exchangers and boiler spare parts and accessories from an affiliate of BBP was contrary to the terms of the Non-Competition Agreement between Babcock Power and BBP, Babcock Power insisted that Balcke-Dürr cease and desist from offering such products in the United States and Canada, and publicly announce that it was not engaging in such activity.

56.    In response to Babcock Power's demand, BBAG -- through one of the three members of its management board, and its General Counsel, Dr. Georg-Peter Kränzlin -- agreed with Babcock Power's position. Dr. Kränzlin was a vital participant in the negotiations leading to both the Non-Competition Agreement and the Stock Purchase Agreement, having participated in numerous meetings by telephone and in person in Massachusetts during the Fall of 2002.

13

57.    After Babcock Power identified SPX's actions as being in breach of the Non-Competition Agreement, Dr. Kränzlin co-signed a letter from BBAG dated January 10, 2003 to Balcke-Dürr confirming that Balcke-Dürr was contractually prohibited from offering in the United States the services stated in Balcke-Dürr's December 2, 2002 information letter. Dr. Kränzlin asked that Balcke-Dürr send a corrective letter to any recipient of the erroneous December 2, 2002 letter stating that in fact, Balcke-Dürr could not offer the services illustrated. Dr. Kränzlin's January 10, 2003 letter on behalf of BBAG ended by reminding Balcke-Dürr of the contractual obligations between BBP Service Ratingen and Balcke-Dürr. Dr. Kränzlin stated that Balcke-Dürr knew before and on December 11, 2002 about the existence of the Non-Competition Agreement.

58.    On January 22, 2003, SPX -- through its Group General Counsel, Paul F. Hally -- informed Babcock Power and BBP that it did not intend to comply with Babcock Power and BBAG's request that it cease and desist from offering heat exchangers and boiler spare parts and accessories obtained from BBP Service. SPX has reiterated this position in subsequent correspondence, notwithstanding Babcock Power's demands.

G.    Babcock Power Is Forced to File A Complaint Against All Defendants

59.    Because Babcock Power's negotiations with defendants proved fruitless, it was forced to file a complaint in the Business Litigation Session on May 14, 2003, captioned Babcock Power, Inc. v. Babcock Borsig Power GmbH, et al., No. 03-2301-BLS (Mass. Super. Court). The complaint alleged (i) breach of contract, (ii) breach of the covenant of good faith and fair dealing, (iii) quantum meruit/unjust enrichment, (iv) injunctive relief, (v) intentional interference with contractual and advantageous business relations, (vi) intentional interference with contractual relations, and (vii) violation of Mass. Gen. L. ch. 93A.

**14**

60.     In response to the filing of Babcock Power's May 14, 2003 complaint, on June 11, 2003, BBAG's outside counsel in the United States forwarded a copy to Babcock Power's outside counsel a document entitled "Amendment No. 1, dated May 28, 2003, to the Acquisition Agreement dated 11 December, 2002" ("Amendment"). The Amendment purports to memorialize an agreement by Balcke-Dürr not to compete with the so-called "Sold Business" in the United States and Canada in certain markets.

61.     Despite a request from Babcock Power's outside counsel to clarify the meaning of this Amendment, BBAG's counsel has not provided any written explanation of what is meant by the defined term "Sold Business." Furthermore, the Amendment states by its terms that it is specifically not applicable to Balcke-Dürr's "Affiliated Companies." Further, without any definition of the term "Affiliated Companies," Babcock Power is left to assume the Amendment is not applicable to SPX and other affiliated companies of SPX, notwithstanding that the Non-Competition Agreement clearly applies to SPX, as parent of Balcke-Dürr, and its affiliates.

62.     As a result of SPX's past refusal to refrain from using BBP Service Ratingen's Service and Heat Exchanger Business in the United States and Canada, and the narrowly worded Amendment that appears to not bind SPX or its affiliates other than Balcke-Dürr, there is the possibility for substantial confusion in the marketplace, which may detrimentally affect Babcock Power's subsidiaries' ability to pursue business in those markets specified in the Non-Competition Agreement. Babcock Power has no way to gauge SPX's intentions or activities at this time, but confidential, competitive or product information may be disseminated to SPX under the Amendment which apparently makes SPX free from the restrictions placed in the Non-Competition Agreement to protect Babcock Power.

