# In The Matter Of:

## *Babcock Borsig Power GmbH   v.*
## *Babcock Power Inc.   v.   Babcock Borsig AG*

---

## *James S. Brantl*
## *Vol. 1, December 20, 2005*

---

## *Doris O. Wong Associates, Inc.*
## *Professional Court Reporters*
## *50 Franklin Street*
## *Boston, MA  02110*
## *(617) 426-2432*

*Original File BRANTL.V1, 164 Pages*
*Min-U-Script® File ID: 3784166966*

# Word Index included with this Min-U-Script®

Page 1

Volume I
Pages 1 to 164
Exhibit 1
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BABCOCK BORSIG POWER GmbH,  :

Plaintiff,  :

vs.                                          : Civil Action No.
                                             : 04 CV 01825-RWZ

BABCOCK POWER INC.,  :

Defendant and  :

Third-Party Plaintiff,  :

vs.                                          :

BABCOCK BORSIG AG,  :

Third-Party Defendant.  :

DEPOSITION OF BABCOCK POWER INC., by its
designee JAMES S. BRANTL, a witness called on behalf
of the Plaintiff and Third-Party Defendant, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Carol H. Kusinitz,
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Offices of Bello Black & Welsh LLP, 535 Boylston
Street, Suite 1102, Boston, Massachusetts, on
Tuesday, December 20, 2005, commencing at 10:07 a.m.

PRESENT:

Bello Black & Welsh LLP (by Kenneth M. Bello,
Esq., John F. Welsh, Esq., and Kevin
Powers, Esq.) 535 Boylston Street, Suite
1102, Boston, MA 02116, for the Plaintiff
and Third-Party Defendant.

Goodwin Procter LLP (by Steven J. Comen, Esq.)
Exchange Place, Boston, MA 02109, for the
Defendant and Third-Party Plaintiff.

Page 2

INDEX

WITNESS    DIRECT  CROSS  REDIRECT  RECROSS
JAMES S. BRANTL
BY MR. BELLO        3

EXHIBITS
NO.    DESCRIPTION                      PAGE
1    Notice of Rule 30(b)(6) deposition  6
     of Defendant Babcock Power Inc.,
     with Attachment A

QUESTIONS WITH INSTRUCTIONS NOT TO ANSWER
         PAGE    LINE
          64      24
          66      18
          67      18
          71      22
          78      14
          81       9
          87      12
         120       7
         134       5
         143      11
         145      18
         146       3
         147      24
         152      21
         153      22

Page 3

[1]                    PROCEEDINGS
[2]                  JAMES S. BRANTL
[3] a witness called for examination by counsel for the
[4] Plaintiff and Third-Party Defendant, having been
[5] satisfactorily identified by the production of his
[6] driver's license and being first duly sworn by the
[7] Notary Public, was examined and testified as
[8] follows:
[9]     MR. BELLO: For the record, this is the
[10] Rule 30(b)(6) deposition of the Defendant Babcock
[11] Power Inc. Mr. Brantl, I believe, has been
[12] designated, but we'll find out, for all topics.
[13] This is not the individual deposition of Mr. Brantl,
[14] however.
[15]               DIRECT EXAMINATION
[16]                  BY MR. BELLO:
[17]     Q: Why don't you state your name —
[18]     MR. COMEN: Excuse me. Do you want me
[19] to — before we get going, I have a pristine thing
[20] to deliver. This is from Mr. Simons. I'm opening
[21] it for the first time. I think there's a cover
[22] letter explaining the disk, the documents.
[23]        The other point is, on the 30(b)(6)
[24] deposition, on Paragraph 8, we'll designate Mr.

Page 4

[1] Brandano for that. You're going to be taking his
[2] deposition in two days.
[3]     MR. BELLO: Do I understand that Mr. Brantl
[4] is being designated on Topics 1 through 7?
[5]     MR. COMEN: Yes, except that — yes.
[6]     MR. BELLO: Okay.
[7]                  BY MR. BELLO:
[8]     Q: Mr. Brantl, my name is Ken Bello. I'm one
[9] of the counsel in this case. You probably recognize
[10] my name. I think my first communication may have
[11] been with you back in March of 2003.
[12]        We're all attorneys, but attorneys are
[13] probably the most unusual deponents, so I'm going
[14] to, as I would with any witness, ask you a series of
[15] questions. I will do my best to make them clear.
[16] If I'm not, if they're not clear to you, I will try
[17] to rephrase them, but you will have to let me know
[18] that it's not clear, because otherwise I'll assume
[19] that it is. Okay?
[20]     A: Yes.
[21]     Q: If you want to take a break, just let me
[22] know, and I'll accommodate it as quickly as I can.
[23] We'll go from there.
[24]        I would ask you to sign the deposition as a

**Page 5**

[1] corporate witness, have it notarized, but it need
[2] not be — I think we just sign it, but an errata
[3] sheet within the time provided by the rules, which I
[4] think is 30 days. Okay?
[5]     A: Yes.
[6]     MR. COMEN: Any other stipulations?
[7]     MR. BELLO: We'll just follow the rules
[8] spelled out in Rule 34. Whatever it is in the rule,
[9] we'll follow.
[10]     MR. COMEN: Okay.
[11]     MR. BELLO: Now, I do have a question, and
[12] why don't we do this off the record to start.
[13]     (Discussion off the record)
[14]     MR. BELLO: In the privilege log that
[15] was —
[16]     (Brief recess)
[17]     MR. BELLO: On the record. Off the record
[18] I asked counsel, because there will be a number of
[19] inquiries today, the following question: In the
[20] privilege log produced by Babcock Power Inc., there
[21] are a number of documents in which the reference
[22] reflects a document, and the description by
[23] document — by way of example, No. 223, but there
[24] are others — indicates that the document in its

**Page 6**

[1] description is redacted. We cannot tell and have
[2] made inquiry as to whether that means that the
[3] document has not been produced at all or has been
[4] produced in a redacted form.
[5]     Because there are no Bates stamp numbers on
[6] the privilege log to reference it to anything, and
[7] because of the voluminous nature of the documents
[8] produced, we can't determine whether or not
[9] documents of that type and nature have been
[10] produced.
[11]     So we would ask, perhaps at an appropriate
[12] break or at some point, just to get a clarification
[13] as to whether those category documents have been
[14] produced in a redacted form and, if so, to get Bates
[15] stamp numbers so we can look at them, or if they
[16] have not been produced at all, just to know that as
[17] well.
[18]     (Document marked as Rule 30(b)(6)
[19] Brantl Exhibit 1 for identification)
[20]     BY MR. BELLO:
[21]     Q: Mr. Brantl, I'm showing you the original
[22] Rule 30(b)(6) deposition notice that was noticed for
[23] a deposition to take place on September 19, 2005.
[24] You can take whatever time you need, obviously, to

**Page 7**

[1] review the document. My question simply is, do you
[2] recall getting a copy of this at or about the time
[3] that it was forwarded to your counsel?
[4]     A: Yes, I recall.
[5]     Q: And do you recall reviewing the topics that
[6] were identified at or about that time, the subject
[7] matters of this examination?
[8]     A: Yes.
[9]     Q: When did you begin your investigation
[10] regarding the fact-gathering as corporate witness as
[11] to the various topics which are now 1 through 7 that
[12] you've been designated as the Rule 30(b)(6) witness?
[13]     A: I would say over the past month. I've been
[14] involved —
[15]     MR. COMEN: You've —
[16]     MR. BELLO: Can he —
[17]     MR. COMEN: But have you finished answering
[18] the question? If you just answer the question, it
[19] will be a lot easier.
[20]     Why don't you repeat the question back.
[21]     (Question read)
[22]     Q: Your answer was, "Over the past month." If
[23] that's your answer, that's fine.
[24]     MR. COMEN: The question is, when did you

**Page 8**

[1] begin doing something?
[2]     Q: If you don't have an exact date, obviously
[3] just your best memory.
[4]     A: I've been involved in most of these topics
[5] over the past three years.
[6]     Q: I understand that, but you have been
[7] designated by the corporation as a specific — in a
[8] specific role, that is, the corporate witness.
[9]     Let me do it — did you undertake a
[10] specific investigation as to the information or a
[11] review of information that you already knew in
[12] connection with this deposition, and if so, when?
[13]     A: I've been reviewing these materials the
[14] last several days.
[15]     MR. COMEN: I object to the question.
[16] You've got two questions, "If so, when?"
[17]     MR. BELLO: That's all right.
[18]     MR. COMEN: It's clear the witness doesn't
[19] understand the question.
[20]     MR. BELLO: You can object, and as you
[21] know, the appropriate thing is to object and he'll
[22] answer, and if there is an appropriate objection, it
[23] can be stricken at another time.
[24]     Q: Let me try the question very simply. When,

Page 9

[1] as to these topics for this deposition, did you
[2] begin an investigation of the subject matters?
[3]     A: When I first read this (indicating).
[4]     Q: So back in September?
[5]     A: Yes.
[6]     Q: What I would suggest I'm going to try to do
[7] to move this along, I'm going to ask a general
[8] question, but if not, we'll go very specific. The
[9] general question would be, what did you do to
[10] investigate each of these topics for the purpose of
[11] this deposition?
[12]     A: Well, I've been involved in getting
[13] together all the documents involving these various
[14] topics.
[15]     Q: Were others involved in assisting you in
[16] getting documents together?
[17]     A: Yes.
[18]     A: Who?
[19]     A: The attorneys from Goodwin Procter.
[20]     Q: Anybody else? Anybody internal to Babcock
[21] Power or anybody other than your attorneys?
[22]     A: Well, I asked certain people who I knew had
[23] documents in the company.
[24]     Q: Who?

Page 10

[1]     A: Anthony Brandano.
[2]     Q: Who is Mr. Brandano?
[3]     A: He's the chief financial officer.
[4]     Q: How long has he been chief financial
[5] officer?
[6]     A: About three and a half years.
[7]     Q: Since the formation of — since the
[8] transaction that —
[9]     A: That —
[10]     MR. COMEN: Let him finish the question.
[11]     Q: Since the transaction by which Babcock
[12] Power Inc. came into existence?
[13]     A: No. It was before that.
[14]     Q: What was the name of the entity before
[15] that?
[16]     MR. COMEN: I object to the form. What's
[17] "the entity"?
[18]     Q: Do you understand my question? Was there a
[19] predecessor to BPI?
[20]     A: BPI bought the stock of BBCC Holding
[21] Company Inc. in November 2002.
[22]     Q: And were you employed by either — by BPI
[23] at that time?
[24]     MR. COMEN: At what time?

Page 11

[1]     MR. BELLO: At the time they bought the
[2] stock, acquired the stock.
[3]     A: No.
[4]     Q: Who were you employed by?
[5]     A: Babcock Borsig Power Corporation — Babcock
[6] Borsig Capital Corporation.
[7]     Q: Who was Mr. Brandano employed by?
[8]     A: Babcock Borsig Capital Corporation.
[9]     Q: What was the relationship, if any, between
[10] Babcock Borsig Capital Corporation and Babcock
[11] Borsig Power GmbH, if you know?
[12]     MR. COMEN: I'm sorry, what was the
[13] question?
[14]     (Question read)
[15]     THE WITNESS: Could you repeat it again.
[16]     (Question read)
[17]     A: Babcock Borsig Capital Corporation was a
[18] wholly owned subsidiary of BBCC Holding Company,
[19] Inc., which was owned by Babcock Borsig Power GmbH.
[20] I'm not totally sure, but I believe — that's what I
[21] recall.
[22]     Q: Now, who, other than Mr. Brandano, did you
[23] ask to gather documents for you in connection with
[24] this deposition?

Page 12

[1]     A: James Wood.
[2]     Q: He's the CEO of Babcock Power Inc.?
[3]     A: Yes.
[4]     Q: Was he employed by Babcock Power — I'm
[5] sorry, Babcock Borsig Capital Corp. at the time of
[6] the acquisition?
[7]     A: Yes.
[8]     Q: How about other than Mr. Wood and Mr.
[9] Brandano, other people you asked for documents?
[10]     A: I asked Mr. Nathan Hevrony.
[11]     Q: Who is Mr. Hevrony?
[12]     A: He is one of the shareholders. He is on
[13] the board of directors.
[14]     Q: Is he still on the board of directors as of
[15] today?
[16]     A: Yes.
[17]     Q: He's not — is he an employee —
[18]     A: No.
[19]     Q: Just so, as you know, she has to take my
[20] full question and your answer. So even if you hear
[21] it, if you can not anticipate and let me get the
[22] full question out, that would be great.
[23]     MR. COMEN: It would be easier if you slow
[24] down and listen to his question and wait until he

---

Page 13

[1] finishes his question.
[2]   **Q:** Was he ever an employee of Babcock Power
[3] Inc.?
[4]   **A:** Not to my knowledge.
[5]   **Q:** To your knowledge, was he ever an employee
[6] of Babcock Borsig Capital Corp.?
[7]   **A:** Not to my knowledge.
[8]   **Q:** To your knowledge, was he ever an employee
[9] of any of the Babcock entities that run up to
[10] Babcock — what is known as BBX, Babcock Borsig AG?
[11]   **MR. COMEN:** I object. You said "run up"?
[12]   **Q:** To your knowledge, was he ever employed by
[13] any of the entities that are related to Babcock
[14] Borsig AG?
[15]   **A:** Not to my knowledge.
[16]   **Q:** Does he hold any title with Babcock Power
[17] Inc., other than as a member of the board of
[18] directors?
[19]   **A:** No.
[20]   **Q:** Has he ever held any title, other than
[21] Babcock — other than as — strike that.
[22]   Has he ever held any other title with
[23] Babcock Power Inc., other than as a member of the
[24] board of directors, from November 29, 2002, to the

