# NON-COMPETITION AGREEMENT

This NON-COMPETITION AGREEMENT (the "*Agreement*") is made as of November 21, 2002, by and among Babcock Power, Inc., a Delaware corporation ("*Purchaser*"), and Babcock Borsig Power GmbH, a German corporation ("*Seller*"). For the purposes of this Agreement, the term "*Seller*" shall mean Babcock Borsig Power GmbH, any of its direct or indirect Subsidiaries, Affiliates or successors or assigns, excluding for all purposes hereof the Seller's subsidiary NEM b.v., a Netherlands corporation and its subsidiaries, successors and assigns; provided, however, that this exclusion shall not apply to any business or operations acquired from and after the date hereof by NEM b.v. or any of its subsidiaries, successors or assigns, from Babcock Borsig AG, its subsidiaries, successors or assigns.

WHEREAS, Purchaser and Babcock Borsig Power GmbH have entered into a Stock Purchase Agreement dated as of November 13, 2002 (the "*Purchase Agreement*") which provides for the purchase by Purchase of all of the outstanding capital stock of BBCC Holding Co., Inc. (the "*Company*"). Capitalized terms used in this Agreement shall have the meaning of such terms as used in the Purchase Agreement, unless otherwise defined herein.

WHEREAS, prior to the consummation of the transactions contemplated in the Purchase Agreement (the "*Sale*"), Seller is the sole owner of the Company, and as a result of the Sale, Seller shall receive from Purchaser significant consideration in exchange for all the Shares of the Company's Common Stock held by Seller pursuant to the terms of the Purchase Agreement.

WHEREAS, as a condition to the Sale, and to preserve the value of the business being acquired by Purchaser after the Sale, the Purchase Agreement contemplates, among other things, that in consideration of the Non-Compete Payment (as defined herein), the Seller shall enter into this Agreement as of the date hereof.

NOW, THEREFORE, in consideration of the mutual promises and covenants made herein, Purchaser and the Seller hereby agree as follows:

Section 1.    Covenant Not to Compete or Solicit.

(a)    Beginning on the date hereof and ending on the third (3rd ) anniversary of the Closing Date (the "*Non-Competition Period*"), Seller shall not directly or indirectly, without the prior written consent of Purchaser, Engage in a Competitive Business Activity anywhere in the Restricted Territory.

For all purposes hereof, the following terms shall be defined as follows:

"*Engage*" (including with correlative meanings the terms "Engages", "Engaging" and "Engaged") shall mean engaging, operating, managing, working, consulting and/or participating (whether as a partner, shareholder, investor, principal, representative, member, officer, director, agent, trustee, consultant, lender, employee, proprietor or in any other relationship or capacity) whether for the Seller's own account or for that of any other Person, either directly or indirectly.

"*Competitive Business Activity*" shall mean Engaging in the Business or having a direct or indirect ownership interest in any business, Person, or other entity which Engages in the Business.

"*Business*" shall mean: (i) within the customer market composed of fossil-fired and waste-to-energy power plants located in the Restricted Territory, all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance and sale of new equipment or replacement parts for selective catalytic reduction and flue gas desulfurization equipment for the reduction of nitrous oxide or sulphur dioxide emissions (the "*Environmental Business*"); (ii) within the customer market composed of fossil-fired (including but not limited to combined cycle) or nuclear power plants located in the Restricted Territory, all activities associated with the provision of the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of boiler components and pressure parts, power plant construction-related services, boiler rebuilds and retrofits, engineered replacement parts or field services (the "*Service Business*"); and (iii) within the customer market composed of fossil-fired (including but not limited to combined cycle) and nuclear power plants located in the Restricted Territory, all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of condensers, feedwater heaters and moisture separator reheaters (the "*Heat Exchanger Business*").

"*Restricted Territory*" shall mean, each and every country, province, state, city or other political subdivision of the United States and Canada.

(b)     During the Non-Competition Period, Seller shall not directly or indirectly: solicit, encourage or take any other action which is intended to induce or encourage any employee of Purchaser, the Company or any of their respective Subsidiaries or to terminate his or her employment with Purchaser, the Company or any of their respective Subsidiaries.

(c)     The covenants contained in Section 1(a) hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenants contained in Section 1(a) and Section 1(b) hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In

the event that the provisions of this Section 1 are deemed to exceed the time, geographic or scope limitations permitted by applicable law of any specific jurisdiction, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be permitted by applicable laws of that jurisdiction, but without impact upon the meaning of those provisions in other jurisdictions.

