**EXHIBIT A**

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3    _____

BABCOCK BORSIG POWER GmbH,      *

4                                *

        Plaintiff,               *

5                                *

vs.                              *  CA No. 04 CV 10825-RWZ

6                                *

BABCOCK POWER, INC.,             *

7                                *

        Defendant.               *

8    _____ *

9

10        ORAL DEPOSITION OF DR. GEORG-PETER

11   KRAENZLIN, produced as a witness at the instance of

12   the Defendant, taken in the above-styled cause on

13   the 28th day of July, 2005, from 10:06 a.m. to 3:19

14   p.m., before Candice F. Flowers, a Certified

15   Shorthand Reporter, at the offices of Babcock Borsig

16   AG i.I., Duisburger Strasse 375, in the City of

17   Oberhausen, Country of Germany, pursuant to the

18   agreements as stated on the record and/or the

19   Federal Rules of Civil Procedure.

20                                         **COPY**

21

22                      Reported By:
                  Candice F. Flowers, CSR
23               European Reporting Service
                     Meesmannstr. 52
24               58456 Witten, Germany
               Tel/Fax:  (011) 49 2302 277485
25             www.EuropeanReportingService.com

1          BBP GmbH entered into a contract with

2    Hudson Investment Group, whatever the legal entity

3    is.

4          Q     Now known as Babcock Power, Inc.

5          A     BPI.  Add an SPA, share purchase

6    agreement, on the BBCC shares, right?  In this

7    contract we have a noncompete provision -- or we had

8    a noncompete provision at the beginning, which

9    covered only any kind of competition coming out of

10   the former Babcock Borsig Power group, not only

11   comprising BBCC, but many other companies as well.

12         In the first draft -- or in one of the

13   first drafts, pretty much to the end actually, this

14   was our perception that the noncompete would cover

15   only the business below BBP GmbH.  Then BPI learned

16   about BBP Systems GmbH.  And I actually had a

17   conversation with Jim Wood on that; that this rescue

18   company will comprise the core businesses of the

19   former Babcock Borsig AG group.

20         I said, hey, wait a minute.  This cannot

21   be that we limit noncompete provision only to this

22   substructure, so to say, below BBP.  And then,

23   although it was not our agenda, we ultimately gave

24   in and said, okay, this business which will be

25   allocated within Babcock Borsig Power Systems GmbH,

1    we put as well under this noncompete agreement which

2    we entered into in the SPA on BBX.

3              Understood so far?

4        Q    Uh-huh.

5        A    In order to get there, we have to -- or we

6    had to accept the bridge to get BBPS, Incorporated

7    in the noncompete.  And then this creature here was

8    enlarged in order to get this involved.

9        Q    When you say "this creature here was

10   enlarged," since you are drawing on a board, you

11   drew a circle around "Holding" -- what's that?

12       A    That's nothing.  That's a one-man show.

13       Q    Okay.  You have a holding entity --

14       A    Right.

15       Q    -- above BBP GmbH --

16       A    Yeah, I don't recall --

17       Q    -- and then that goes to BBX.

18       A    AG, right.

19       Q    BBX is Babcock Borsig AG.

20       A    A simple holding company.

21              THE REPORTER:  Wait.  This is going

22   to get lost.  I need one person speaking at a time,

23   please.

24              MR. COMEN:  Okay.

25              THE REPORTER:  It's not going to come

1  out right in the transcript, because you're talking

2  over each other and I'll lose it.

3           MR. COMEN:  I understand.

4       A    Again, originally, the noncompete covered

5  the substructure of BBP GmbH in the course of the

6  negotiations.  Then Hudson Investment learned about

7  rescue company, which was in the process of being

8  developed over the following months.

9       Q    And the rescue company your hand is on is

10 Babcock Borsig Power Systems GmbH.

11      A    Called now Babcock Hitachi Europe GmbH.

12      Q    Okay.

13      A    So, finally, we made a concession, okay?

14 We broaden the scope of the noncompete from BBP

15 group structure in a way so that BBP Systems GmbH

16 will be also bound by the noncompete.

17      Q    And you drew this circle -- your blue

18 circle goes all the way above and around BBX.

19      A    Right.  Why?  We had to go to the legal

20 structure in order to get there, because this is 100

21 percent, this is 100 percent, and this is 100

22 percent.

23      Q    And when you say "this" and "this" and

24 "this," the court reporter won't be able to take

25 that down.  You are drawing that BBX owns 100

**<u>EXHIBIT B</u>**

060117BA.txt

UNCERTIFIED ROUGH TRANSCRIPT    1

COURT REPORTER'S DISCLAIMER IN THE MATTER OF

Babcock Borsig Power GmbH
vs.
Babcock Power Inc., ETC.