15

63.    The uncertainty engendered by the limited terms of the Amendment, and the actions of defendants that have led to the ambiguities contained in the Amendment and the delay in its consummation have caused Babcock Power to incur substantial losses, costs and expenses including, but not limited to: (a) the consideration paid to BBP for the Non-Competition Agreement; (b) the consideration paid to BBP for BBCC Holding; (c) loss of goodwill; and (d) attorneys fees, costs and disbursements incurred in enforcing the terms of the Non-Competition Agreement

H.    BBP Fails to Pay Over $1.7 Million in Additional Workers' Compensation Premiums

64.    As part of the sale of the Environmental, Service and Heat Exchanger Businesses to Babcock Power, the German entities agreed to compensate Babcock Power for certain operating obligations the American entities purchased by Babcock Power had incurred for entities related to the selling German entities. Included in these obligations were various payments related to workers' compensation. The parties agreed that these expenses would be paid in the normal course of business.

65.    As of the closing of the sale to Babcock Power on November 29, 2002, such expenses included $667,000 payable on account of workers' compensation payments for entites affiliated with the German conglomerate. By letter dated July 2, 2003, Babcock Power informed BBP that due to increased deductible payments, these ongoing workers' compensation expenses had risen to $1,731,395. BBP was asked to remit payment within 30 days of the July 2, 2003 letter. As of the date of this complaint, none of the German entities have paid this outstanding amount to Babcock Power.

## COUNT I (against all defendants)
(Declaratory Judgment)

66.    Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 65 above.

67.    An actual controversy exists as to the obligations of the parties under the Non-Competition Agreement and the Amendment.

68.    Enforcement of the Non-Competition Agreement is reasonably necessary to protect Babcock Power's legitimate business interests.

69.    Babcock Power is entitled to a declaratory judgment that due to the Non-Competition Agreement, and notwithstanding any construction of the Amendment to the contrary, SPX and all of its affiliates and subsidiaries are prohibited from marketing, advertising, selling or offering for sale, directly or indirectly, in the United States and Canada, any heat exchanger, boiler spare part and accessory, and related service, for a period of three years from November 29, 2002.

70.    In the alternative, Babcock Power is entitled to a declaratory judgment that it has been deprived the benefit of the bargain contained in the Non-Competition Agreement and thus it should be excused from any payments of interest or principal under the Notes; furthermore, BBP is enjoined from transferring or otherwise alienating the Notes.

71.    The granting of the declaratory relief above will terminate the controversy amongst the parties and remove an uncertainty as to the respective parties' obligations.

## COUNT II (against all defendants other than Balcke-Dürr)
(Breach of Contract)

72. Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 71 above.

73. BBP, and its direct and indirect affiliates, parent and successors, including all purchasers of all or substantially all of BBP related entities, have contractual obligations under the Non-Competition Agreement not to engage, directly or indirectly, in the Environmental, Service and Heat Exchanger Businesses in the United States or Canada for three years beginning November 29, 2002.

74. All defendants have directly or indirectly engaged in the Service and Heat Exchanger Businesses by BBP Service Ratingen's sale to Balcke-Dürr of operative businesses which manufacture and supply heat exchanger, boiler spare parts and accessories, and related services, and have failed to prohibit SPX and its affiliates, other than Balcke-Dürr, from the sale of such products and services in the United States and Canada until November 29, 2005.

75. As a result of defendants' breach of contract, Babcock Power has sustained, and continues to sustain, substantial damages.

## COUNT III (against all defendants against all defendants other than Balcke-Dürr)
(Breach of the Covenant of Good Faith and Fair Dealing)

76. Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 75 above.

77. The Non-Competition Agreement includes, as all contracts do, an implied covenant of good faith and fair dealing.

18

78.    The actions of all defendants, in enabling and allowing SPX to sell BBP Service Ratingen's heat exchangers, boiler spare parts and accessories, and related services in the United States and Canada, constitute a breach of the implied covenant of good faith and fair dealing.

79.    As a result of defendants' breach of their duty of good faith and fair dealing, Babcock Power has sustained, and continues to sustain, substantial damages.

### COUNT IV (against BBP, BBAG, Schmitz and John Does 1-5)
(Declaratory Judgment)

80.    Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 79 above.

81.    Babcock Power has conferred a measurable benefit upon BBP, and by extension its parent BBAG, by, among other things, providing the insolvent German corporations with substantial monetary consideration upon the closing of the Stock Purchase Agreement, and obligating itself under Notes for additional future sums.