---

Page 14

[1] present?
[2]   **A:** No. I would have to check the records, but
[3] I believe that's the...
[4]   **Q:** When you say he's a shareholder, is he
[5] personally a shareholder, or is a company that he
[6] owns or has an interest in a shareholder?
[7]   **A:** I believe — I don't know exactly — that
[8] he owns an interest in a company that's a
[9] shareholder.
[10]   **Q:** What's the name of that company?
[11]   **A:** Hudson Power Ventures 1 LLC.
[12]   **Q:** Do you have any knowledge as to whether
[13] that entity was created for the purpose of the
[14] investment and ownership of what is now known as
[15] Babcock Power Inc.?
[16]   **MR. COMEN:** Excuse me. I object. Is this
[17] within the scope of the 30(b)(6)?
[18]   **MR. BELLO:** Yes, I believe it is. Do you
[19] want to instruct him not to answer? As I recall,
[20] Dr. Kraenzlin's deposition went way outside the
[21] 30(b)(6). Do you want him not to answer?
[22]   **MR. COMEN:** Well, if it's outside the
[23] scope — you said this was limited to the 30(b)(6).
[24] Won't we go faster if we just deal with the

---

Page 15

[1] 30(b)(6)? You're clearly going to call him back
[2] again.
[3]   **MR. BELLO:** Are you going to instruct him
[4] not to answer, Steve? That's all I want to know.
[5]   **MR. COMEN:** Yes.
[6]   **MR. BELLO:** Let's mark that that the
[7] witness is being instructed not to answer, which as
[8] I understand the rules, the only basis for
[9] instructing a witness not to answer, as opposed to
[10] objecting, is if there is an issue of privilege, and
[11] that is it. So if we need to get to the Discovery
[12] Master over this, that will be unfortunate.
[13]   I'm trying to get some background
[14] information to understand — and this is within the
[15] framework of the 30(b)(6) in terms of the background
[16] for the specific topics — who was involved in
[17] various negotiations, what roles they had, what
[18] entities they came from. So it is clearly related.
[19]   **MR. COMEN:** Okay. I just don't want to go
[20] far beyond the 30(b)(6). Why don't we take a few
[21] more questions, and we'll see how far you're going
[22] to go.
[23]   **BY MR. BELLO:**
[24]   **Q:** Do you want to answer the question, please.

---

Page 16

[1] Do you want me to reread it? Would that be helpful?
[2]   **A:** Please.
[3]   **Q:** Do you have any knowledge as to whether the
[4] entity that you identified, Hudson Powers Ventures 1
[5] LLC, was created for the purpose of investing in and
[6] having ownership in the entity now known as Babcock
[7] Power Inc.?
[8]   **A:** I have no knowledge.
[9]   **Q:** Did Mr. Hevrony produce any documents for
[10] you in connection with your request?
[11]   **A:** Yes.
[12]   **Q:** What did he produce for you?
[13]   **A:** He downloaded several e-mails from his
[14] computer.
[15]   **Q:** Do you recall how many? If you don't
[16] recall the exact, give me more than five, more than
[17] ten?
[18]   **A:** I would say more than ten.
[19]   **Q:** More than 20?
[20]   **A:** I really don't recall.
[21]   **Q:** Do you know if those e-mails have been
[22] produced in connection with the request for
[23] production of documents in this case?
[24]   **A:** I don't know.

---

Page 17

[1] **Q:** I take it you reviewed those e-mails that
[2] he forwarded to you in connection with this
[3] deposition as well?
[4] **A:** I briefly looked at them.
[5] **MR. BELLO:** *Off the record.*
[6] (Discussion off the record)
[7] **MR. BELLO:** On the record.
[8] **MR. COMEN:** Off the record what Mr. Bello
[9] asked me was whether — what documents were
[10] produced.
[11] **MR. BELLO:** That's not what I asked you.
[12] **MR. COMEN:** The simple answer that I gave
[13] him was that my understanding is that whatever Mr.
[14] Brantl talked to from all of the people that he
[15] talked to was turned over to me and my colleagues.
[16] We went through them for privilege, and those
[17] documents that weren't privileged, but were
[18] responsive to the request for production of
[19] documents, we have turned over to Mr. Bello and his
[20] colleagues.
[21] And as recently as early this morning, to
[22] the extent that there was a computer glitch on a few
[23] of the documents, we turned over the rest of them,
[24] and I believe in the package there were one or two

Page 18

[1] more documents from Mr. Hevrony.
[2] **MR. BELLO:** Well, for the record, so what
[3] I've just heard is — by the way, the computer
[4] glitch, number one, was not a few documents. It was
[5] at least, we believe, a couple hundred documents.
[6] **MR. COMEN:** Out of 14,000.
[7] **MR. COMEN:** A couple hundred at least,
[8] maybe more. Second, if there were documents
[9] produced for the first time this morning with
[10] respect to Mr. Hevrony, obviously we have not seen
[11] those, and no one is pointing out where those are in
[12] what looks to be several hundred pages of documents.
[13] **BY MR. BELLO:**
[14] **Q:** Sir —
[15] **MR. COMEN:** Can I see the cover letter?
[16] **Q:** — when did you ask Mr. Hevrony to produce
[17] the documents for you?
[18] **MR. COMEN:** Excuse me. I think the record
[19] will reflect —
[20] **MR. BELLO:** Can you stop it, Steve.
[21] **MR. COMEN:** — that the cover letter — no,
[22] you put on the record —
[23] **MR. BELLO:** Steve, can you stop
[24] interrupting me.

Page 19

[1] **MR. COMEN:** It's not fair, though.
[2] **MR. BELLO:** Would you stop —
[3] **MR. COMEN:** It says in the cover letter
[4] that I gave to Mr. Welsh, "Also included in this
[5] production are two e-mails recently received from
[6] Nathan Hevrony, marked with Bates Nos. BPI 11266 and
[7] 11267." It isn't fair for you to put things like
[8] that on the record, Mr. Bello.
[9] **MR. BELLO:** What is accurate, and does not
[10] need to be characterized as fair or unfair, is that
[11] those were produced this morning.
[12] **BY MR. BELLO:**
[13] **Q:** Now, Mr. Brantl, when did Mr. Hevrony
[14] produce for you the document — let me do it this
[15] way: When did you ask him to produce documents for
[16] you in connection with this deposition?
[17] **A:** Several months ago. I don't recall
[18] exactly.
[19] **Q:** When did he actually produce them for you,
[20] these e-mails that you have testified about earlier?
[21] **A:** He gave us some e-mails several months ago,
[22] and then he recently gave us a couple recently.
[23] **Q:** Now, if I recall, Mr. Hevrony and his
[24] company, in connection with the acquisition, were

Page 20

[1] represented by the law firm of Gadsby & Hannah; is
[2] that correct?
[3] **A:** Yes.
[4] **Q:** And your group was represented by who, the
[5] management group? Who did the deal for you?
[6] **MR. COMEN:** I object.
[7] **Q:** Can you answer the question, please.
[8] **MR. COMEN:** If he understands it.
[9] **Q:** Do you understand — were you represented
[10] by counsel in connection with the acquisition of the
[11] shares from BBCC?
[12] **MR. COMEN:** Who is the "you"?
[13] **Q:** Was there an entity created by your
[14] management group in connection with a Newco created
[15] in connection with the acquisition?
[16] **A:** No.
[17] **Q:** Were individuals involved in connection
[18] with that transaction? Were you involved?
[19] **A:** Yes.
[20] **Q:** Was Mr. Wood involved?
[21] **A:** Yes.
[22] **Q:** Was Mr. Brandano involved?
[23] **A:** Yes.
[24] **Q:** *Did you have counsel that was advising you*

Page 21

[1] in connection with that?
[2] A: Jim Brantl personally did not have any
[3] counsel advise him.
[4] Q: Who were the lawyers involved in the deal,
[5] Mr. Brantl? Let's do it that way. What law firms?
[6] A: Nixon Peabody represented Babcock Borsig
[7] Power GmbH and Babcock Borsig AG.
[8] Q: Who else?
[9] A: Gadsby & Hannah represented the Hudson
[10] group, and Goodwin Procter provided some limited
[11] advice to the company.
[12] Q: To which company?
[13] A: Babcock Borsig Capital Corporation.
[14] Q: So Goodwin Procter was representing a
[15] Babcock Borsig entity in connection with the
[16] acquisition in a limited way?
[17] A: Not in connection with the acquisition,
[18] but —
[19] MR. COMEN: Well, you're just —
[20] Q: Do you know if there was a waiver executed
[21] by the parties in connection with that, a conflict
[22] waiver?
[23] A: I don't understand the question.
[24] Q: You understand what a waiver is, don't

Page 22

[1] you —
[2] A: Yes.
[3] Q: — as a general counsel? Do you know
[4] whether Babcock Borsig Capital Corporation signed a
[5] waiver authorizing Goodwin Procter to represent the
[6] entity in whatever capacity it did? Do you know?
[7] A: No, I don't believe a waiver was ever
[8] executed.
[9] Q: Are those all the law firms involved that
[10] you recall?
[11] A: We had several law firms around the country
[12] helping out, doing various things.
[13] Q: Who else that you recall?
[14] A: In connection with title work and, say, in
[15] Erie, Pennsylvania, where the plants were, and
[16] looking at various things.
[17] Q: If you understand my question, so maybe
[18] we'll not — in connection with the negotiation of
[19] the deal itself, were there any other law firms?
[20] MR. COMEN: I object to the form. It's
[21] clearly — the witness needs an explanation of what
[22] you mean about "negotiation of the deal itself."
[23] MR. BELLO: You know, talking objections is
[24] what is not permitted, Steve.

Page 23

[1] A: Let me just go back to Goodwin Procter for
[2] a second. Goodwin Procter did not participate in
[3] any of the negotiations for — involving the
[4] documents between Babcock Borsig AG and Babcock
[5] Power Inc.
[6] Q: What did Goodwin Procter do?
[7] MR. COMEN: What —
[8] MR. BELLO: Can he answer the question?
[9] MR. COMEN: No. Let me object.
[10] MR. BELLO: Then object and then let him
[11] answer the question.
[12] MR. COMEN: What did Goodwin Procter do?
[13] Did you finish the question?
[14] MR. BELLO: Yes, I did.
[15] MR. COMEN: I object.
[16] MR. BELLO: Fine.
[17] Q: You can answer the question.
[18] MR. COMEN: What did Goodwin Procter do
[19] about what?
[20] MR. BELLO: Steve, it would really be
[21] helpful if you stopped doing talking objections.
[22] A: Goodwin Procter provided some advice on
[23] some of the intercompany agreements.
[24] Q: Anything else you recall, besides the

Page 24

[1] intercompany agreements?
[2] MR. COMEN: Anything you recall about what?
[3] MR. BELLO: Steve, you can object to my
[4] question, and that's all you can do.
[5] MR. COMEN: I object.
[6] MR. BELLO: Okay. Good.
[7] Q: Anything else you recall Goodwin Procter
[8] doing in connection with advice other than with
[9] respect to the intercompany agreements?
[10] A: That's all I can recall right now.
[11] Q: You referenced the Hudson group?
[12] MR. COMEN: Excuse me, can I just take this
[13] call for one second. (?) Come out for a second.
[14] MR. BELLO: I have a question pending,
[15] actually.
[16] MR. COMEN: Oh, you do have a question?
[17] MR. BELLO: Yes, I have a question.
[18] MR. COMEN: What's your question? And then
[19] I just need to take this call for a second.
[20] Q: The question was, you referenced the Hudson
[21] group. Who or what entities — we can take them
[22] separately — did the Hudson group comprise?
[23] A: I only know the shareholders of Babcock
[24] Power Inc. I don't know any of the other entities

Page 25

[1] that owned those shares.
[2]    Q: Who were the shareholders that you're
[3] referencing?
[4]    A: Hudson Power Ventures 1 LLC and Hudson
[5] Power Ventures 2 LLC.
[6]    MR. COMEN: Okay. Now that there is no
[7] question pending —
[8]    MR. BELLO: Actually, I would like to
[9] finish this line, Steve, for a minute, if I can,
[10] unless you agree that you're not going to talk until
[11] I finish this line.
[12]    MR. COMEN: What's the line that — he's
[13] answered your question.
[14]    MR. BELLO: Steve —
[15]    MR. COMEN: What line?
[16]    Q: In your personal capacity, you were not
[17] part of the Hudson group, right?
[18]    A: Right.
[19]    Q: Nor was Mr. Wood, correct?
[20]    A: As far as I know.
[21]    Q: Nor was Mr. Brandano; is that correct?
[22]    A: As far as I know.
[23]    Q: And did you become a shareholder of the new
[24] entity?

Page 26

[1]    A: Yes.
[2]    Q: Did Mr. Wood become a shareholder of the
[3] new entity?
[4]    A: Yes.
[5]    Q: Did Mr. Brandano become a shareholder of
[6] the new entity?
[7]    A: Yes.
[8]    Q: And you hold these shares all in your
[9] individual capacities?
[10]    A: Yes.
[11]    Q: Is there any other management person within
[12] what is now known as Babcock Borsig — Power Inc.,
[13] that is a shareholder who was there at the time of
[14] November 29, 2002?
[15]    A: Yes.
[16]    Q: Who?
[17]    A: There's a list of about 14 or 15 other
[18] people.
[19]    MR. BELLO: Okay. Want to take a break?
[20]    MR. COMEN: Yes.
[21]    (Recess)
[22]           BY MR. BELLO:
[23]    Q: I just want to make sure I got the
[24] alignment right, Mr. Brantl. Gadsby & Hannah

Page 27

[1] represented, as you said, the Hudson group, is that
[2] correct, the Hudson investor?
[3]    A: Yes. I don't know the exact name.
[4]    Q: Gadsby did not represent Babcock Borsig
[5] Capital group or Corp., correct?
[6]    A: Yes, that's right.
[7]    Q: Now, going back to — I just want to make
[8] sure we've got the complete list of folks that you
[9] asked for documents. Mr. Brandano, Mr. Wood, Mr.
[10] Hevrony. Anybody else? This is documents in
[11] connection with your preparation and investigation
[12] for this deposition.
[13]    THE WITNESS: Could you read back the
[14] question.
[15]    (Question read)
[16]    MR. COMEN: I'm sorry. Please repeat that
[17] again.
[18]    (Question read)
[19]    A: The question is confusing to me.
[20]    Q: Let me try to — as I understand your
[21] testimony — earlier I asked you who did you request
[22] produce for you documents so you could prepare for
[23] the topics listed in this deposition. Do you
[24] remember that question? This was a while ago.