(d)     Seller acknowledges that the goodwill associated with the existing business, customers and assets of the Company and its Subsidiaries prior to the sale are an integral component of the value of the Company to Purchaser and is reflected in the Non-Compete Payment and the consideration in the sale payable to Seller, and Seller's agreement as set forth herein is necessary to preserve the value of the Company and its Subsidiaries for Purchaser following the Sale. Seller also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things, (i) the Company, its Subsidiaries and Purchaser are engaged in a highly competitive industry, and (ii) Seller is receiving significant consideration in connection with the Sale and this Agreement.

Section 2.     Non-Compete Payment. In consideration of the Seller's covenants contained herein, Purchaser shall deliver upon the execution hereof: (i) a Promissory Note in the face amount of $5,000,000 in the form attached hereto as Exhibit A; and (ii) a payment in cash by wire transfer in the amount of $2,500,000.00 ((i) and (ii), collectively, the "Non-Compete Payment").

Section 3.     Choice of Law; Enforcement

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without giving effect to the principles of conflicts of laws.

(b)     Each of the parties hereto acknowledge and agree that the rights acquired by each party hereunder are unique and that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or other interim or conservatory relief (as necessary) to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of the United States located in the Commonwealth of Massachusetts or in a Massachusetts state court, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties: (i) consents to submit itself to the personal jurisdiction of any Federal court in the Commonwealth of Massachusetts or any Massachusetts state court in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated hereby in any court other than a Federal court sitting in the Commonwealth of Massachusetts or a Massachusetts state court.

B644654.2
B0280695v4

(c)    Without limiting any of the rights or remedies of the Purchaser contained herein, the parties hereto agree that the damages recoverable by any party under this Agreement shall be limited to actual damages and shall not include incidental, consequential, indirect or punitive damages whether arising in contract, tort, statute or otherwise.

(d)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUR OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 4.    Miscellaneous.

(a)    Severability.  Without limiting the generality of Section 1 hereof: (i) In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect; and (ii) in the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

(b)    Interpretation.  The parties hereto acknowledge and agree that the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(c)    Headings and Captions.  The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

(d)    No Waiver of Rights, Powers and Remedies.  No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party.

No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

(e)     Attorney Fees.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

(f)     Transfer of Rights.  This Agreement, and the rights and benefits which may inure to the Purchaser hereunder, may be transferred by the Purchaser to any transferee or purchaser of the Purchaser in connection with any transaction in which such transferee or purchaser acquires at least fifty (50%) percent of the stock equity or assets of the Purchaser.  No such transfer shall, however, be effective unless and until the Seller is given written notice of such transfer and the transferee has provided the Seller with its principal business address and has agreed in writing to be bound by the terms and conditions of this Agreement.

(g)     Notices.  All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either:  (i) delivered by hand, (ii) made by facsimile transmission, (iii) sent by overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid.

if to the Seller:

> Babcock Borsig Power GmbH
> Duisburger Strasse 375
> 46044 Oberhausen
> Germany
> Facsimile: 011-49.208.833.4657
>     Attention:  General Counsel

with a copy to:

> Nixon Peabody LLP
> 101 Federal Street
> Boston, MA 02110
> Facsimile: (617) 345-1300
> Attention:  Brian J. Crush, P.C.

if to the Purchaser:

Babcock Power Inc.
c/oHudson Investment Group, Inc.
200 East 61st Street, Suite 406
New York, NY 10021
Facsimile: (212) 750-5039
Attention: Nathan Hevrony, President

with a copy to:

Gadsby Hannah LLP
225 Franklin Street
Boston, MA 02110
Facsimile: (617) 204-8011
Attention: Jeffrey M. Stoler, Esq.

All notices, requests, consents and other communications hereunder shall be deemed to have been given (a) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (b) if made by facsimile transmission, at the time during business hours that receipt thereof has been acknowledged by electronic confirmation or otherwise and if not, at 10:00 a.m. the following business day, (c) if sent by overnight courier, at the time of receipt thereof on the next business day following the day such notice is delivered to the courier service, or (d) if sent by certified mail, at the time of receipt thereof by the receiving party at the address of such party set forth above.

(h)    Entire Agreement. This Agreement, together with the Exhibits hereto and the other agreements executed and delivered herewith, embody the entire agreement and understanding between the Purchaser and the Seller , and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

(i)    Modifications and Amendments. Every amendment, change or modification of this Agreement shall be in writing and signed by the parties hereto.

(j)    Waivers and Consents. The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

(k)    <u>Binding Effect, Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Seller and the Purchaser and their respective, successors (including, without limitation, by sale or transfer of all or substantially all assets, merger or consolidation) and permitted assigns, except that the Seller shall have no right to delegate its obligations hereunder or to assign its rights hereunder or any interest herein except by a consent complying with the provisions set forth above.

(l)    <u>Counterparts</u>.  This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

[ REMAINDER OF PAGE INTENTIONALLY LEFT BLANK ]

IN WITNESS WHEREOF, the Parties have executed this Non-Competition and Non-Solicitation Agreement as of the date first above written.