5          The following deposition transcript of
Georg-Peter Kraenzlin, taken on Tuesday, Januar 17,
2006, is being delivered UNEDITED and UNCERTIFIED by
the court reporter at the request of Attorneys Comen
and Bello.

          The party working with this product agrees not
to share, give, copy, scan, fax, or in any way
distribute this realtimed rough draft in any form
(written or computerized) to any other party.
10

          The party's experts, co-counsel, and staff may
have limited internal use thereof with the
understanding that this realtimed rough draft will
be destroyed and replaced by the final edited,
certified transcript when it is received by the
party in due course.

          The party agrees to indemnify and hold harmless
Doris O. Wong Associates, Inc., and its court
15   reporter Carol H. Kusinitz if the unedited and
uncertified version of this transcript is cited by
any party to this matter and becomes a point of
contention within this case or any other
controversy.



20

⬜

UNCERTIFIED ROUGH TRANSCRIPT    2

P R O C E E D I N G S

GEORG-PETER KRAENZLIN, Resumed

a witness called for examination by counsel for the

Defendant, being duly identified by his German

5   identification card and sworn, was examined and

Page 1

060117BA.txt

Q        So you have no damages which you are

UNCERTIFIED ROUGH TRANSCRIPT    21

asserting in connection with Mitsui; is that
correct?

A        I did not enter or Dr. Schmitz did not
enter into a contract with Mitsui.  Mitsui backed
5    off when we were in the course of selling the
service business.

Q        So you claim no damages now in connection
with any transaction associated with Mitsui; is that
correct?

10    A        With Mitsui, correct.

Q        Now, you listed three companies, the German
financial investors that bought Babcock Borsig
service, the Austrian company that bought the
Espania entity, and someone who bought the UK
15    entity.  Are there any others that you specifically
claim damages on account of?

A        For the time being I think we did not claim
damages, per se, because I wanted to see how the
case goes, the first answer.  The second answer, I
20    don't recall now on the top of my head whether there
were other transactions where I had, again, these
dispute on this non-compete agreement.  I made so
many transactions that I have to go into my files
and check.

UNCERTIFIED ROUGH TRANSCRIPT    22

Q        Well, then having in mind this is discovery
Page 18

**EXHIBIT C**

060117BA.txt

UNCERTIFIED ROUGH TRANSCRIPT     1


COURT REPORTER'S DISCLAIMER IN THE MATTER OF

Babcock Borsig Power GmbH
vs.
Babcock Power Inc., ETC.

5          The following deposition transcript of
Georg-Peter Kraenzlin, taken on Tuesday, Januar 17,
2006, is being delivered UNEDITED and UNCERTIFIED by
the court reporter at the request of Attorneys Comen
and Bello.

           The party working with this product agrees not
to share, give, copy, scan, fax, or in any way
distribute this realtimed rough draft in any form
(written or computerized) to any other party.
10

           The party's experts, co-counsel, and staff may
have limited internal use thereof with the
understanding that this realtimed rough draft will
be destroyed and replaced by the final edited,
certified transcript when it is received by the
party in due course.

           The party agrees to indemnify and hold harmless
Doris O. Wong Associates, Inc., and its court
15  reporter Carol H. Kusinitz if the unedited and
uncertified version of this transcript is cited by
any party to this matter and becomes a point of
contention within this case or any other
controversy.



20


UNCERTIFIED ROUGH TRANSCRIPT     2


P R O C E E D I N G S

GEORG-PETER KRAENZLIN, Resumed

a witness called for examination by counsel for the

Defendant, being duly identified by his German

5   identification card and sworn, was examined and

Page 1

060117BA.txt

Q        Antitrust laws in the United States or in Germany?

A        Here.

Q        And you received an opinion from someone on
15   that or that was your opinion?

         MR. BELLO:  Objection.  Again, if you're going to ask what he's talked to counsel about --

Q        Is that opinion based on --

         MR. BELLO:  If it's your own opinion, can
20   you testify.

A        I am not admitted to the bar here, but for me personally, the originally expressed hostile interpretation of the non-compete would have violated U.S. antitrust law, or at least it would

☐

                UNCERTIFIED ROUGH TRANSCRIPT     67

have been, according to European standards.

Q        I only have a couple of questions and then we'll break for lunch.  You expressed an opinion that Babcock Power had a post closing fiduciary duty
5   to sign the documents you requested be signed in connection with the Hitachi deal, did you not?

A        The legal evaluation, I leave to our local lawyers here.

Q        No, no, but it was your term.  Do you
10   recall using the term, "post closing fiduciary duty"?