82.    Babcock Power acted with the reasonable expectation that BBP and BBAG would not, directly or indirectly, cause the value of BBCC Holding's assets to be diminished through immediate competition in the United States and Canada.

83.    BBP and BBAG have caused the dilution or erosion of the value of the BBCC Holding assets by allowing BBP Service Ratingen to sell competing products to Balcke-Dürr and by not preventing Balcke-Dürr's parent, SPX, from offering competing products and services from BBP Service Ratingen's Service and Heat Exchanger Businesses to Babcock Power's American and Canadian customers.

84.    John Does 1-5 profited through bonuses, commissions or other remuneration from their involvement in misrepresenting or concealing the terms of the Non-Competition Agreement. These bonuses, commissions and other remuneration derived, in part or in whole,

from proceeds BBAG received from Babcock Power as consideration for the sale of BBCC Holding.

85.    An actual controversy exists as to whether Babcock Power is entitled to restitution in the amount of the bonuses, commissions and other remuneration paid to John Does 1-5 for their involvement in misrepresenting or concealing the terms of the Non-Competition Agreement.

86.    Babcock Power is entitled to a declaratory judgment that it is entitled to restitution in the amount of the bonuses, commissions and other remuneration paid to John Does 1-5 for their involvement in misrepresenting or concealing the terms of the Non-Competition Agreement.

87.    The granting of the declaratory relief above will terminate the controversy amongst the parties and remove an uncertainty as to the respective parties' obligations.

## COUNT V (against BBP, BBAG and Schmitz)
(Declaratory Judgment)

88.    Babcock Power realleges and incorporates by reference the allegations in paragraphs 1 through 87 above.

89.    BBP, and its parent BBAG, agreed as part of the sale of its American assets to Babcock Power to pay to Babcock Power certain operating expenses that the American entities had paid on behalf of the German entities. Schmitz, through his authorized representative, ratified this agreement.

90.    To date, the German entities have not paid at least $1,731,395 under this obligation, nor have they paid the applicable interest on such outstanding sums.

20

91.   An actual controversy exists as to whether Babcock Power is entitled to $1,731,395 plus interest for the workers' compensation obligations, as adjusted after closing, related to the sale of assets to Babcock Power.

92.   Babcock Power is entitled to a declaratory judgment that it is entitled to $1,731,395 plus interest for the workers' compensation obligations, as adjusted after closing, related to the sale of assets to Babcock Power.

93.   The granting of the declaratory relief above will terminate the controversy amongst the parties and remove an uncertainty as to the respective parties' obligations.

WHEREFORE, Plaintiff Babcock Power prays that the Court order the following relief:

1.   Enter a declaratory judgment in Babcock Power's favor under Counts I, IV and V, stating:

a.   SPX and all of its affiliates and subsidiaries are prohibited from marketing, advertising, selling or offering for sale, directly or indirectly, in the United States and Canada, any heat exchanger, boiler spare part and accessory, and related service, for a period of three years from November 29, 2002;

b.   Babcock Power is excused from any payments of interest or principal under the Notes; furthermore, BBP is enjoined from transferring or otherwise alienating the Notes;

c.   Babcock Power is entitled to restitution in the amount of the bonuses, commissions and other remuneration paid to John Does 1-5 for their involvement in misrepresenting or concealing the terms of the Non-Competition Agreement; and

d.   Babcock Power is entitled to $1,731,395 plus interest for the workers' compensation obligations, as adjusted after closing, related to the sale of assets to Babcock Power.

21

2.    Award Babcock Power damages under Counts II and III;

3.    Further award Babcock Power costs and attorneys' fees under Count II;

4.    Further award Babcock Power full restitution under Count IV for all amounts Babcock Power paid to BBP in consideration for the Stock Purchase Agreement and all bonuses, commissions and other remuneration John Does 1-5 obtained as a result of the sale of BBP Service Ratingen to Balcke-Dürr;

5.    Further award Babcock Power $1,731,395 plus interest under Count V; and

6.    Award such other and further relief as the Court deems appropriate.

> BABCOCK POWER, INC.
>
> By its attorneys,
>
> Steven J. Comen (**BBO #093320**)
> James O. Fleckner (BBO #641494)
> GOODWIN PROCTER LLP
> Exchange Place
> Boston, MA  02109
> (617) 570-1000

DATED: November 10, 2003

LIBA/1293600.1

22