Page 28

[1]    A: I don't remember the exact phraseology.
[2]    Q: And the phraseology being — do you
[3] understand the gist of that question, which is
[4] you — I'll try it again.
[5]     You indicated that, in connection with your
[6] investigation and preparation for this deposition as
[7] a corporate witness, that you reviewed documents,
[8] and in connection with that, you asked individuals
[9] to provide you with relevant documents. I asked you
[10] who. You've indicated Mr. Brandano, Mr. Wood, Mr.
[11] Hevrony. Now I'm just asking you, anyone else?
[12]    A: I'm confused by your question. It had
[13] several parts, and I don't know which answer I'm
[14] supposed to give you to which part.
[15]    Q: Okay. We'll just take as much time as we
[16] need. Well, the beginning was just a restatement of
[17] what I think is accurate.
[18]     Did you ask people to provide you documents
[19] in connection with your preparation for this
[20] deposition, sir?
[21]    A: No.
[22]    Q: You did not ask anyone to provide you with
[23] documents in connection with the preparation of this
[24] deposition; is that your testimony now?

Page 29

[1] **A:** Yes.

[2] **Q:** So your testimony earlier was incorrect?

[3] **A:** I had asked people for documents in
[4] response to the production of document request, not
[5] in reference to this deposition.

[6] **Q:** Let's go back to, what specifically did you
[7] do to prepare for this deposition as corporate
[8] witness? Did you review documents? Yes or no,
[9] please.

[10] **A:** Yes, I reviewed some documents.

[11] **Q:** What types of documents did you review,
[12] sir?

[13] **A:** The closing documents and a lot of the
[14] documents that were produced.

[15] **Q:** Did you review documents that were not
[16] produced?

[17] **A:** Not recently.

[18] **Q:** In connection with your investigation for
[19] this deposition, at any time since you received this
[20] notice, did you review documents that were not
[21] produced?

[22] **A:** Yes, some documents that were not produced.

[23] **Q:** What documents that were not produced?

[24] **A:** Several of them were attorney-client

Page 30

[1] privilege documents.

[2] **Q:** What are they? I'm asking you for an
[3] identification of those, not the substance of them.

[4] **A:** I can't recall off the top of my head what
[5] those documents were.

[6] **Q:** Well, can you recall at all? Because I can
[7] tell you that you have obligations to come to this
[8] deposition with knowledge under Rule 30(b)(6). Do
[9] you have at least a general memory of any of the
[10] documents that you reviewed that were not produced?

[11] **MR. COMEN:** Instead of — I object. You've
[12] been making facial gestures that don't show up
[13] because this isn't a video deposition. You're now
[14] telling the witness what his obligations are. You
[15] know, suffice it to say he has counsel who will
[16] guide him in what he's supposed to do.

[17] **Q:** Sir, I'm going to —

[18] **MR. COMEN:** Why don't you just ask him the
[19] questions without the facial gestures when he makes
[20] an answer.

[21] **MR. BELLO:** Steve, if you want to put on
[22] the record, you can put on any record.

[23] **MR. COMEN:** I just did.

[24] **MR. BELLO:** I will put on the record your

Page 31

[1] own facial gesture right now, which looks like one
[2] of sarcasm and disdain.

[3] **Q:** I will inform you for the record, and I
[4] will suggest that if you want to look at it at a
[5] break, that Judge Collings set out in great detail
[6] the obligations of a 30(b)(6) witness in the case
[7] of — and I can't pronounce it right —
[8] C-a-l-z-a-t-u-r-f-i-c-i-o, 201 Mass. FRD 33. Those
[9] are the obligations, and you can review them with
[10] your counsel.

[11] But what I'm suggesting to you, sir, is
[12] there are obligations, and if they're not complied
[13] with, then we will have to deal with it in a
[14] different way.

[15] * I am asking if you have any memory at all of
[16] the documents that you reviewed that have not been
[17] produced, because of a privilege or any other
[18] reason, in connection with this deposition. **

[19] **THE WITNESS:** Could you repeat the
[20] question.

[21] (Record read from * to **)

[22] **A:** Just one sticks out at the present time. I
[23] also reviewed the privilege log.

[24] **Q:** What is the one that sticks out? Who were

Page 32

[1] the authors and recipients of that?

[2] **A:** It's subject to the attorney-client
[3] privilege. It was written to me.

[4] **Q:** I understand that, but you're obligated to
[5] disclose date, authors and subject matter, without
[6] violating the attorney-client privilege that you
[7] claim.

[8] **A:** It was a note from Jim Wood to me.

[9] **Q:** Were there any other recipients or copies?

[10] **A:** No, not that I can recall.

[11] **Q:** So you're not sure?

[12] **A:** I'm not totally sure.

[13] **Q:** Were any of the documents that Mr. Hevrony
[14] produced to you, whether in connection with a
[15] response to the document request or your review for
[16] this deposition, that you reviewed — have any of
[17] those not been produced, to your knowledge?

[18] **MR. COMEN:** I'm sorry, would you repeat the
[19] question.

[20] (Question read)

[21] **A:** To my knowledge, I don't believe anything
[22] has been held back from production.

[23] **Q:** Whether it is the request for production of
[24] documents or this deposition, who else did you ask

Page 33

[1] to review and produce documents responsive either to
[2] your investigation or the document request, besides
[3] Mr. Hevrony, Mr. Wood, Mr. Brandano?
[4]   **A:** I believe I asked Dale Miller.
[5]   **Q:** Who is Mr. Miller?
[6]   **A:** He's also involved with the Hudson
[7] investment group.
[8]   **Q:** Do you know what his position — is he an
[9] employee of Hudson investment group, to your
[10] knowledge?
[11]   **A:** I don't know.
[12]   **Q:** Do you know if he's a shareholder of
[13] Babcock Power Inc.?
[14]   **A:** He's not a shareholder.
[15]   **Q:** Has he ever held any position as an
[16] employee of Babcock Power Inc.?
[17]   **A:** Not to my knowledge.
[18]  * Q. Has he ever been an officer of Babcock
[19] Power Inc.?
[20]   **A:** Not since November 29th, 2002, to my
[21] knowledge.
[22]   **Q:** Was he an officer in some capacity prior to
[23] November 29th, 2002? **
[24]   **MR. COMEN:** Excuse me. I object.

Page 34

[1]   **Q:** You can answer my question, please.
[2]   **MR. COMEN:** Would you repeat the question.
[3]    (Record read from * to **)
[4]   **A:** I'm not familiar with the records prior to
[5] that.
[6]   **Q:** Well, your answer suggested that you
[7] thought he might have held an office or position.
[8] Maybe I'm misreading your answer.
[9]   **A:** I became involved in that company November
[10] 29th, 2002, so I'm familiar with the records from
[11] then.
[12]   **Q:** Do you have any knowledge of him being an
[13] employee of Babcock or Babcock Borsig Capital
[14] Corporation, Mr. Miller?
[15]   **A:** No.
[16]   **Q:** And do you have any knowledge that he was
[17] any kind — that he held any office or other
[18] position with Babcock Borsig Capital Corporation?
[19]   **A:** No.
[20]   **Q:** To your knowledge, did Mr. Miller ever hold
[21] a director position with Babcock Power Inc.? Has he
[22] ever been a director?
[23]   **A:** Yes.
[24]   **Q:** He was a director?

Page 35

[1]   **A:** Yes.
[2]   **Q:** When was Mr. Miller a director?
[3]   **A:** I don't know exactly when he began to be a
[4] director, but —
[5]   **MR. COMEN:** You've answered the question.
[6]   **Q:** Is he a director now?
[7]   **A:** Yes.
[8]   **Q:** Was he a director in November 2002,
[9] November 29, 2002?
[10]   **A:** I don't recall.
[11]   **Q:** You don't recall he was a director at the
[12] time of the transaction?
[13]   **MR. COMEN:** I object.
[14]   **Q:** Let me do it this way: Who were the
[15] initial directors of Babcock Power Inc.?
[16]   **A:** I don't know what you mean by "initial."
[17]   **Q:** Well, when the corporation was formed, as
[18] of November 29th, 2002, who were the directors?
[19]   **A:** I can only recall in December 2002.
[20]   **MR. COMEN:** You answered the question.
[21]   **Q:** December —
[22]   **MR. BELLO:** We'll go as slow as Mr. Comen
[23] wants it to go.
[24]   **Q:** In December 2002, who were the directors?

Page 36

[1]   **A:** James Wood, Anthony Brandano, Nathan
[2] Hevrony, Dale Miller, Guy Roberts.
[3]   **Q:** And has Mr. Miller been a director on a
[4] continual basis since December 2002 to the present?
[5]   **A:** Yes.
[6]   **Q:** Did Mr. Miller produce documents for your
[7] review?
[8]   **A:** I don't believe he did.
[9]   **Q:** Anybody other than the individuals you
[10] identified that, again, whether in connection with
[11] your investigation for this deposition or in
[12] response to the document request, that you asked for
[13] documents? I can review the names again, if that
[14] would be helpful to you.
[15]   **THE WITNESS:** Could you repeat the
[16] question.
[17]    (Question read)
[18]   **A:** I believe I spoke to a representative from
[19] Gadsby & Hannah.
[20]   **Q:** No, I don't believe you did, so why
[21] don't — who would that be?
[22]   **A:** Jeff Stoler.
[23]   **Q:** Did Mr. Stoler produce documents to you?
[24]   **A:** He gave some to our attorneys.

Page 37

[1] Q: Do you know what types of documents he gave
[2] to your attorneys?
[3] A: No.
[4] Q: Have you ever seen those documents, either
[5] in connection with the document production or this
[6] deposition?
[7] A: I've seen them in a box.
[8] Q: Have you looked at any of the documents?
[9] A: No.
[10] Q: None of them?
[11] A: No.
[12] Q: Do you know whether those documents have
[13] been produced in connection with this case in
[14] response to the request for production of documents?
[15] A: I don't know.
[16] MR. BELLO: Off the record.
[17] (Discussion off the record)
[18] MR. BELLO: On the record. I've asked off
[19] the record whether or not those documents have been
[20] produced. I got a generic answer, they've complied
[21] with the request.
[22] I can state for the record that we do not
[23] have a box of documents from Gadsby & Hannah. We
[24] have a couple documents, which would suggest to me

Page 38

[1] that they have not been produced.
[2] I know of no basis by which they could be
[3] withheld; there is no privilege that I am aware of.
[4] And therefore, I would note for the record that it
[5] appears to us, absent a contrary representation by
[6] Mr. Comen, that those documents have not been
[7] produce, and we would ask that they be produced
[8] promptly.
[9] MR. COMEN: My turn?
[10] MR. BELLO: Sure.
[11] MR. COMEN: I said that instead of having
[12] discussions off the record, we should have the
[13] discussions on the record.
[14] Mr. Brantl gave whatever documents he
[15] received to me and my colleagues. We produced
[16] whatever documents, along with the other documents
[17] we produced, whatever documents were responsive to
[18] the request for production and complied with the
[19] rules.
[20] MR. BELLO: Mr. Comen, both in writing and
[21] here, keeps saying he complied with the rules. We
[22] have asked on several occasions to understand what
[23] documents have not been produced, to which we've
[24] gotten no response other than he's complied with the

Page 39

[1] rules.
[2] If necessary, we will address this with the
[3] Discovery Master. We do not have any understanding
[4] as to whether the production is complete. To the
[5] extent that there were Gadsby & Hannah documents,
[6] those should have been — they're no doubt within
[7] the request, in our document request, and they
[8] should have been produced in toto, and it's clear to
[9] us that they have not.
[10] MR. COMEN: Well, if we're going to make
[11] speeches for the record, maybe what we can do — we
[12] should have a meeting with the Discovery Master, and
[13] we can go over what documents have been produced by
[14] Mr. Bello and his client and go over what documents
[15] have been produced by us, and we can sort through
[16] who is doing what and who has been responsive in a
[17] timely fashion. We can do that at an appropriate
[18] time.
[19] MR. BELLO: Well —
[20] MR. COMEN: How much more of a discussion
[21] do you want to have about that today?
[22] MR. BELLO: Well, the problem is our
[23] deposition really can't be complete, even remotely,
[24] because we don't think we have the documents.

Page 40

[1] MR. COMEN: Was there ever a possibility,
[2] even remotely, that this deposition would be
[3] complete today anyway?
[4] MR. BELLO: It could have been.
[5] BY MR. BELLO:
[6] Q: Sir, did you talk with — did you have a
[7] conversation with Mr. Stoler regarding the
[8] production of the documents? Did you personally
[9] speak with him?
[10] A: Yes.
[11] Q: When did you have — was it one
[12] conversation?
[13] A: I think it was two conversations.
[14] Q: When did those occur? Your best memory. I
[15] don't need an exact date.
[16] A: Several months ago.
[17] Q: Both were several months ago?
[18] A: Yes.
[19] Q: After the receipt of the request for
[20] production of documents?
[21] A: Yes.
[22] Q: Do you know if it was after receipt of the
[23] first time we noticed the Rule 30(b)(6) deposition?
[24] A: I don't recall exactly what it was.