SELLER

**BABCOCK BORSIG POWER GmbH**

By: _____

Name: _KRINIGMANN_

Its: _____


By: _____

Name: _Hamper_

Its: _____


PURCHASER

**BABCOCK POWER INC.**

By: _____

Nathan Hevrony, President

B0280695v4

**EXHIBIT A**

## PROMISSORY NOTE

$5,000,000                                November ___, 2002

    FOR VALUE RECEIVED, the undersigned, Babcock Power Inc., a Delaware corporation, with a place of business at 82 Cambridge Street, Burlington, Massachusetts 01803 (hereinafter referred to as the "Maker"), promises to pay to the order of Babcock Borsig Power GmbH, a German corporation ("BBP," and together with any subsequent holders of this Note, the "Payee"), in accordance with the payment instructions designated below, or at such other place as the Payee may from time to time designate in writing, the principal sum of

## FIVE MILLION UNITED STATES DOLLARS ($5,000,000)

    together with interest on the unpaid principal balance hereof from time to time at the LIBOR Rate (as defined below).  Such interest shall be due and payable monthly in arrears on the first day of each month commencing on the first day of the month next succeeding the date hereof, in the amount then accrued and unpaid.  In the absence of demonstrable error, the books and records of the Payee shall constitute prima-facie evidence of the unpaid principal balance and accrued interest hereof from time to time.

    This Note is being delivered to BBP pursuant to the terms of that certain Non-Competition Agreement dated even herewith between the Maker and BBP.

    As used herein, the term "LIBOR Rate" means the rate per annum as determined each month on the basis of the offered rates for deposits in U.S. Dollars, for a one (1) year period which appears on the Telerate page 3750 as of 11:00 a.m. London time on the day that is two (2) London Banking Days preceding the first day of each such month; *provided, however,* if the rate described above does not appear on the Telerate System on any applicable interest determination date, the LIBOR Rate shall be the rate per annum for deposits in U.S. Dollars for a one (1) year period on the Reuters Page "LIBO" (or such other page as may replace the LIBO Page on that service for the purpose of displaying such rates), as of 11:00 a.m. London time, on the day that is two (2) London Banking Days prior to the beginning of each such month.  As used herein, the term "London Banking Days" means a day on which dealings in U.S. Dollar deposits are transacted in the London Interbank Market.

    Principal shall be due and payable on the third anniversary of the date hereof, unless said third anniversary is a holiday or otherwise is a date upon which the New York Stock Exchange

B0280695v4

is not open, in which event principal shall be due and payable on the next succeeding business day as so defined. If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Payee on such date. This Note may be prepaid in whole, or from time to time in part, at any time without premium or penalty. The principal amount prepaid, if any, may not at any time be reborrowed.

In the event that the aggregate of all contingent obligations of Maker and its subsidiaries arising, directly or indirectly, from its guaranties, sureties, or other exposures to the Contingent Risks (as defined in the Stock Purchase Agreement dated as of November 13, 2002, between the Maker and the Payee pursuant to which the Maker purchased all of the issued and outstanding shares of capital stock of BBCC Holding Co., Inc. (the "Company") from BBP) is reduced below the principal amount of this Note then outstanding, Maker shall be required to post an irrevocable, unconditional letter of credit (with an expiration date no earlier than 30 days after the maturity date of this Note) issued by a first class international bank acceptable to the Payee (an "Letter of Credit") for an amount no less than the amount by which the then-outstanding principal amount of this Note exceeds the Contingent Risks. As and when the principal amount of this Note is reduced, Maker shall be entitled to reduce any Letter of Credit to reflect such reduction. If any Contingent Risks become non-contingent, or result in the incurrence of liability or payment on account thereof by Maker (a "Loss"), the principal amount of this Note shall be reduced dollar-for-dollar to reflect such Loss.

Payee hereby waives any right it may now have or hereafter acquire to require any of the Senior Lenders to marshal assets or otherwise exercise their respective rights and remedies in any particular order or manner.

In the event that the Payee intends to sell or otherwise transfer this Note, the Payee shall provide the Maker with written notice of such intended transfer and the price and other relevant terms relating to such transfer and provide the Maker with the right to elect in writing to purchase the Note upon the same terms as the intended transfer. In the event that the Maker does not provide notice to Payee exercising the Maker's right to purchase the Note within five (5) days of Maker's receipt of the Payee's notice to the Maker, the foregoing right shall thereupon expire.