A        I don't recall.

Q        Do you claim that anyone on behalf of Babcock Power affirmatively stated to anyone an

                        Page 57

060117BA.txt

15  interpretation or did anything else affirmatively to

    interfere with your deal with Hitachi, or is your

    claim that they simply failed to sign one of the

    documents you asked them to sign?

        MR. BELLO:  Objection.  Compound question.

20  Would you read it back, please.

        (Question read)

        MR. BELLO:  Objection.  You can answer

    that.

    A       When your question was, if somebody told me

                UNCERTIFIED ROUGH TRANSCRIPT    68

    from BPI's side whether or not the non-compete

    should refer also to the already existing business

    of, for example, Hitachi --

    Q       No, let me see if I can make my --

5   A       The clear answer is yes.

    Q       After the closing --

    A       Correct.

    Q       -- someone told you what?

    A       That already existing businesses of the

10  purchaser here, in this case Hitachi, should be

    bound by the non-compete agreement.

    Q       Who told you that?

    A       Nathan Hevrony, although he was relaying or

    referring Jim Wood's opinion to me, because he,

15  Nathan Hevrony, confirmed our understanding of the

    non-compete.  And therefore he was complaining about

    the behavior of the board of Babcock Power Inc..

    Q       Other than that conversation that you just

    described, was there anything else that was done or

                        Page 58

060117BA.txt

20    said by anyone on behalf of Babcock Power that you

      claim wrongfully interfered with your dealings with

      Hitachi?

              MR. BELLO:  Objection.

      A       It was not only one meeting in which Nathan

                UNCERTIFIED ROUGH TRANSCRIPT    69

      Hevrony relayed that to me, it were several meetings

      or phone conversations I had with him, because at

      the time when I was trying to close the sale on the

      rescue company, there was a constant effort on my

5     side to get the closing conditions done, and

      therefore I was contacting him, Nathan Hevrony, and

      I got this information back.

      Q       So other than conversations that you had

      with Mr. Hevrony in which he said something about

10    what Jim Wood had said to him, there is nothing else

      that you claim that interfered at all with your

      Hitachi deal; is that --

              MR. BELLO:  Objection.

      A       The statement is not correct.

15    Q       What else do you claim?

      A       I have to check my files whether there is

      any correspondence directly from myself to Jim Wood.

      Q       All right.  But is it your claim that

      either Mr. Hevrony, Jim Wood or anyone else from

20    Babcock ever said anything to anyone at Babcock

      Hitachi that interfered with your deal?

      A       Whether Hitachi people told me that they

      were told by BPI representatives?

                        Page 59

060117BA.txt

Q        Or in any other way you claim that someone

from Babcock Power said something to Babcock Hitachi

people that interfered with your deal.  All you've

described up to now is conversations you had with

Mr. Hevrony about what he said Jim Wood said to him.

5    A        Because he was the guy who we were

negotiating within the course of the acquisition --

or the sale of the rescue company.

Q        I understand, but --

A        So, therefore, he was our natural point of

10    reference when we talk about contract issues.

Q        Please let's be clear before we break for

lunch.  All you have described so far is

conversations that someone had with you --

A        I think.

15    Q        How did those conversations wrongfully

interfere with anything that was happening with

Hitachi?

A        I think I stated already that this

statement is not correct.  I have to look into my

20    correspondence I had directly with Jim Wood or

representatives of BPI in regard to that issue.

So --

Q        Other than communications with Jim Wood or

other representatives asking them to sign a

document, do you claim that anyone from Babcock

Page 60

060117BA.txt

Power said anything to Babcock Hitachi people
directly that interfered with your deal?

A        I don't recall.

5    Q        As you sit here today, you have absolutely
no memory of any such statements being made by
anyone from Babcock Power to Babcock Hitachi?

A        I don't recall.  I have to look into my
files.  And it also might very well be that on
10    another communication level or line, actually, this
information was referred to.

Q        What other communication level or line?

A        For example, somebody from Hitachi said
something to Dr. Schmitz or Ludger Kramer or
15    whatever.

Q        Said something to those gentlemen about a
conversation that they may have had with someone
from Babcock Power?

A        Right.  -- no, whether they were informed
20    by Babcock Hitachi representatives about any saying
BPI representatives made to Hitachi representatives.

Q        Okay.

MR. COMEN:  Why don't we break for lunch
and see if your memory is refreshed over lunch and

UNCERTIFIED ROUGH TRANSCRIPT    72

I'll follow upright where we left off.

MR. BELLO:  We want 45 minutes.

MR. COMEN:  20 past 2:00 or a quarter past
2:00.

5    MR. BELLO:  20 past 2:00.

Page 61