**Babcock Borsig Power GmbH   v.**
**Babcock Power Inc.   v.   Babcock Borsig AG**

Page 41

[1] **Q:** Do you keep notes of conversations as a
[2] regular and ordinary course of how you conduct
[3] business?
[4] **A:** No.
[5] **Q:** Do you know if you kept any notes of your
[6] conversation in any form, whether it's on a computer
[7] or handwritten, of your conversation with Mr.
[8] Stoler?
[9] **A:** No.
[10] **Q:** You did not? Is that your answer? I just
[11] want to be sure.
[12] **A:** Right, I did not.
[13] **Q:** Can you separate the two conversations, the
[14] first and the second, in terms of the substance of
[15] them?
[16] **A:** No.
[17] **Q:** Give me your best memory of what you said
[18] to him and what he said to you in those
[19] conversations.
[20] **A:** I asked him for the documents, and he said
[21] he would collect them, and I followed up with him.
[22] **Q:** What documents did you ask him to collect?
[23] **A:** I sent him over one of the production of
[24] documents requests.

Page 42

[1] **Q:** Did you ever send him the Rule 30(b)(6)
[2] topic designation?
[3] **A:** I don't recall.
[4] **Q:** Now you said a box, you saw a box. A box
[5] similar to what's on here, which is a banker's box?
[6] **A:** I never looked at the documents
[7] individually.
[8] **Q:** I'm just asking the size. Were the
[9] documents contained in a box similar to the box
[10] that's sitting here, which is a banker's box?
[11] **A:** No.
[12] **Q:** What kind of box was it?
[13] **A:** They were in a box in an office, and —
[14] **Q:** I'm just asking what kind of box.
[15] **A:** It was a banker's box, but the banker's box
[16] did not contain all of their documents.
[17] **Q:** As I understand, the box contained other
[18] documents, in addition to the Gadsby documents?
[19] **A:** Yes.
[20] **Q:** How do you know that if you didn't look in
[21] the box, you didn't look at the documents?
[22] **A:** Well, that's what I was told.
[23] **Q:** Who told you that?
[24] **A:** One of our attorneys.

Page 43

[1] **MR. COMEN:** I'm not waiving the privilege.
[2] Please don't get into discussions —
[3] **MR. BELLO:** I don't think there is any
[4] legal advice given about what's in a box or not.
[5] **MR. COMEN:** I'm just telling him not to get
[6] into discussions —
[7] **MR. BELLO:** I'm not asking you to waive any
[8] privileges, sir, that legitimately exist.
[9] **Q:** Do you know what — can you approximate,
[10] was it a hundred documents — and I know you don't
[11] have an exact number — several hundred that Gadsby
[12] produced? You can do it any which way. A half a
[13] box, a quarter of a box? I'm just trying to get
[14] some sense of the volume.
[15] **A:** I don't know.
[16] **Q:** No idea?
[17] **A:** No, I don't.
[18] **Q:** Now, did you have any conversations — did
[19] *you speak to Mr. Hevrony in connection with your*
[20] request that he produce documents that he has?
[21] **THE WITNESS:** Could you repeat the
[22] question.
[23] (Question read)
[24] **A:** There are two parts to that question. I'm

Page 44

[1] not sure —
[2] **Q:** You've testified that you asked Mr. Hevrony
[3] for documents. You testified first that it was in
[4] connection with the deposition, and you testified
[5] later that it was in connection with the responses
[6] to the request for production of documents. Now I'm
[7] simply asking you, did you have a conversation with
[8] Mr. Hevrony about producing those documents?
[9] **A:** Yes, I've had several conversations with
[10] Mr. Hevrony.
[11] **Q:** Let me put that on hold for a moment. In
[12] preparing for this deposition, from September to the
[13] present, did you review the documents that Mr.
[14] Hevrony produced to you?
[15] **A:** Yes.
[16] **Q:** If you don't know the exact number — when
[17] did you last speak to Mr. Hevrony, the last
[18] conversation you had?
[19] **A:** It was during Thanksgiving week, November.
[20] **Q:** Was there anyone else on the phone besides
[21] you and Mr. Hevrony?
[22] **A:** I spoke to him personally.
[23] **Q:** Was there anybody else besides you and Mr.
[24] Hevrony on the line?

Page 45

[1]   A: I didn't speak to him by telephone.
[2]   Q: How did you speak to him?
[3]   A: I spoke to him, I believe, in an office.
[4]   Q: Was there anyone else physically present in
[5] the office besides you and Mr. Hevrony?
[6]   A: I don't recall.
[7]   Q: Where was the office? Whose office?
[8]   A: In the Danvers office.
[9]   Q: So Mr. Hevrony was physically present in
[10] Massachusetts, obviously?
[11]   A: Yes.
[12]   Q: Do you know how long he was in
[13] Massachusetts during that week?
[14]   A: For a few hours. He stayed overnight.
[15]   Q: Prior to — let me see if I can start with
[16] the general. Between the time of the initial
[17] noticing of the deposition and the present day, can
[18] you tell me, if not an exact number, your best
[19] memory of how many times you have talked to Mr.
[20] Hevrony, whether in person or by phone.
[21]   THE WITNESS: Can you repeat the question.
[22]   (Question read)
[23]   A: I believe it's just twice.
[24]   Q: Twice including Thanksgiving or twice in

Page 46

[1] addition to?
[2]   A: Including Thanksgiving.
[3]   Q: When was the earlier conversation?
[4]   A: In September.
[5]   Q: And in that context, did you make inquiry
[6] of Mr. Hevrony regarding any of the subject matters
[7] that are part of the Rule 30(b)(6) notice?
[8]   A: I asked him about the production of
[9] documents, and we discussed the case in general.
[10] Those conversations are subject to attorney-client
[11] privilege, though.
[12]   Q: Sir, if you would look at what is marked as
[13] Exhibit 1 and look at the list of subjects for the
[14] Rule 30(b)(6) deposition, the third page.
[15]   A: (Reviewing document)
[16]   Q: Did you discuss with Mr. Hevrony the
[17] subject matter identified in Item No. 1, "The
[18] negotiations and any other communications that led
[19] to the execution of the Stock Purchase Agreement and
[20] the Non-Competition Agreement"?
[21]   A: That was one of the items that we
[22] discussed, yes.
[23]   Q: Did you discuss with him Item No. 2, "The
[24] negotiations and any other communications that led

Page 47

[1] to the execution of the $5 million promissory note"?
[2]   A: Yes, 1 and 2 are related.
[3]   Q: Did you discuss with him Item No. 3, "The
[4] negotiations and other communications between BBP or
[5] BBX and BPI concerning the scope of the restrictive
[6] covenants in the Non-Competition Agreement"?
[7]   A: Yes.
[8]   Q: Did you discuss with him Item No. 4, "BPI's
[9] communications with Babcock Hitachi K.K. or Hitachi
[10] Ltd. concerning Hitachi's purchase of BBX's
[11] subsidiary Power Systems in December 2002"?
[12]   A: Yes.
[13]   Q: Did you discuss with Mr. Hevrony the Item
[14] No. 5, "Negotiations between BPI and Hitachi and
[15] monies pledged or paid by Hitachi or others in order
[16] to obtain a release from BPI of claims relating to
[17] the Non-Competition Agreement and Hitachi's purchase
[18] of Power Systems"?
[19]   A: Yes.
[20]   Q: Did you discuss with him Item No. 7,
[21] "Communications between BPI and Mitsui Babcock
[22] concerning the latter's purchase of BBX's subsidiary
[23] Power Service"?
[24]   A: That's not No. 7, that's No. 6.

Page 48

[1]   Q: I'm sorry. I stand corrected. No. 6. I
[2] don't count very well.
[3]   A: I don't believe we discussed that.
[4]   Q: Did you discuss —
[5]   A: In the sense —
[6]   Q: Sorry.
[7]   A: We didn't discuss it because —
[8]   MR. COMEN: Your answer is you didn't
[9] discuss it.
[10]   Q: Is that your answer? Have you completed
[11] your answer?
[12]   A: Yes. We didn't discuss 6.
[13]   Q: Did you discuss with him No. 7, that is,
[14] Mr. Hevrony, in one or the other conversations that
[15] you've identified, "The allegation by BPI in its
[16] counterclaim that BBP has breached the
[17] Non-Competition Agreement"?
[18]   A: Yes.
[19]   Q: And I appreciate that you're not designated
[20] the Rule 30(b)(6) respondent for Item No. 8, but my
[21] question still remains, did you discuss with him the
[22] subject matter of No. 8, "The allegation by BPI in
[23] Paragraph 6 that 'the German entities have failed to
[24] pay Babcock Power over $1.7 million in post-closing

Page 49

[1] adjustments arising from workers' compensation
[2] payments paid by American entities on behalf of the
[3] German entities under the agreement to purchase the
[4] American assets'"?
[5]     A: I don't remember.
[6]     Q: You don't recall one way or the other?
[7]     A: Yes.
[8]     Q: In connection with the items that you do
[9] remember, which was 1 through 6, did you review with
[10] Mr. Hevrony any of the documents that he had
[11] produced to you per your request to him, either in
[12] September or Thanksgiving?
[13]     THE WITNESS: Could you repeat the
[14] question.
[15]     (Question read)
[16]     A: I don't recall. I may have reviewed a few
[17] of the items with him.
[18]     Q: And these discussions were at least in part
[19] part of your investigation to be the corporate
[20] witness; is that correct?
[21]     A: We have general discussions all the time,
[22] and — we had those two discussions, but we — in
[23] relation to the case, I don't start the conversation
[24] by saying, "These are the four reasons I'm having

Page 50

[1] the discussion with you." So it's just not how
[2] conversations work.
[3]     Q: I understand that. Whether you articulated
[4] it or not, was it part of the investigation that you
[5] did to prepare for this deposition?
[6]     A: It wasn't specifically at that time.
[7]     Q: Whether at that time or not, was it part —
[8] sitting here today, was that part —
[9]     MR. COMEN: I object. You've asked the
[10] question several times. He's answered it as best he
[11] can.
[12]     Q: I'm going to try it again, sir.
[13]     MR. COMEN: If he doesn't understand it any
[14] better, how many times can he answer it?
[15]     MR. BELLO: How many times do you want to
[16] do a talking objection, Steve, to try to coach the
[17] witness?
[18]     MR. COMEN: I am not trying to coach the
[19] witness.
[20]     MR. BELLO: Yes, you are.
[21]     MR. COMEN: It's been going an hour and a
[22] half, and you're still in background questions.
[23]     MR. BELLO: No, we're not in background
[24] questions. We're in his obligation as a 30(b)(6)

Page 51

[1] witness. Let me try —
[2]     MR. COMEN: Can you try —
[3]     MR. BELLO: Tell me when you're done.
[4]     MR. COMEN: I'm done.
[5]         BY MR. BELLO:
[6]     Q: Is it fair to say, sir, that those
[7] discussions, not designated in a category, but were
[8] part of your investigation to prepare for this
[9] deposition as the corporate designated witnesses on
[10] those topics?
[11]     A: That discussion was part of my preparation,
[12] yes.
[13]     Q: Did you have discussions with Mr. Wood as
[14] part of your preparation to respond to the topics
[15] identified in the Rule 30(b)(6) notice?
[16]     A: Yes, I've had many discussions with Mr.
[17] Wood.
[18]     Q: And I can do it one by one, or I can do it
[19] all eight. Did you have discussions with Mr. Wood
[20] as to each of the topics identified in the Rule
[21] 30(b)(6) notice as part of your investigation to be
[22] designated the corporate witness?
[23]     A: Yes.
[24]     Q: The same question with respect to Mr.

Page 52

[1] Brandano. I can spell the question out for clarity,
[2] if you like, but the question is, did you have
[3] conversations with Mr. Brandano as to each of the
[4] items that you have been designated as the corporate
[5] witness?
[6]     MR. COMEN: Did you finish?
[7]     MR. BELLO: Yes, I think so.
[8]     MR. COMEN: You left out "as part of your
[9] investigation."
[10]     MR. BELLO: Thank you.
[11]     MR. COMEN: Do you want to have him
[12] distinguish between which were part of his
[13] investigation and which weren't, or do you want him
[14] to just say whether he had conversations with Mr.
[15] Brandano? What is the question that you're asking
[16] him?
[17]     MR. BELLO: I started out, it was the same
[18] question.
[19]     Q: Do you understand my question?
[20]     A: No.
[21]     Q: As part of your investigation for being the
[22] corporate witness for the seven items that you've
[23] identified, did you have conversations with Mr.
[24] Brandano as to each of those items?

Page 53

[1]    **MR. COMEN:** I'll object to the question.
[2] If he understands it, he can answer it.
[3]    **A:** I'm confused.
[4]    **Q:** I'll ask you the exact same question that I
[5] asked you earlier that you were able to answer with
[6] respect to Mr. Wood. Did you have discussions with
[7] Mr. Brandano as to each of the topics identified in
[8] the Rule 30(b)(6) notice as part of your
[9] investigation to be designated the corporate
[10] witness?
[11]    **MR. COMEN:** I object to that question too.
[12]    **MR. BELLO:** He answered it before.
[13] Presumably he can answer it now.
[14]    **MR. COMEN:** I know. Whether it was clear
[15] then or not, I'll object.
[16]    **A:** I've had general discussions with Mr.
[17] Brandano about all these topics over the course —
[18]    **Q:** And would that include as part of your
[19] investigation to be prepared for this deposition
[20] today?
[21]    **MR. COMEN:** I object. Let me just state
[22] for the record, Mr. Bello has not asked this witness
[23] what his position is with the company, I don't
[24] believe. This witness is the general counsel of the

Page 54

[1] Defendant, Babcock Power Inc.
[2]    As such, it appears that he's being asked
[3] to distinguish between the conversations he's had in
[4] the normal course of his duties as general counsel
[5] with all of these people in connection with this
[6] litigation and otherwise about these subjects. And
[7] I don't know how anyone could distinguish
[8] conversations as Mr. Bello keeps persisting and
[9] asking him to distinguish.
[10]    **Q:** Can you answer my question now that we've
[11] had the speech? Let me try it this way: Is it fair
[12] to say that, as part of your preparation being
[13] designated as the Rule 30(b)(6) witness, that you
[14] had conversations with Mr. Brandano as to each of
[15] the topics contained in the Rule 30(b)(6) notice?
[16]    **MR. COMEN:** I object again.
[17]    **Q:** Is that fair to say?
[18]    **A:** I'm totally confused by the question.
[19]    **Q:** You understood my question before with
[20] Mr. — when is the last time you talked to Mr.
[21] Brandano about any of the topics? We'll take
[22] whatever time we need, Mr. Brantl. When was the
[23] last time you talked with Mr. Brandano about any of
[24] the topics identified in the Rule 30(b)(6) notice?