Unless otherwise designated by Payee, all payments hereunder shall be submitted to Payee as follows:

If by Wire Transfer:

    Bank:        Sparkasse Krefeld, 47719 Krefeld

    Account No.:  60055795

-2-

Bank ID No.:  32050000

Swift Code:  SPKRDE33

IBAN:  DE84 3205 0000 0060 0557 95

Account

Holder:  Babcock Borsig Power GmbH

Attention:  Dr. Helmut Schmitz, Custodian of Babcock Borsig Power GmbH

If by delivery of check, draft, or money order:

Sparkasse Krefeld

Ostwall 155

GY-47798 Krefeld

All payments hereunder shall be payable in lawful money of the United States which shall be legal tender for public and private debts at the time of payment. Interest shall be calculated on the basis of a year consisting of 365 days. All payments shall be applied first to any costs and expenses of the Payee due hereunder, then to interest due hereunder, and any balance shall be applied in the manner as set forth above and the remainder shall be applied in reduction of principal in the inverse order of maturities.

Notwithstanding any other provision hereof, the Maker shall not be required to pay any amount pursuant hereto which is in excess of the maximum amount permitted under applicable law. It is the intention of the parties hereto to conform strictly to any applicable usury law, and it is agreed that if any amount contracted for, chargeable or receivable under this Note shall exceed the maximum amount permitted under any such law, any such excess shall be deemed a mistake and cancelled automatically and, if theretofore paid, shall be refunded to the Maker or, at the Payee's option, shall be applied as set forth above.

It is expressly agreed that the occurrence of any one or more of the following shall constitute an "Event of Default" hereunder: (a) failure to pay any amount of any installment of interest or principal hereunder which is not cured within five (5) days after Payee has given written notice to Maker of such failure other than pursuant to a valid exercise of the Maker's right of set off set forth in Section 8.6 of the Stock Purchase Agreement; or (b) the Maker's commencement of a voluntary case under Title 11 of the United States Code as from time to time in effect, or its authorizing, by appropriate proceedings, the commencement of such a voluntary case; (c) the Maker filing an answer or other pleading admitting or failing to deny the material allegations of a petition

-3-

B0280695v4

filed against it commencing an involuntary case under said Title 11, or seeking, consenting to or acquiescing in the relief therein provided, or admitting in writing the material allegations of any such petition; (d) the entry of an order for relief in any involuntary case commenced under said Title 11; (e) the Maker seeking relief as a debtor under any applicable law, other than said Title 11, of any jurisdiction relating to the liquidation or reorganization of debtors or to the modification or alteration of the rights of creditors, or its consenting to or acquiescing in such relief; (f) the entry of an order by a court of competent jurisdiction (i) finding the Maker to be bankrupt or insolvent, (ii) ordering or approving its liquidation, reorganization or any modification or alteration of the rights of creditors, or (iii) assuming custody of, or appointing a receiver or other custodian for, all or a substantial part of its property and such receiver or custodian is not discharged within thirty (30) days; (g) by its making an assignment for the benefit of, or entering into a composition with, its creditors, or appointing or consenting to the appointment of a receiver or other custodian for all or a substantial part of its property; or (h) the failure of Maker to provide the Letter of Credit within five (5) business days after the Maker has been informed by Payee, in writing, that the conditions requiring the post of the Letter of Credit have been satisfied. If any such Event of Default hereunder shall occur, the Payee may, at its option, declare to be immediately due and payable the then outstanding principal balance under this Note, with all accrued and unpaid interest thereon, and all other amounts payable to the Payee hereunder, whereupon all such amounts shall become and be due and payable immediately. The failure of the Payee to exercise said option to accelerate shall not constitute a waiver of the right to exercise the same at any other time.

In the event of a sale or merger, in either a single transaction, or a series of directly related transactions, whereby there is a change in ownership of (1) a majority of the capital stock of the Maker, (2) a majority of the assets of the Maker, (3) a majority of the capital stock of the subsidiaries of the Maker which, on a consolidated basis, account for a majority of the income of the Maker and its subsidiaries, or (4) a majority of the assets of the subsidiaries of the Maker, the Payee may, at its option, declare to be immediately due and payable the then outstanding principal balance under this Note, with all accrued and unpaid interest thereon, and all other amounts payable to the Payee hereunder, whereupon all such amounts shall become and be due and payable immediately; provided however, that any such accelerated payment shall be made only and to the extent that, and in the amount by which, the outstanding principal balance under this Note exceeds the aggregate amount of the contingent and actual obligations of Payee under Section 8.06 of the Stock Purchase Agreement between Maker and Payee, as amended from time to time. The failure of the Payee to exercise said option to accelerate shall not constitute a waiver of the right to exercise the same at any other time.

The Maker will pay on demand all costs and expenses, including reasonable attorneys' fees, incurred or paid by the Payee in enforcing or collecting any of the obligations of the Maker hereunder. The Maker agrees that all such costs and expenses and all other expenditures incurred by the Payee on account hereof, other than advances of principal, which are not reimbursed by the Maker immediately upon demand, all amounts due under this Note after maturity, and any amounts due hereunder if an Event of Default shall occur hereunder, shall bear interest at the LIBOR

-4-

Rate plus two percent (2%), but in no event more than the maximum rate of interest then permitted by law (the "Default Rate"), until such expenditures are repaid or this Note and such amounts as are due are paid to the Payee.