Page 55

[1]    **A:** Yesterday.
[2]    **Q:** And how about before that?
[3]    **A:** I speak to Mr. Brandano sometimes several
[4] times a day.
[5]    **Q:** I'm asking specifically with respect to
[6] these topics.
[7]    **A:** I've had many conversations with him over
[8] the past several years about this subject.
[9]    **Q:** Well, let's break it down. Since September
[10] of 2005 to the present, have you had many
[11] conversations with Mr. Brandano regarding the
[12] subject matters contained in the deposition notice?
[13]    **A:** Yes.
[14]    **Q:** Five, ten, fifteen, twenty? Can you
[15] estimate?
[16]    **A:** Maybe a dozen.
[17]    **Q:** Did you take notes in any of those
[18] conversations?
[19]    **A:** No.
[20]    **Q:** No notes at all?
[21]    **A:** No.
[22]    **Q:** No recording, no computer, no written
[23] record?
[24]    **A:** No.

Page 56

[1]    **Q:** Do you maintain a day-to-day notebook?
[2]    **A:** No.
[3]    **Q:** How do you record things that you put in
[4] writing on a day-to-day basis, if you record at all?
[5] Do you record any of your day-to-day activities in a
[6] written form?
[7]    **A:** No.
[8]    **Q:** In your conversation with Mr. Brandano
[9] yesterday, did you review each of the seven items
[10] that you have been designated the Rule 30(b)(6)
[11] witness?
[12]    **A:** Yes, we looked at this.
[13]    **Q:** Did you review any documents with Mr.
[14] Brandano relating to any of these topics?
[15]    **A:** Yes.
[16]    **Q:** Do you know if those documents included any
[17] documents that have not been produced in this
[18] litigation?
[19]    **A:** The only one I recall is that one I
[20] mentioned before.
[21]    **Q:** Is it fair to say there may be others, but
[22] you do not know, sitting here today, whether they
[23] all were or were not produced?
[24]    **A:** Yes. I'm not sure I understood that

Page 57

[1] question.
[2] **Q:** I'm just simply asking you whether you know
[3] there were documents that you reviewed with Mr.
[4] Brandano yesterday that have not been produced
[5] pursuant to the request for production of documents.
[6] And you said you think you know of one, from what I
[7] understood you just told me, and I'm simply saying,
[8] there may be others, but you do not know sitting
[9] here today?
[10] **A:** Yes. There's a big privilege log, and
[11] there were many memos on that privilege log.
[12] **Q:** Do you know, sitting here today, whether
[13] you reviewed some of those documents on the
[14] privilege log with Mr. Brandano?
[15] **MR. COMEN:** Yesterday?
[16] **Q:** Yesterday.
[17] **A:** I don't recall.
[18] **MR. COMEN:** Excuse me. Before you ask
[19] another question, all I need to do is run to the
[20] men's room for one minute just in the next ten
[21] minutes, the next five minutes.
[22] **MR. BELLO:** I will do that.
[23] **Q:** Who else was present at your meeting
[24] yesterday, if anyone?

Page 58

[1] **A:** Mr. Comen and an associate from Goodwin
[2] Procter.
[3] **Q:** Do you remember the name of the associate?
[4] **A:** Yes.
[5] **Q:** Who?
[6] **A:** Peter Simons.
[7] **Q:** How long did you meet for?
[8] **A:** From about 8:30 until about 5:30. We
[9] covered other things also.
[10] **Q:** Did you meet with Mr. Woods to review any
[11] of the topics identified in the Rule 30(b)(6)?
[12] **MR. COMEN:** It's Wood.
[13] **Q:** Wood, sorry. Powerjim.
[14] **A:** I have spoken to Mr. Wood several times.
[15] **Q:** When was the last time you spoke to Mr.
[16] Wood with respect to any of the subject matters in
[17] the Rule 30(b)(6) notice?
[18] **A:** In November.
[19] **Q:** Was it a meeting?
[20] **A:** I've had several separate conversations
[21] with him, several separate conversations.
[22] **Q:** I'm just asking you when you identified in
[23] November. Was that a meeting, a face-to-face
[24] meeting?

Page 59

[1] **A:** Yes.
[2] **Q:** Was anyone else present?
[3] **A:** The discussion — there was a discussion I
[4] had with Mr. Wood separately, and then I believe
[5] there was — also it came up at a meeting in
[6] November.
[7] **Q:** Who was present at the meeting?
[8] **A:** Mr. Brandano and Mr. Wood, Mr. Miller and
[9] Mr. Hevrony.
[10] **Q:** Where was that meeting?
[11] **A:** In Danvers.
[12] **Q:** Is that the same meeting during
[13] Thanksgiving that you were referencing earlier?
[14] **A:** Yes.
[15] **Q:** Was there anyone besides Mr. Miller, Mr.
[16] Brandano, you and Mr. Wood present for that meeting,
[17] whether in person or by phone?
[18] **A:** Yes, there was one other person.
[19] **Q:** Who?
[20] **A:** Mr. Mason, Earl Mason.
[21] **Q:** Who is Mr. Mason?
[22] **A:** He's vice-president of finance.
[23] **Q:** For BPI?
[24] **A:** Yes.

Page 60

[1] **Q:** Anyone else present at the meeting?
[2] **A:** No.
[3] **Q:** How long was that meeting, rough, your best
[4] memory?
[5] **A:** Four hours, maybe.
[6] **MR. COMEN:** Do me a favor, if you're
[7] concerned that I'm going to talk to him, just hold
[8] your thought for a moment. I'll be back in one
[9] minute. I'm just going to the men's room. Don't
[10] talk.
[11] (Recess)
[12] **BY MR. BELLO:**
[13] **Q:** I take it, as part of your — let me do it
[14] a different way. Mr. Brantl, I understand that you
[15] wear the hat of general counsel, and on a — you may
[16] have not distinguished precisely when you were
[17] gathering information for documents for this
[18] deposition or otherwise, but what I do need to
[19] understand is what specific activities you undertook
[20] as — in preparing to be the corporate witness. The
[21] fact that you're a general counsel is what it is,
[22] but you are the corporate witness.
[23] * What you've told us is that you've reviewed
[24] documents gathered by various individuals. What

Page 61

[1] else did you specifically do from September to the
[2] present to gather information so you could testify
[3] as a corporate witness on these seven topics? **
[4]     MR. COMEN: I object.
[5]     THE WITNESS: Could you repeat the
[6] question.
[7]     (Record read from * to **)
[8]     A: I've been staying up to date with the case
[9] and the various motions and items being filed and
[10] giving input to them and met all day yesterday about
[11] this.
[12]     Q: Is it your testimony that your sole
[13] preparation for the seven topics, your sole
[14] investigation, was your meeting yesterday?
[15]     MR. COMEN: I object.
[16]     A: No.
[17]     Q: Well, then — the motions have nothing to
[18] do with these topics, sir. * What I'm asking you to
[19] do is to go one by one what you did so that you
[20] could be the corporate witness, so you were prepared
[21] to testify as to each of these seven items. **
[22]     A: I have been involved in these seven items
[23] since October of 2002.
[24] *** Q. I'm only asking since September of 2005,

Page 63

[1]     MR. BELLO: No.
[2]     MR. COMEN: Okay.
[3]     THE WITNESS: Could you repeat question
[4] again.
[5]     (Record read from * to ** and from ***
[6] to ****)
[7]     A: I've had several discussions in meetings
[8] since September 2005 about this case as the general
[9] counsel. I'm generally familiar with all the
[10] documents in the closing. I'm generally familiar
[11] with the correspondence and several meetings. And
[12] I've had discussions with our attorneys, and I had
[13] an all-day meeting yesterday.
[14]     Q: Is it fair to say that in part all of those
[15] activities that you've just described were part of
[16] your investigation to be able to testify as to these
[17] seven items?
[18]     A: It's not only for that topic, but as
[19] general counsel, it's my responsibilities.
[20]     Q: Is it also in part preparation for you to
[21] be the corporate witness?
[22]     A: Yes.
[23]     MR. BELLO: We might as well do this as a
[24] general, if we can, and I will preface it on the

Page 62

[1] sir, to the present. ****
[2]     MR. COMEN: You've answered the question.
[3]     MR. BELLO: No, he has not answered the
[4] question.
[5]     MR. COMEN: Well, you know — explain to
[6] him what more you want him to say.
[7]     MR. BELLO: What I need to understand is
[8] what he did to investigate to be the corporate
[9] witness. That's what I need to understand.
[10]     Q: Now, if your testimony is — and that's
[11] fine, I can leave it at that — that everything
[12] you've been doing in connection with these topics
[13] since then in part is part of your preparation to be
[14] the corporate witness, then I'll accept that, and
[15] you don't have to distinguish that two minutes was
[16] for one thing and three minutes was for the other.
[17] I'll accept that.
[18]     THE WITNESS: Can you repeat the question.
[19]     (Last question read and record read
[20] from * to ** and from *** to ****)
[21]     MR. COMEN: Given the pause, I'll object to
[22] the question, because it obviously isn't clear to
[23] the witness. If he can't distinguish, then let him
[24] say he can't distinguish. Can't we move on?

Page 64

[1] record. I'm going to ask the witness to describe
[2] each and every one of those conversations. I do not
[3] believe that there can be a privilege for those
[4] conversations where he's been designated the
[5] corporate witness.
[6]     You are obligated — this is my view of
[7] this, so I'm just trying to be clear on the
[8] record — as the corporate witness to prepare on
[9] each of these topics and then to come forward. In
[10] that role, it is our belief, and we believe
[11] supported by what we've looked at, that the
[12] privilege simply does not apply.
[13]     So if you're going to instruct him not to
[14] answer, I will ask some questions that make it clear
[15] the subject matter, so when we bring this before the
[16] Discovery Master, if we have to, it will be clear
[17] what is being refused to answer.
[18]     MR. COMEN: Please do that, because my
[19] instructions will be for him not to answer anything
[20] that may implicate either the privileged
[21] conversations he had with us or the privileged
[22] conversations he had with people within his company.
[23]             BY MR. BELLO:
[24]     Q: Let's start out, the conversation that you

**Page 65**

[1] had with Mr. Brandano yesterday, I would ask you to
[2] describe in as much detail as you can recall what
[3] was said in that conversation by the individuals
[4] participating.
[5]     MR. COMEN: I'll instruct him not to
[6] answer.
[7]     MR. BELLO: On the basis of attorney-client
[8] privilege?
[9]     MR. COMEN: Yes.
[10]     MR. BELLO: Any other basis that he's being
[11] instructed not to answer, so I can understand that?
[12]     MR. COMEN: No.
[13]     Q: Now, when did you most recently have a
[14] conversation, between September 2005 and the
[15] present, with Mr. Brandano regarding any of these
[16] topics in the Rule 30(b)(6) deposition — that was
[17] part of the subject matter — when Mr. Comen was not
[18] present, nor anyone from his office?
[19]     MR. COMEN: Could you repeat the question.
[20]     (Question read)
[21]     THE WITNESS: Could you repeat that,
[22] please.
[23]     Q: Let me rephrase it. Between September 2005
[24] and the present — we're working backwards, the most

**Page 66**

[1] recent — when did you last have a conversation with
[2] Mr. Brandano regarding any of the topics that are
[3] the subject of Items 1 through 7 of the Rule
[4] 30(b)(6) notice where Mr. Comen nor anyone else from
[5] his office was present, either by phone or in
[6] person?
[7]     THE WITNESS: Could you repeat that
[8] question.
[9]     MR. COMEN: I think you may have left out a
[10] "not."
[11]     (Question read)
[12]     Q: And to clarify what Mr. Comen said, the
[13] intent of the question was that neither Mr. Comen
[14] nor anyone else from his office was present.
[15]     A: I believe I had a conversation with Mr.
[16] Brandano in November concerning the note, the
[17] $5 million note.
[18]     Q: Tell me everything you recall Mr. Brandano
[19] saying to you and you saying to him in that
[20] conversation.
[21]     MR. COMEN: I object and instruct him not
[22] to answer.
[23]     MR. BELLO: On the basis of attorney-client
[24] privilege?

**Page 67**

[1]     MR. COMEN: Yes.
[2]     Q: And did you have — between September 2005
[3] and November 2005, did you have conversations with
[4] Mr. Brandano outside the presence of outside counsel
[5] regarding any of the other topics contained in the
[6] Rule 30(b)(6) notice?
[7]     A: Yes.
[8]     Q: All of them?
[9]     A: Not all of them, but several of them.
[10]     Q: Which ones, please?
[11]     A: (Reviewing document) I guess Item 4, Item
[12] 5, Item 7, and during the meeting in September the
[13] first three items were discussed.
[14]     Q: Is it your testimony that Item 8 was never
[15] discussed? I appreciate that you were not
[16] designated on Item No. 8.
[17]     A: Yes, Item 8 was also discussed.
[18]     MR. BELLO: Excluding No. 8, do I
[19] understand, Mr. Comen, that if I ask the witness to
[20] testify as to all conversations between him and Mr.
[21] Brandano as to any of these topics outside the
[22] presence of outside counsel, he will be instructed
[23] not to answer on the basis of attorney-client
[24] privilege?