All notices required or permitted to be given hereunder shall be given in the manner required by the Stock Purchase Agreement between the Maker and the Payee.

All of the provisions of this Note shall be binding upon and inure to the benefit of the Maker and the Payee and their respective successors and assigns. This Note shall be interpreted in accordance with and governed by the laws of the Commonwealth of Massachusetts without regard to choice of law principles.

The Maker and every endorser and guarantor hereof hereby consents to any extension of time of payment hereof, release of all or any part of the security for the payment hereof, or release of any party liable for this obligation, and waives presentment for payment, demand, protest and notice of dishonor. Any such extension or release may be made without notice to the Maker and without discharging its liability.

IN WITNESS WHEREOF, the Maker has executed and delivered this Note, under seal, on the day and year first above written.

BABCOCK POWER INC.

By: _____

Nathan Hevrony, President

GH:0280483.7

-5-

B0280695v4

Exhibit B

Updated Schedule 3.06

Schedule 3.06

Hudson Investment Group, Inc.
Heads of Agreement
Agreed Terms on September 28, 2002
November 25, 2002

Combined Power Group
Due to/from Other Babcock Companies
As of October 31, 2002
($ Thousands)

| Due from Other Babcock Companies | BSPI | Vogt-NEM (a) | IEI | BGCC | Total | Assign to BSP GmbH | Net Payment due to BSP Environment | Forgive at of Closing | Offset & Against Vogt-NEM | BSW/T.T Note (b) | Pay to Item br | BSP RBX Release (c) | Pay Under Normal Terms | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Babcock Borsig AG | | | | 90,116 | 90,116 | 90,116 | | | | | | | | 90,116 |
| BP Turbine Services | | | | 1,010 | 1,010 | 1,010 | | | | | | | | 1,010 |
| BSP Environment | 48 | | | | 48 | 25 | 48 | | | | | | | |
| FB Companies, Inc. | 25 | | | | 25 | 856 | | | | | | | | 25 |
| Babcock Borsig Power Energy GmbH | 856 | | | | 856 | 4,500 | | | | | | | | 856 |
| Babcock Borsig Power GmbH | 4,500 | | | | 4,500 | | | | | | | | 7 (d) | 4,500 |
| Babcock Stalmaullar Wroclaw Sp.z o.o. | 4 | | | | 4 | 4 | | | | | | | | 7 |
| LT Babcock, Inc. | 7 | | | | 7 | 8 | | | | | | | | |
| Babcock Processautomation GmbH | 4 | | | | 4 | 4,700 | 8 | | | | | | | |
| Babcock Borsig Power Environment GmbH | 19 | | | | 19 | | 19 | | | | | | 90 (d) | |
| Babcock Borsig Machinery, Inc. | 5,896 | | | | 5,896 | | | | | | | | | 5,896 |
| BF Inc. | | | | | | | | 72 | | 1,100 | | | 6 (d) | |
| BF Inc. | 72 | | 72 | | 72 | | | | | | | | 17 (d) | |
| Ruassigo Pipe Rehab | | | | | | | | 185 | | | | | | |
| Babcock Textile Machinery, Inc. | 17 | | 17 | | 17 | | | 43 | | | | | | 17 |
| O Air FPL Inc. | 185 | | 185 | | 185 | | | 322 | | | | | | 185 |
| Hados Durr Service GmbH | 43 | | 43 | | 43 | | | 112 | | | | | | 43 |
| Thermal Engineering International Limited | 322 | | 322 | | 322 | | | | | | | | 577 (e) | 322 |
| SD Construcon, Inc. | 112 | | 112 | | 112 | | | | | | | | | 112 |
| Thermal Engineering International Limited | 377 | | 383 | | 377 | | | | 3,036 | | | | | 4,484 |
| HKCT Corp | 3 | 4,484 | | | | 1,446 | | | | | | | | |
| NEM b.v. | | | | | | | | | | | | | | |
| **Total** | **11,464** | **4,484** | **1,135** | **91,416** | **108,406** | | | | | | | | | |