**Page 68**

[1]     MR. COMEN: Yes, but let me be clear. My
[2] assumption is that those conversations all are in
[3] the context of his giving legal advice, in the
[4] context of his being the general counsel.
[5]     If there were an occasional conversation
[6] that said, "Do you recall how much the note was?",
[7] or "Do you recall what someone's name was?", or
[8] something incidental like that, obviously that isn't
[9] legal advice. But everything else, I'm assuming —
[10]     MR. BELLO: So he is instructed not to
[11] answer; is that correct?
[12]     MR. COMEN: Yes.
[13]     MR. BELLO: Let me be clear for the record
[14] so — again, because I expect this issue will have
[15] to be presented. It is our position that the
[16] obligation of Babcock Power Inc. to designate a
[17] corporate witness to testify as to all matters
[18] including the investigation, regarding that, cannot
[19] be shielded by designating the general counsel as
[20] the corporate witness and then reflecting that all
[21] communications with respect to that designation and
[22] the individual's testimony with respect to that
[23] therefore are privileged.
[24]     I put that on the record just for your

Page 69

[1] consideration, because it will be presented. We
[2] think that, in our view, that's an inappropriate and
[3] improper use of privilege, and either there is no
[4] privilege or the privilege is waived by doing that.
[5]     MR. COMEN: Under the circumstances of this
[6] case and this company, we believe that we are acting
[7] appropriately, and we're prepared to deal with that
[8] whenever it is appropriate to deal with and with
[9] whomever.
[10]    MR. BELLO: Well, just so it's clear, we
[11] will be preparing and at least it's our intent to
[12] present this as a motion to compel, and if there is
[13] another way you would like us to consider presenting
[14] it, we'll consider that.
[15]              BY MR. BELLO:
[16]    Q: Now, you testified regarding a meeting in
[17] November with Mr. Miller, Mr. Hevrony, Mr. Wood, I
[18] think you said Mr. Mason and Mr. Brandano. Do you
[19] recall you identified that meeting?
[20]    A: Yes.
[21]    Q: How long was that meeting? You said it
[22] was — I may have missed — did you say about four
[23] hours? Was that a different meeting?
[24]    A: Could you repeat the question.

Page 70

[1]    Q: Just, how long was that meeting?
[2]    A: There was a meeting in November that lasted
[3] about four hours.
[4]    Q: Is that the meeting we're talking about?
[5]    A: Yes.
[6]    Q: Do you remember the topics discussed at
[7] that meeting relative to — were each of the topics
[8] in the Rule 30(b)(6) notice discussed at that
[9] meeting, and if not, which ones?
[10]    A: These topics weren't specifically covered.
[11] It was more of me reporting as general counsel about
[12] various items.
[13]    Q: My question to you is whether they were
[14] specifically — look at each of the topics. Which
[15] of those were in substance discussed at the meeting,
[16] whether you designate them as 1, 2, 3, 4, 5, 6, 7 or
[17] not?
[18]    A: We had discussions about several of these
[19] topics, at least the subject matter of some of these
[20] topics, but we did not —
[21]    Q: Which ones?
[22]    A: Regarding the note.
[23]    Q: Can you identify the number, please.
[24]    A: No. 2.

Page 71

[1]    Q: Not No. 1?
[2]    A: I don't recall No. 1 being discussed. We
[3] were just discussing the note.
[4]    Q: How about No. 3?
[5]    A: I don't recall.
[6]    Q: Do I understand, when you say you don't
[7] recall, you don't remember? You're not saying yes
[8] or no; you just don't have a memory?
[9]    A: I just don't have a memory.
[10]    Q: I just want to make sure I understand how
[11] you're using the words.
[12]      No. 4?
[13]    A: I don't recall.
[14]    Q: No. 5?
[15]    A: I don't recall.
[16]    Q: No. 6?
[17]    A: I don't believe we did.
[18]    Q: No. 7?
[19]    A: I think I mentioned something about No. 7.
[20]    Q: No. 8?
[21]    A: I don't recall.
[22]    MR. BELLO: And do I understand, if I asked
[23] the witness to tell me his best memory of what was
[24] said on each of these topics, that he would be

Page 72

[1] instructed not to answer?
[2]    MR. COMEN: Yes.
[3]    MR. BELLO: On the basis of attorney-client
[4] privilege?
[5]    MR. COMEN: Yes.
[6]    Q: Did you talk to anyone not employed as a —
[7] not employed nor in the position of a director or
[8] officer of BPI about any of the topics reflected in
[9] the Rule 30(b)(6) notice from the time you received
[10] that notice to the present?
[11]    THE WITNESS: Can you repeat the question.
[12]      (Question read)
[13]    A: I don't understand what you mean by "not
[14] employed."
[15]    Q: Did you talk to any outsiders, any
[16] investment bankers, anyone other than individuals
[17] employed by or serving as an officer or director,
[18] regarding any of the topics in the Rule 30(b)(6)
[19] notice? Your accountants, investment bankers?
[20]    A: I've had discussions with the accountants
[21] about — and also outside counsel.
[22]    Q: Put aside outside counsel. Who were the
[23] accountants that you had discussions?
[24]    A: KPMG representatives.

Page 73

[1] **Q:** Who specifically, please?
[2] **A:** I forget their names.
[3] **Q:** You have no knowledge of any of the
[4] representatives? You can't remember any of them?
[5] **A:** They're new people that they just put on —
[6] **MR. COMEN:** Well, you just said — if you
[7] can't remember, you can't remember.
[8] *Q: When did you have these conversations*
[9] between September — between the time you got the
[10] notice and the present?
[11] **A:** About a month ago.
[12] **Q:** Who was a participant in that conversation?
[13] **A:** The KPMG representative. His first name is
[14] Paul. I forget his last name.
[15] **Q:** Out of which office? Where are they
[16] located, do you know?
[17] **A:** Probably Boston.
[18] **MR. COMEN:** Well, if you don't know —
[19] **A:** I don't know.
[20] **MR. COMEN:** Don't say "probably" if you
[21] don't know.
[22] **Q:** Was anybody else party to the communication
[23] besides you and Paul?
[24] **A:** I can't recall.

Page 74

[1] **Q:** Tell me everything you recall you saying to
[2] Paul and Paul saying to you with respect to any of
[3] these topics.
[4] **A:** I think they had asked what my opinion was
[5] about the claim made by BB AG.
[6] **Q:** Did you respond to that inquiry?
[7] **A:** I believe I did, yes.
[8] **Q:** What did you say?
[9] **A:** *I believe I said it was totally specious.*
[10] **Q:** Anything else you recall saying?
[11] **A:** No.
[12] **Q:** Has BPI taken a reserve for this case?
[13] **A:** No.
[14] **Q:** In its financials, no reserves?
[15] **A:** Not that I can recall right now.
[16] **Q:** Other than your opinion and saying it was
[17] totally specious, was that the totality of the
[18] entire conversation that you recall with Paul?
[19] **A:** Yes. We were discussing all of the cases.
[20] So when this one came up...
[21] **Q:** Did you review in any detail any of the
[22] specific — and not by the number, but the substance
[23] of any of the topics that are in the Rule 30(b)(6)
[24] notice?

Page 75

[1] **A:** No.
[2] * **Q.** Since September of 2005 — when I say
[3] "September," from the time you received, first
[4] received the Rule 30(b)(6) notice, whatever date
[5] that was, have you had any conversations with anyone
[6] from Fresh Fields with respect to the subject matter
[7] of any of these topics?
[8] **A:** I have not.
[9] **Q:** Do you know if anyone else has? **
[10] **THE WITNESS:** Could you repeat the
[11] question.
[12]     (Record read from * to **)
[13] **A:** Our outside counsel may have.
[14] **Q:** How about with any representatives of
[15] Hitachi? Have you had any conversations from
[16] September of 2005, when you received the notice, to
[17] the present with any representative of Babcock
[18] Hitachi with respect to any of the topics reflected
[19] in the Rule 30(b)(6) notice?
[20] **A:** Yes.
[21] **Q:** Who?
[22] **MR. COMEN:** Excuse me. May I just have a
[23] moment. (Pause) Okay.
[24] **Q:** There's a question pending.

Page 76

[1] **A:** Could you repeat it.
[2] **Q:** The question was simply — you said you
[3] have, and I said, "Who?" Babcock Hitachi.
[4] **A:** I'm not sure I understand the question.
[5] **Q:** I don't mean to be — I asked you whether
[6] you had spoken with anyone from Babcock Hitachi
[7] regarding any of the topics reflected in the Rule
[8] 30(b)(6) notice. You said yes. Then I asked you
[9] who from Babcock Hitachi.
[10] **A:** I've had discussions with them about —
[11] **MR. COMEN:** The question was who.
[12] **Q:** The question was who.
[13] **A:** Actually, two Japanese people. I forget
[14] their names. I actually forget their names.
[15] **Q:** You have no idea who their names are? You
[16] can't remember at all?
[17] **A:** I have a difficult time with Japanese
[18] names.
[19] **Q:** Are these individuals that were involved in
[20] the covenant not to sue and business cooperation
[21] agreement executed between BPI and Babcock Hitachi?
[22] **MR. COMEN:** You left out a word. You mean
[23] involved in the negotiations?
[24] **Q:** Involved in any way, in any of the

Page 77

[1] communications, negotiations in any fashion?
[2]    A: They were not.
[3]    Q: Where are these individuals located? Where
[4] are they physically located?
[5]    A: I believe in Japan.
[6]    Q: You don't know?
[7]    A: They have an office in Tarrytown.
[8]    Q: Tarrytown, Ohio?
[9]    A: New York.
[10]    Q: When you say "they," who is they who has an
[11] office in Tarrytown, New York?
[12]    A: Babcock Hitachi America, or Hitachi
[13] America, I don't know.
[14]    Q: And —
[15]    MR. COMEN: Did you get the answer?
[16]    THE STENOGRAPHER: "Or Hitachi America."
[17]    MR. COMEN: He said, "Or Hitachi, I don't
[18] know." He didn't know the name of the particular
[19] entity.
[20]    Q: To your knowledge, do the two individuals
[21] spend time in part at the Tarrytown, New York,
[22] office?
[23]    A: I don't know where they work out of.
[24]    Q: Have you ever met with these individuals?

Page 78

[1]    A: Yes.
[2]    Q: When?
[3]    A: Three or four months ago.
[4]    Q: Where?
[5]    A: In Tarrytown.
[6]    Q: So you know they at least have been
[7] physically present at Tarrytown?
[8]    A: Yes.
[9]    Q: How many individuals were present at that
[10] meeting?
[11]    A: The two gentlemen from Japan, the in-house
[12] lawyer from Hitachi, an outside lawyer for Hitachi,
[13] and two other representatives from Hitachi.
[14]    Q: Were any of the topics designated by number
[15] in the Rule 30(b)(6) notice discussed at that
[16] meeting?
[17]    MR. COMEN: Let me step in here and tell
[18] you. The agreements that are referenced in the 4
[19] and 5 were — and the conduct of the parties with
[20] respect to carrying out those agreements was the
[21] subject of discussion at that meeting, which was a
[22] confidential settlement negotiation with respect to
[23] issues that arose during that period.
[24]    MR. BELLO: Surely you're not going to

Page 79

[1] instruct the witness not to answer — it's not
[2] privileged — about the subject matter of those
[3] meetings which were part of this notice.
[4]    MR. COMEN: No, but I don't think it's
[5] within the scope.
[6]    MR. BELLO: It certainly is within the
[7] scope. Let me be clear, part of the scope here is
[8] the view of Babcock, our client, that there has been
[9] collusion between BPI and Hitachi from the very
[10] beginning in connection with the negotiation,
[11] consummation and then execution of this agreement.
[12] So it is certainly within the scope of the topic.
[13] And if you —
[14]    MR. COMEN: There has been collusion?
[15]    MR. BELLO: We believe — that's certainly
[16] an allegation, and it is one that we are pursuing.
[17] And that is part of the reason —
[18]    MR. COMEN: There's an allegation in the
[19] complaint that there is continuing collusion?
[20]    MR. BELLO: We can't — since we haven't
[21] done the depositions, we don't know whether there is
[22] continuing collusion or not. We believe the genesis
[23] of the agreement involved collusion between BPI —
[24]    MR. COMEN: But subsequent to the

Page 80

[1] agreement — we're talking about subsequently. The
[2] subject of the discussion in Tarrytown had to do
[3] with incidents that arose subsequent to the
[4] agreement. And if you're saying that your client
[5] had relationships with the carrying out of that
[6] agreement subsequent to the execution of the
[7] agreement, then you're aware of something that we
[8] may not be aware of.
[9]    MR. BELLO: Well, that's fine.
[10]    THE WITNESS: I have to go to the men's
[11] room.
[12]    MR. COMEN: It's 12:30. When do you want
[13] to break for lunch?
[14]    MR. BELLO: As soon as I — I'll get to
[15] hopefully a natural breaking point.
[16]    MR. COMEN: How much longer?
[17]    MR. BELLO: I'm trying — I'm hoping the
[18] next ten to fifteen minutes.
[19]    MR. COMEN: I've been e-mailing people
[20] telling them I will call them, because you said you
[21] would break around 12:30. If it's ten or fifteen
[22] minutes, that's fine, but if it's going to be longer
[23] than that, I have to make a call.
[24]    (Brief recess)