| Due to Other Babcock Companies | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BSP Environment | 4,956 | | | | 4,956 | | (1,959) | (2,996) | | | | (98) | (4,3) (d) | |
| Babcock Borsig Power GmbH | 272 | | | | 272 | | | (272) | | | | (84) | (1,104) (d) | |
| TLT Babcock, Inc. | 3,184 | | | | 3,184 | | | | | | | (29) | | |
| Babcock Textile Machinery, Inc. | 96 | | | | 96 | | | | | | | (72) | | |
| LDuri Durr Service GmbH | 64 | | | | 64 | | | | | | | (110) | | |
| Babcock Stalmuullar Wroclaw Sp. Z o.o | 28 | | 10 | | 28 | | | | | | | | | |
| Babcock Processautomation GmbH | 73 | | | | 73 | | | | | | | | | |
| Babcock Borsig Power Environment GmbH | 140 | | | | 140 | | | | | | | | | |
| Babcock Borsig GmbH | 100 | | | | 100 | | | (103) | | | | | | |
| Babcock Borsig Machinery, Inc. | 65 | | | | 65 | | | (85) | | | | | (87) (d) | |
| NEM b.v. | | | | | 48,182 | (43,765) | | (1,379) | (3,036) | | (1,379) | | | |
| NEM Energy Services b.v. | 3,038 | 3,038 | | | 67 | | | | | | | | | |
| NEM Power Systems | 67 | 67 | | | 4,723 | | | (812) | | | | | (3,344) (d) | |
| Babcox Durr Service GmbH | 3,897 | 826 | 812 | 45,144 | | | | | | | | | | |
| **Total** | **12,070** | **3,931** | **822** | **45,144** | **63,767** | **50,115** | **(1,912)** | **(4,954)** | | **1,100** | **(1,379)** | **(401)** | **(5,995)** | |

(a)  Vogt-Nem amounts are as of November 11, 2002.

(b)  Note due from TLT/BEMJ to BSPI.  Subject to subordination from BSP GmbH and BBX and right of offset by BSPI.  Also Subject to the setoff provisions of 8.06

(c)  Hudson to receive release from BBX/BSP GmbH; however there will be no guarantees by either of these entities

(d)  Subject to offset provision of 8.06

(e)  Subject to offset provisions of 8.06 after deducting out 272 payable forgiven by BSP Power GmbH.

Exhibit C

Assignment of Account Receivable and Confirmation Agreement

## ASSIGNMENT OF ACCOUNT RECEIVABLE
## AND CONFIRMATION AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of this ___ day of November, 2002, by and among Babcock Borsig Power GmbH, a company incorporated under the laws of Germany ("BBP GmbH"), Babcock Borsig Machinery, Inc., a Delaware corporation ("BBMI"), and Vogt-NEM, Inc., a Delaware corporation ("VNI").

WHEREAS, BBP GmbH has entered into a stock purchase agreement (the "Stock Purchase Agreement") with Hudson Investment Group, Inc. ("Hudson") dated as of November 13, 2002, pursuant to which Hudson will purchase and acquire all of the issued and outstanding capital stock of BBCC Holding Co, Inc.; and

WHEREAS, in anticipation of, and as a condition precedent to, the consummation such transaction, the parties hereto desire to effect the assignment of a portion of a certain account receivable from BBP GmbH to VNI, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.   Effective Time. This Agreement and the transactions contemplated herein shall become effective immediately prior to the consummation of the transactions contemplated under the Stock Purchase Agreement; provided, however, that if such transactions are not consummated on or before December 31, 2002, this Agreement shall be null and void and shall have no force or effect whatsoever.

2.   Assignment by BBP GmbH to VNI. BBP GmbH hereby assigns, transfers and sets over unto VNI, its indirect wholly-owned subsidiary, all of its right, title and interest in and to a portion of the approximately Five Million Eight Hundred Ninety Five Thousand Four Hundred Fifty-One Dollars ($5,895,451) account receivable owed to BBP GmbH by BBMI as more particularly described on Schedule A attached hereto (the "BBP GmbH Receivable"), with such assigned portion (the "Assigned Portion") being equal to One Million One Hundred Thousand Dollars ($1,100,000).

3.   Acknowledgment of Assignment by BBMI. BBMI hereby acknowledges the assignment by BBP GmbH of the Assigned Portion to VNI, and agrees to pay the Assigned Portion in full within ten (10) business days following the consummation of and receipt of proceeds from the sale of TLT Babcock, Inc., an Ohio corporation, in the following order of priority: (a) to its commercial lenders in the principal amount of approximately $1,800,000 plus interest and fees, (b) to Vits America, Inc. in the aggregate amount of approximately $1,400,000, and (c) $1,100,000 to VNI in full satisfaction of the Assigned Portion. The balance of the proceeds from the sale of TLT Babcock, Inc. will be applied to (i) trade debt, amounts payable to creditors and costs of winding down the business and reserves therefore and (ii) the remaining balance due under the BBP Receivable to BBP GmbH. BBP GmbH hereby acknowledges such

order of priority of payments and agrees that its right to receive payment from BBMI on the BBP Receivable shall be subordinate to VNI's right to receive payment of the Assigned Portion in full.