Babcock Borsig Power GmbH v.
Babcock Power Inc. v. Babcock Borsig AG

James S. Brantl
Vol. 1, December 20, 2005

Page 81

BY MR. BELLO:

[2] Q: I want to go back to my question of the
[3] witness. As to the topics in here, because counsel
[4] seemingly answered for you, but I would like to get
[5] it from you, did you discuss at all in that meeting
[6] the subject matter of Hitachi's purchase of Power
[7] Systems as reflected in Item No. 4?
[8] A: No.
[9] Q: Did you discuss at all the Non-Compete as
[10] reflected in Items 1 and 3?
[11] MR. COMEN: Let me just —
[12] MR. BELLO: Oh, come on, Steve.
[13] MR. COMEN: No, I want to instruct the
[14] witness. I want to consider during the lunch break
[15] the privilege and whether or not it's within the
[16] scope.
[17] What I've told you were the subjects of
[18] discussion were the documents that were executed
[19] with Hitachi as a result of the issues that arose,
[20] and it's only the execution of those documents and
[21] some issues that arose subsequent to the documents
[22] being executed that were discussed.
[23] And whether or not those settlement
[24] discussions that were confidential are the kinds of

Page 82

[1] discussions that are appropriate to be gone into in
[2] detail during this deposition, I'd like to consider
[3] during the lunch break. Since we're having a lunch
[4] break in a few minutes, I would like to consider
[5] those.
[6] MR. BELLO: You can consider it, but that's
[7] not even my question right now, Steve. The question
[8] is whether or not — I'm going to go back to my
[9] question in a moment. But there clearly is no
[10] privilege between — an attorney-client privilege.
[11] This settlement between those parties is not
[12] settlement discussions that we're a part of.
[13] MR. COMEN: But whether it's within the
[14] scope of this deposition and whether or not it's
[15] objectionable, I would like to consider —
[16] MR. BELLO: Even if objectionable, if it's
[17] not privilege, absent a protective order, he's got
[18] to answer.
[19] BY MR. BELLO:
[20] Q: But let me go back to my much more narrow
[21] question, which was interrupted, which is, did you
[22] discuss at that meeting the subject matter reflected
[23] in Items No. 1 and/or 3 of the Rule 30(b)(6) notice?
[24] A: No.

Page 83

[1] Q: Did you discuss the subject matter of Item
[2] No. 5 in the Rule 30(b)(6) notice?
[3] A: I can't recall exactly what was discussed
[4] about No. 5, but I believe there was some discussion
[5] of that.
[6] Q: Do you have any general recollection of
[7] what was discussed with respect to Item No. 5?
[8] A: I believe there was — we responded to some
[9] questions about who was at the meeting in which the
[10] agreements between BPI and Hitachi took place.
[11] Q: Tell me what you recall about what the
[12] questions were and what the responses were.
[13] MR. COMEN: The names of the persons who
[14] were there?
[15] MR. BELLO: Whatever he recalls. He says
[16] he responded to some questions about who was at the
[17] meeting.
[18] Q: I'm asking more specifically, what
[19] questions and what did you respond to them?
[20] A: I just remember, I believe we told them who
[21] was at the meeting.
[22] Q: Who did you tell them was at the meeting?
[23] A: I forget the names.
[24] Q: You don't remember any of the names?

Page 84

[1] A: I think — I think Mr. Ogawa was one of the
[2] people at the meeting.
[3] Q: Do you know how to spell that?
[4] A: O-g-a-w-a.
[5] Q: Anyone else you recall being at the
[6] meeting?
[7] A: Maybe Mr. Minura, M-i-n-u-r-a.
[8] Q: Other than who was at the meeting, do you
[9] recall any other questions or discussion at the
[10] meeting you're describing in Tarrytown regarding
[11] Item No. 5?
[12] A: I think they — I believe they asked if
[13] there was an attorney from Hitachi present.
[14] Q: What did you tell them?
[15] A: I said there was no one present. They
[16] had — they had counsel available.
[17] Q: That's what you told them?
[18] A: Yes.
[19] Q: Anything else discussed besides whether
[20] there was an attorney present and who was there?
[21] A: I — that's all I can recall.
[22] Q: So is it fair to say there were no
[23] questions and no discussion regarding the substance
[24] of Item No. 5; it was just all who was there? Is

Page 85

[1] that my understanding?
[2]    A: They didn't ask anything about the
[3] negotiations or — I said they asked about the
[4] identity of who was involved with that, and we gave
[5] them the names.
[6]    Q: Did they explain why they were asking this?
[7]    MR. COMEN: I object.
[8]    MR. BELLO: I'm asking if they said.
[9]    MR. COMEN: I object. That's going beyond
[10] the scope of this.
[11]    MR. BELLO: It is not.
[12]    Q: Please answer my question.
[13]    MR. COMEN: I object and direct him not to
[14] answer.
[15]    MR. BELLO: Then let's call the Discovery
[16] Master. You're going to instruct him not to answer
[17] about —
[18]    MR. COMEN: Why they were asking a
[19] question?
[20]    MR. BELLO: That's right.
[21]    Q: Did they identify why they were asking
[22] about —
[23]    MR. COMEN: Read back the question. You're
[24] asking him to say why someone was asking a question.

Page 86

[1]    MR. BELLO: No. I'm asking if they said
[2] why.
[3]    MR. COMEN: Okay.
[4]    MR. BELLO: I'm not asking him to read
[5] minds.
[6]    A: They did not say why.
[7]    Q: When was the last time you talked to Mr.
[8] Ogawa?
[9]    A: At that meeting.
[10]    Q: He was also at the meeting in — this
[11] meeting, the earlier meeting?
[12]    A: He was in the earlier meeting.
[13]    Q: In early 2003?
[14]    A: Yes.
[15]    Q: Was that the last time you spoke to Mr.
[16] Ogawa?
[17]    A: Yes.
[18]    Q: How about Mr. Minura?
[19]    A: Yes. I haven't spoken to any of them since
[20] then.
[21]    Q: Other than the meeting that you had in
[22] Tarrytown, was there — between the time you got the
[23] Rule 30(b)(6) notice and the present, have you had
[24] any other communications — oral, written,

Page 87

[1] meeting — with Hitachi representatives regarding
[2] any of the topics contained in the Rule 30(b)(6)
[3] notice?
[4]    THE WITNESS: Could you repeat the
[5] question.
[6]    (Question read)
[7]    A: I have not had any communications.
[8]    Q: Do you know if anyone else within BPI has
[9] had such communications?
[10]    A: I believe our outside counsel has had
[11] discussions with them.
[12]    Q: Did your outside counsel identify who he's
[13] had discussions with?
[14]    MR. COMEN: I object and direct him not to
[15] answer.
[16]    MR. BELLO: You're asserting that there's a
[17] privilege regarding the identity of the discussions
[18] that counsel had with a third party?
[19]    MR. COMEN: This goes way beyond the scope
[20] of that discussion — of this deposition.
[21]    MR. BELLO: You're not entitled to object
[22] and instruct him not to answer on a scope issue.
[23] Now, you can object to it.
[24]    MR. COMEN: I'll instruct him not to

Page 88

[1] answer.
[2]    MR. BELLO: I think we'll take a break and
[3] maybe we'll see if we can get the Discovery Master,
[4] because you're now instructing him not to answer
[5] questions that are relevance questions and —
[6]    MR. COMEN: Why don't you explain to me the
[7] relevance of who I spoke to in connection with an
[8] issue that has arisen between Hitachi and Babcock
[9] Power.
[10]    MR. BELLO: That's not my question.
[11]    MR. COMEN: That is.
[12]    MR. BELLO: Just let me know when you're
[13] going to be done.
[14]    MR. COMEN: Go ahead. You finish.
[15]    MR. BELLO: My questions are all within the
[16] scope of the seven items that are identified in this
[17] Rule 30(b)(6) notice.
[18]    MR. COMEN: And what I just told you is
[19] that it's way beyond the scope.
[20]    MR. BELLO: No. You keep interrupting, but
[21] Mr. Brantl has affirmed that he believes that there
[22] were discussions between outside counsel and Hitachi
[23] regarding some of the topic matters of this Rule
[24] 30(b)(6) notice. That is his testimony on the

Page 89

[1] record.
[2]   MR. COMEN: I don't believe that's
[3] accurate.
[4]   MR. BELLO: Well, I can find his testimony,
[5] if you would like.
[6]   I asked the witness whether or not he was
[7] aware — whether he had any other communications,
[8] oral, written, meeting, with Hitachi representatives
[9] regarding any of the topics contained in the Rule
[10] 30(b)(6) notice. The answer was, "I have not had
[11] any communications."
[12]   I asked, "Do you know if anyone else within
[13] BPI has had such communications?" The answer was,
[14] "I believe our outside counsel has had discussions
[15] with them."
[16]   My questions are all related to the seven
[17] items or eight items in the Rule 30(b)(6) notice.
[18]   A: I would just like to correct the record. I
[19] don't believe our outside attorney has had any
[20] discussions regarding the negotiations or who were
[21] the people at the meeting in 2003 regarding the
[22] agreements between BPI and Hitachi.
[23]   Q: I hear you. I'm asking about any of the
[24] seven items. Those are two or three of the seven

Page 90

[1] items. If your testimony is that you are not aware
[2] of your outside counsel having had any
[3] communications regarding any of these seven items,
[4] then I for the moment will accept your testimony.
[5]   A: I don't believe that that was the subject
[6] matter of the conversations, those specific items
[7] listed in the 30(b)(6) notice.
[8]   Q: Have you communicated — have you had any
[9] communications with any potential buyers of BPI?
[10]   MR. COMEN: You're going on to another
[11] subject. It's now ten of one. I told you —
[12]   MR. BELLO: Maybe it will be a yes or no
[13] question and we'll leave this.
[14]   Q: Have you had any communications with any
[15] potential buyers of BPI, since the time you received
[16] this notice and the present, regarding any of the
[17] topics contained in the Rule 30(b)(6) notice?
[18]   A: No, I don't believe we've had any
[19] discussions with them.
[20]   Q: Have you discussed —
[21]   A: Anyone.
[22]   Q: Have you —
[23]   MR. COMEN: Now you — how much longer are
[24] you going to go?

Page 91

[1]   Q: Have you disclosed to any potential buyer
[2] the existence of this lawsuit?
[3]   A: Yes.
[4]   MR. BELLO: We'll break now.
[5]   MR. COMEN: Okay. We'll see you at ten of
[6] two.
[7]   (Luncheon recess taken
[8] from 12:47 to 2:04 p.m.)

Page 92

[1]               AFTERNOON SESSION
[2]               BY MR. BELLO:
[3]   Q: Mr. Brantl, just so I'm clear, are you also
[4] a director of BPI?
[5]   A: No.
[6]   Q: Do you hold any office or title other than
[7] general counsel? Vice-president?
[8]   A: Vice-president.
[9]   Q: Are there other vice-presidents?
[10]   A: Yes.
[11]   Q: How many? Is Mr. Brandano a
[12] vice-president?
[13]   A: Yes.
[14]   MR. COMEN: Give him a chance to answer.
[15]   A: There are probably about ten.
[16]   MR. COMEN: He has started to count on his
[17] fingers, let the record reflect.
[18]   A: I could list them if you wanted that
[19] information.
[20]   Q: At BBCC were you a director?
[21]   A: I believe I was.
[22]   Q: Were you an officer?
[23]   A: Yes.
[24]   Q: Vice-president?

Page 93

[1]    **A:** Yes.

[2]    **Q:** And were you general counsel?

[3]    **A:** Yes.

[4]    **Q:** How many years were you in that role,

[5] roughly?

[6]    **A:** From when to —

[7]    **Q:** Well, how long had you been general counsel

[8] at BBCC prior to November 29, 2002?

[9]    **A:** I believe about a year and a half.

[10]    **Q:** Were you employed by BBCC before that year

[11] and a half, or is that when you began employment?

[12]    **A:** I was employed before I became general

[13] counsel at BBCC with affiliates.

[14]    **Q:** What affiliates?

[15]    **A:** Riley Power. It was actually — yes, Riley

[16] Power. It may have been the holding company for

[17] Riley Power, Riley Consolidated, for several years,

[18] but Riley Power was the main one.

[19]    **Q:** Were you general counsel for Riley Power?

[20]    **A:** Yes.

[21]    **Q:** Were you an officer?

[22]    **A:** Yes.

[23]    **Q:** Were you a director?

[24]    **A:** Yes.

Page 94

[1]    **Q:** Roughly how many years were you at Riley

[2] Power or whatever entity it may have been?

[3]    **A:** Since the end of '84.

[4]    **Q:** Did you hold any functional title other

[5] than general counsel at either BBCC or Riley Power?

[6]    **MR. COMEN:** I object.

[7]    **Q:** Did you have any role other than lawyer?

[8] For example, some general counsels also serve as HR,

[9] some general counsels also serve in finance. Did

[10] you serve any other functional role at either BBCC

[11] or Riley Power?

[12]    **A:** When I — as director of contract

[13] administration or vice-president of contract

[14] administration for a short time, HR administrative

[15] services reported to me.

[16]    **Q:** Of which one, BBCC or Riley or both?

[17]    **A:** Riley.

[18]    **Q:** How about at BBCC, were you the director of

[19] contract administration or anything of that type and

[20] nature?

[21]    **A:** Yes. At one point risk management and HR

[22] reported to me for a short period.

[23]    **Q:** Was that just prior to November 29, 2002,

[24]    or —

Page 95

[1]    **A:** Yes, prior to that.

[2]    **MR. COMEN:** You didn't let him finish his

[3] question. He was asking you whether it was just

[4] prior.

[5]    **Q:** You were there for a year and a half in

[6] that role, so it was a fairly short period of time.

[7] Was it the beginning, middle, end of that period of

[8] time?