    4.    <u>Miscellaneous</u>

    (a)    This Agreement contains the entire agreement of the parties with respect to the subject matter hereof; all prior agreements, commitments, understandings, representations, warranties and negotiations in connection herewith, if any, are hereby merged into this Agreement, and no oral representations shall in any manner whatsoever modify or explain any of the terms and conditions of this Agreement.

    (b)    This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

    (c)    The parties shall execute and deliver to each other, upon demand and from time-to-time, such other and additional documents and instruments of transfer and/or assumption as may reasonably be necessary to effectuate this Agreement.

    (d)    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized officers, under seal, as of the date first set forth above.

BABCOCK BORSIG POWER GMBH

By:_____

Name:_____

Its:_____


BABCOCK BORSIG MACHINERY, INC.

By:_____

Name:_____

Its:_____


VOGT-NEM, INC.

By:_____

Name:_____ Thomas C. Harmon

Its:_____ Sec. / Treasurer / CEO

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized officers, under seal, as of the date first set forth above.

BABCOCK BORSIG POWER GMBH

By:_____
Name:_____
Its:_____

BABCOCK BORSIG MACHINERY, INC.

By: Kennett M Dunk
Name: Kenneth M Fischer
Its: President + CEO

VOGT-NEM, INC.

By:_____
Name:_____
Its:_____

SCHEDULE A
BABCOCK BORSIG POWER, INC.
STATEMENT OF ACCOUNTS RECEIVABLE WITH BABCOCK BORSIG MACHINERY, INC.
10/31/2002

| | | |
|---|---:|---|
| 1-Sep JE181 and JE258 | 5,044,997.17 | Transfer CW Investment to BBMI |
| JE212 | 2,000.00 | Trans invest of FOM's |
| 1-Oct Verizon #2443 170500: | | |
| Beckmann | 88.36 | |
| Fischer | 287.14 | |
| VISA JE#3 and JE60 - Elaine Robinson | 420.65 | |
| AmExp #70 170802 - Beckmann - 8/17/01 | 668.50 | |
| BBMI payroll on BBPI's books | 18,419.03 | |
| 1-Nov JE3046 Verizon Wireless | 763.30 | |
| JE1 VISA PC Connection | 313.39 | |
| Cafe Services #164 172535 | 6.51 | |
| Joey's Limo #2665 172828 | 137.00 | |
| JE3065 telephone charge back | 885.17 | |
| BBMI payroll on BBPI's books | 30,307.73 | |
| 1-Dec BBMI payroll on BBPI's books | 33,655.72 | |
| BBMI payroll on BBPI's books - corr Oct | 12,742.04 | |
| BBMI payroll on BBPI's books - corr Nov | 4,204.40 | |
| BBMI payroll on BBPI's books - corr Dec | -3,544.08 | |
| Services for Oct | 3,633.00 | |
| Services for Nov | 3,633.00 | |
| Services for Dec | 3,633.00 | |
| Boise Cascade #218 173857 | 247.85 | |
| American Express #70 174048 | 788.00 | |
| Verizon Wireless #2443 174439 | 792.89 | |
| Cafe Services #164 174553 | 44.20 | |
| Hodes, Bernard Group #105 174754 | 855.00 | |
| JE3065 telephone charge back | 1,235.80 | |
| JE2 VISA PC Connection | 154.34 | |
| JE15 VISA Sunnyside Ford - Fischer | 148.42 | |
| 2-Jan JE1 VISA | 517.29 | |
| JE30652 J.Wood calling card adj | -153.80 | |
| BBMI payroll on BBPI's books - corr Jan | -10,411.59 | |
| BBMI payroll on BBPI's books | 88,307.91 | |
| BBMI payroll on BBPI's books | 24,881.14 | |
| Services for Jan | 3,633.00 | |
| American Express #70  176020 | 3,178.29 | |
| American Express #70  176604 | 604.11 | |
| Verizon wireless #2443  176533 | 162.57 | |
| Verizon wireless #2443  176533 | 43.75 | |
| Verizon wireless #2443  176533 | 285.49 | |
| Verizon wireless #2443  176533 | 226.75 | |
| Verizon wireless #2443  176533 | 66.89 | |
| Hodes Bernard Group #105  177219 | 855.00 | |
| JE3065 telephone charge back | 326.79 | |
| 2-Feb JE6 VISA | 216.64 | |
| Verizon Wireless #2443 178260 | 844.10 | |
| American Express #70 178344 | 668.00 | |
| American Express #70 178348 | 603.61 | |
| Boise Cascade #218 178764 | 37.68 | |
| Cafe Services #164  179445 | 45.57 | |
| JE3065 telephone charge back | 896.39 | |
| Services for February | 3,633.00 | |
| BBMI payroll on BBPI's books | 25,542.28 | |
| BBMI payroll on BBPI's books | 4,907.04 | |
| 2-Mar VISA | 189.00 | |
| VISA | 503.55 | |
| Boise Cascade #218  180584 | 90.12 | |
| American Express #70  180513 | 678.00 | |
| American Express #70  180726 | 613.61 | |
| Verizon Wireless #2443  180838 | 864.87 | |
| Voice Stream Wireless #2779  181311 | 80.46 | |
| JE3065 telephone charge back | 690.06 | |
| Services for March | 3,633.00 | |
| BBMI payroll on BBPI's books | 25,542.29 | |