[9]    **A:** When —

[10]    **Q:** Where you served in these other roles at

[11] BBCC?

[12]    **MR. COMEN:** I don't think he — I don't

[13] think he said it was during that year.

[14]    **Q:** I asked the question, "How about at BBCC,

[15] were you director of contract administration or

[16] anything of that type and nature?" The answer was,

[17] "Yes. At one point risk management and HR reported

[18] to me for a short period." I was trying to define

[19] when that period was.

[20]    **A:** From the beginning of when I joined there

[21] until about November of 2002.

[22]    **Q:** Okay. How about at BPI? Do you — are you

[23] responsible for risk management, director of

[24] contract administration, HR, anything of that type

Page 96

[1] and nature?

[2]    **MR. COMEN:** I object.

[3]    **A:** No.

[4]    **MR. COMEN:** Go ahead.

[5]    **A:** At BPI my title is general counsel and

[6] vice-president of legal.

[7]    **Q:** And from a functional role, is your

[8] function limited to the legal work of BPI as opposed

[9] to some other area, like contract administration,

[10] risk, HR?

[11]    **MR. COMEN:** I object. He didn't say he

[12] functioned in any of those roles.

[13]    **MR. BELLO:** I'm asking if he did —

[14]    **MR. COMEN:** Well, he hasn't said he

[15] functioned before as anything other than lawyer.

[16]    **MR. BELLO:** The record will stand as it is,

[17] Steve.

[18]    **Q:** Do you function in any other role, other

[19] than a legal role, at BPI? Do you have — we'll

[20] leave it at that. Do you function in any other

[21] role?

[22]    **A:** I'm not sure I know what you mean by "legal

[23] role." What's the difference between a legal role

[24] and not a legal role?

Babcock Borsig Power GmbH   v.                                    James S. Brantl
Babcock Power Inc.   v.   Babcock Borsig AG          Vol. 1, December 20, 2005

Page 97

[1]  Q: You are the general counsel, sir. Do you
[2] have an understanding of what the legal role is?
[3]  A: Well, technically the role is involving
[4] litigation, but I also serve other functions for
[5] BPI.
[6]  Q: Do you serve a risk management function in
[7] any —
[8]  A: Not for insurance.
[9]  Q: Do you serve a risk management function
[10] other than for legal risk?
[11]  A: I serve a function of making sure our
[12] contracts comply with certain standards.
[13]  Q: Internal standards, external standards,
[14] both?
[15]  A: Internal standards.
[16]  Q: Do you have any functional HR role?
[17]  A: No.
[18]  Q: Do you have any functional finance role?
[19]  A: No.
[20]  Q: Do you have any functional operational
[21] role?
[22]  A: No.
[23]  Q: When did you first become aware of and
[24] involved in the potential purchase of the assets or

Page 98

[1] the stock of BBCC leading to the transaction of
[2] November 29, 2002?
[3]  MR. COMEN: Could you repeat that.
[4]  (Question read)
[5]  MR. COMEN: There are two questions there.
[6] I object to the form.
[7]  Q: I'm hoping that you understand. Do you
[8] understand my question?
[9]  A: Yes.
[10]  MR. COMEN: You said when did you first
[11] become aware and when did you become involved.
[12] Those are not necessarily the same thing.
[13]  MR. BELLO: I heard your objection.
[14]  A: Could you repeat the question.
[15]  Q: When did you first become aware of the
[16] sale, the potential sale?
[17]  A: The parent company attempted to sell BBCC
[18] Holding Company, Inc., in the fall of 2001 —
[19]  MR. COMEN: You've answered that. That's
[20] enough.
[21]  MR. BELLO: I would appreciate if you don't
[22] interrupt the witness, when he's in the middle of an
[23] answer, trying to stop him.
[24]  MR. COMEN: Okay.

Page 99

[1]  MR. BELLO: It would be helpful.
[2]  MR. COMEN: Go ahead.
[3]  Q: What was the entity that was the parent
[4] company that tried to sell BBCC Holding Company in
[5] the fall of 2001? What was the entity?
[6]  A: I don't recall — you're talking about the
[7] German entity?
[8]  Q: You said "the parent company." What are
[9] you referring to?
[10]  A: I'm generically referring to the German
[11] holding company of the stock of BBCC Holding
[12] Company, Inc.
[13]  Q: Were you involved in that attempted sale as
[14] general counsel?
[15]  A: I had a limited role, yes.
[16]  Q: And do you know — were there any
[17] identified potential buyers in connection with that
[18] sale?
[19]  A: There was an investment bank that was
[20] identified, but that's about all.
[21]  Q: Do you recall the value, the price being
[22] sought by the parent in connection with that sale?
[23]  A: I believe it was a couple hundred million
[24] dollars.

Page 100

[1]  Q: And that sale, that effort was not
[2] successful; is that correct?
[3]  A: Right.
[4]  Q: When did that process end, if it did?
[5]  A: I'm not sure it ever really had an
[6] announced termination.
[7]  Q: Did it have a practical termination when it
[8] ceased active efforts to sell?
[9]  A: I don't recall exactly when.
[10]  Q: This was before the insolvency of the
[11] German entities; is that correct?
[12]  A: Yes.
[13]  Q: When did you first become involved as part
[14] of the management group at BBCC in the potential
[15] acquisition of the stock that led to the November
[16] 29, 2002, transaction?
[17]  A: Could you repeat the question.
[18]  Q: When did you first become involved as part
[19] of the management group at BBCC in the potential
[20] acquisition of the stock that led to the November
[21] 29, 2002, transaction?
[22]  A: I guess immediately after the bankruptcy.
[23]  Q: When was the bankruptcy?
[24]  A: July 4th or 5th, 2002.

James S. Brandt
Vol. 1, December 20, 2005

Babcock Borsig Power GmbH    v.
Babcock Power Inc.    v.    Babcock Borsig AG

Page 101

[1] Q: And how did you become involved? Did
[2] someone come to you? Describe to me how that
[3] occurred, the context, please.
[4] A: The German parent went bankrupt. We found
[5] out about it through Internet newswires. And over
[6] the course of the next several weeks, it became
[7] evident that the German parent was not going to be
[8] reorganized and that it was just going to sell its
[9] assets. And the American company was one of its
[10] assets.
[11] Q: When you say "we," who is the "we"?
[12] A: I'm not sure I understand what you mean.
[13] Q: You said, "We found out about it." Who is
[14] "we"?
[15] A: All the managers in the U.S.
[16] Q: Who did you have specific discussions with
[17] about pursuing the acquisition of this entity?
[18] A: We did not have any specific discussions in
[19] July. The specific discussions began in September,
[20] October.
[21] Q: And who did those specific discussions
[22] occur between or among?
[23] A: Representatives from BB AG and the Hudson
[24] group and some of the managers at BPI.

Page 102

[1] Q: Let's break that down. The managers of
[2] BPI, who was involved?
[3] A: It was mostly Jim Wood and Tony Brandano.
[4] I participated in some of the meetings. And the
[5] other —
[6] MR. COMEN: Wait — I'm sorry. Go ahead.
[7] I thought you finished your answer.
[8] A: There were other managers who may have been
[9] in discussions also.
[10] Q: What other managers may have been in
[11] discussions?
[12] A: Well, there's a group of 17 who have shares
[13] in BPI. There were discussions with them.
[14] Q: Can you identify who those are, please.
[15] A: You want me to list them all?
[16] Q: Sure.
[17] MR. COMEN: Is it clear that he's answering
[18] a question with a point in time, because —
[19] MR. BELLO: He said they began in
[20] September.
[21] MR. COMEN: Yes, but —
[22] MR. BELLO: September through November 29,
[23] 2002.
[24] MR. COMEN: Okay. Because to give the

Page 103

[1] impression that it began with a discussion with
[2] these 17 people would be misleading.
[3] A: The discussions were in November with these
[4] 17 people.
[5] Q: Who are they? Let's list who they are,
[6] please, as many as you can remember.
[7] A: James Dougherty.
[8] Q: Just to make it easy, give me the positions
[9] that they hold as you go through the names, if you
[10] know them.
[11] A: President, Babcock Power Environmental.
[12] Eric Balles.
[13] Q: B-a-l-i-s?
[14] A: B-a-l-l-e-s, senior vice-president of
[15] technology for Babcock Power Environmental. Burk
[16] Alred, vice-president, project management.
[17] Q: Same entity?
[18] A: Yes. John Zicconi, vice-president of
[19] finance for Riley Power. George Phillips, the
[20] president of Thermal Engineering International. Ken
[21] Murakoshi, who is vice-president of Thermal
[22] Engineering International. Mark Horvay.
[23] Q: Spell the last name, please.
[24] A: H-o-r-v-a-y, president of Vogt Power

Page 104

[1] International. Thomas Harmon, vice-president,
[2] finance, for Vogt Power International. Michael
[3] LeClair, L-e-C-l-a-i-r, vice-president of operations
[4] for Vogt Power International. How many is that so
[5] far?
[6] Q: Nine.
[7] A: Then there's Jim Wood, Tony — Anthony
[8] Brandano, Earl Mason, Scott Leeman.
[9] Q: Who is Mr. Mason?
[10] A: He's the vice-president, finance.
[11] Q: Of?
[12] A: BPI.
[13] Q: What was he then?
[14] A: He was working for BBCC at that point. And
[15] Richard Murphy.
[16] Q: After — there was another name that you
[17] mentioned, Scott Leeman?
[18] A: Scott Leeman.
[19] Q: What was his position then?
[20] A: Vice-president, tax.
[21] Q: For BBCC?
[22] A: BBCC. Richard Murphy.
[23] Q: What was his position?
[24] A: Vice-president, human resources.

Babcock Borsig Power GmbH   v.                                James S. Brantl
Babcock Power Inc.   v.   Babcock Borsig AG          Vol. 1, December 20, 2005

Page 105

[1]  Q: For BBCC?
[2]  A: He joined in the month right after BPI
[3] was —
[4]  Q: So was he employed by any entity?
[5]  A: I think he started with BPI.
[6]  Q: Other than Mr. Brandano, Mr. Wood and
[7] yourself of this group, were any of these other
[8] individuals involved in the negotiation for the —
[9] regarding the terms of either the Stock Purchase
[10] Agreement, the Non-Compete Agreement or the
[11] promissory notes?
[12]  A: Excuse me. I forgot a name.
[13]  Q: Sure.
[14]  A: Dale Naughton, N-a-u-g-h-t-o-n. He's the
[15] president of Thermal Engineering International
[16] Construction.
[17]  Q: Would you like me to repeat my question?
[18]  A: Yes.
[19]  Q: Other than Mr. Brandano, Mr. Wood and
[20] yourself, of all the names you've now mentioned,
[21] were any of these other individuals involved in the
[22] negotiations regarding either the Stock Purchase
[23] Agreement, the Non-Compete or the promissory notes?
[24]  A: Earl Mason and Scott Leeman may have been

Page 106

[1] giving some input on certain facts.
[2]  Q: Given input or taken input from or both?
[3]  A: Giving input.
[4]  Q: They were giving input?
[5]  A: Yes.
[6]  Q: On which topic or topics?
[7]  A: Scott Leeman is in charge of tax. Earl
[8] Mason was giving them possibly financial
[9] information.
[10]  Q: Other than Mr. Wood, Brandano, Mason,
[11] Leeman, Murphy — who does Naughton work for now?
[12] Does he work for BPI?
[13]  A: He reports in to the service unit.
[14]  Q: Of what company?
[15]  A: Babcock Power Services.
[16]  Q: But he's not an employee of BPI?
[17]  A: Right.
[18]  Q: Other than Mr. Murphy, Mr. Leeman, Mason,
[19] Brandano, Wood and yourself, do any of the other
[20] individuals you identified either work now or at any
[21] time between November 29 and the present for BPI?
[22]  A: No. I believe they work for all the
[23] subsidiaries.
[24]  Q: Subsidiaries of?

Page 107

[1]  A: BPI.
[2]  Q: Okay. Maybe I'm a little confused. What
[3] are the subsidiaries of BPI?
[4]  A: There's Babcock Power Environmental,
[5] Babcock Power Services, Boiler Tube Company of
[6] America, Thermal Engineering International, Thermal
[7] Engineering International Construction, Riley Power,
[8] Vogt-NEM, Inc., Vogt Power International, Babcock
[9] Power Capital Corporation, BBCC Holding Company,
[10] Inc., Babcock Power Sales. I think that's who I
[11] recall now.
[12]  Q: Do all these entities —
[13]  A: Excuse me. There are several European
[14] entities for Vogt Power too.
[15]  Q: Did all of these entities exist as of
[16] November 29, 2002?
[17]  A: No.
[18]  Q: Did any of the entities exist as of
[19] November 29, 2002?
[20]  A: Yes.
[21]  Q: Were they part of the acquisition, those
[22] that existed?
[23]  A: Yes.
[24]  Q: Which ones came into existence after —

Page 108

[1] either by acquisition or creation after November 29,
[2] 2002?
[3]  A: Babcock Power Sales, Babcock Power
[4] Environmental, Babcock Power Services. Boiler Tube
[5] Company of America is a newly formed company. It
[6] was previously a division. I forget —
[7]  Q: Why don't I go through them. Thermal
[8] Engineering International?
[9]  A: That's an old company.
[10]  Q: It came as part of the acquisition?
[11]  A: Yes.
[12]  Q: Thermal Engineering International
[13] Construction?
[14]  A: That's an old company.
[15]  Q: Riley Power?
[16]  A: That's an old company.
[17]  Q: Vogt-NEM?
[18]  A: That's an old company.
[19]  Q: Vogt Power?
[20]  A: That's a new company.
[21]  Q: Babcock Power Capital Corp.?
[22]  A: That's an old company.
[23]  Q: BBCC Holding Company?
[24]  A: That's an old company.