SCHEDULE A
BABCOCK BORSIG POWER, INC.
STATEMENT OF ACCOUNTS RECEIVABLE WITH BABCOCK BORSIG MACHINERY, INC.
10/31/2002

|  |  |  |
|---|---|---:|
|  | BBMI payroll on BBPI's books | 4,966.14 |
|  | BBMI payroll adj. for March | 1,251.27 |
| 2-Apr | BBMI payroll adj. for March | -402.91 |
|  | Joey's Limo #2665  182181 | 107.00 |
|  | American Express #70  182418 | 4,501.22 |
|  | American Express #70  182835 | 613.61 |
|  | Voice Stream Wireless #2779  182628 | 175.32 |
|  | Verizon Wireless #2443  182944 | 701.39 |
|  | Boise Cascade #218  183257 | 161.51 |
|  | Boise Cascade #218  183961 | 24.32 |
|  | JE3065 telephone charge back | 1,508.52 |
|  | Services for April | 3,633.00 |
|  | BBMI payroll on BBPI's books | 25,542.28 |
|  | BBMI payroll on BBPI's books | 4,849.80 |
|  | KPMG #641  182939 | 1,400.00 |
| 2-May | BBMI payroll adj. for April | 7,733.97 |
|  | BBMI payroll for May | 445,541.17 |
|  | VISA JE 18 annual fee | 5.00 |
|  | American Express #70  184725 | 678.00 |
|  | Voicestream Wireless #2779  185142 | 163.31 |
|  | Verizon Wireless #2443  185258 | 754.26 |
|  | Cafe Services #164  185390 | 110.56 |
|  | KPMG #641  186397 | 3,725.00 |
|  | Boise Cascade #218  186448 | 388.61 |
|  | JE3065 telephone charge back | 1,027.03 |
|  | Services for May | 3,633.00 |
| 2-Jun | VISA | 1,780.00 |
|  | Joey's Limousine #2665  186922 | 92.00 |
|  | VoiceStream Wireless #2779  187167 | 165.22 |
|  | American Express #70  187288 | 678.00 |
|  | American Express #70  187560 | 630.73 |
|  | Verizon Wireless #2443  187660 | 637.90 |
|  | JE3065 telephone charge back | 502.47 |
|  | Services for June | 3,633.00 |
|  | BBMI payroll for June | 12,460.29 |
| 2-Oct | JE3329 Services to BBMI | 3,633.00 |
|  | BMI Payroll for Oct | 13,065.22 |
|  | T-Mobile #2779  196410 | 166.28 |
|  | Verizon Wireless #2443  196608 | 847.31 |
|  | American Express #70  196895 | 47.05 |
|  |  | 5,895,451.24 |

**Note:  All amounts are listed as of October 31, 2002.  The actual amounts will be the amounts outstanding as of the date of the consummation of the transactions contemplated in the stock purchase agreement.**

## APPROVAL OF BANKRUPTCY CUSTODIAN

     The undersigned, being duly authorized to act on behalf of Dr. Helmut Schmitz, the court-appointed Custodian of Babcock Borsig Power GmbH, a German company, pursuant to that certain Delegation of Authority dated November 29, 2002, in such capacity, and not individually, hereby approve the Non-Competition Agreement dated as of November 29, 2002, by and between Babcock Borsig Power GmbH and Hudson Investments Group, Inc. n/k/a Babcock Power Inc., a Delaware corporation, attached hereto, in accordance with the applicable laws of Germany as of this 29th day of November, 2002.


_____
Claus Brinkmann


_____
Bernhard Hampen

## APPROVAL OF BANKRUPTCY CUSTODIAN

The undersigned, being duly authorized to act on behalf of Dr. Helmut Schmitz, the court-appointed Custodian of Babcock Borsig Power GmbH, a German company, pursuant to that certain Delegation of Authority dated November 29, 2002, in such capacity, and not individually, hereby approve the First Amendment to Stock Purchase Agreement dated as of November 29, 2002, by and between Babcock Borsig Power GmbH and Hudson Investments Group, Inc. n/k/a Babcock Power Inc., a Delaware corporation, attached hereto, in accordance with the applicable laws of Germany as of this 29th day of November, 2002.

_____
Claus Brinkmann

_____
Bernhard Hampen