# EXHIBIT A

060117BA1.txt

UNCERTIFIED ROUGH TRANSCRIPT    1

COURT REPORTER'S DISCLAIMER IN THE MATTER OF

Babcock Borsig Power GmbH
vs.
Babcock Power Inc., ETC.

5      The following deposition transcript of
Georg-Peter Kraenzlin, taken on Tuesday, Januar 17,
2006, is being delivered UNEDITED and UNCERTIFIED by
the court reporter at the request of Attorneys Comen
and Bello.

The party working with this product agrees not
to share, give, copy, scan, fax, or in any way
distribute this realtimed rough draft in any form
(written or computerized) to any other party.

10

The party's experts, co-counsel, and staff may
have limited internal use thereof with the
understanding that this realtimed rough draft will
be destroyed and replaced by the final edited,
certified transcript when it is received by the
party in due course.

The party agrees to indemnify and hold harmless
Doris O. Wong Associates, Inc., and its court
15    reporter Carol H. Kusinitz if the unedited and
uncertified version of this transcript is cited by
any party to this matter and becomes a point of
contention within this case or any other
controversy.

20

0

UNCERTIFIED ROUGH TRANSCRIPT    2

P R O C E E D I N G S

GEORG-PETER KRAENZLIN, Resumed

a witness called for examination by counsel for the

Defendant, being duly identified by his German

5    identification card and sworn, was examined and

060117BA.txt

Q        Antitrust laws in the United States or in Germany?

A        Here.

Q        And you received an opinion from someone on
15    that or that was your opinion?

MR. BELLO:  Objection.  Again, if you're going to ask what he's talked to counsel about --

Q        Is that opinion based on --

MR. BELLO:  If it's your own opinion, can
20    you testify.

A        I am not admitted to the bar here, but for me personally, the originally expressed hostile interpretation of the non-compete would have violated U.S. antitrust law, or at least it would

UNCERTIFIED ROUGH TRANSCRIPT    67

have been, according to European standards.

Q        I only have a couple of questions and then we'll break for lunch.  You expressed an opinion that Babcock Power had a post closing fiduciary duty
5    to sign the documents you requested be signed in connection with the Hitachi deal, did you not?

A        The legal evaluation, I leave to our local lawyers here.

Q        No, no, but it was your term.  Do you
10    recall using the term, "post closing fiduciary duty"?

A        I don't recall.

Q        Do you claim that anyone on behalf of Babcock Power affirmatively stated to anyone an

Page 57

060117BA.txt

15    interpretation or did anything else affirmatively to

interfere with your deal with Hitachi, or is your

claim that they simply failed to sign one of the

documents you asked them to sign?

          MR. BELLO:  Objection.  Compound question.

20    Would you read it back, please.

          (Question read)

          MR. BELLO:  Objection.  You can answer

that.

A         When your question was, if somebody told me

0

          UNCERTIFIED ROUGH TRANSCRIPT    68

from BPI's side whether or not the non-compete

should refer also to the already existing business

of, for example, Hitachi --

Q         No, let me see if I can make my --

5    A         The clear answer is yes.

Q         After the closing --

A         Correct.

Q         -- someone told you what?

A         That already existing businesses of the

10    purchaser here, in this case Hitachi, should be

bound by the non-compete agreement.

Q         Who told you that?

A         Nathan Hevrony, although he was relaying or

referring Jim Wood's opinion to me, because he,

15    Nathan Hevrony, confirmed our understanding of the

non-compete.  And therefore he was complaining about

the behavior of the board of Babcock Power Inc..

Q         Other than that conversation that you just

described, was there anything else that was done or

Page 58

060117BA.txt

20    said by anyone on behalf of Babcock Power that you
      claim wrongfully interfered with your dealings with
      Hitachi?

            MR. BELLO:  Objection.

      A       It was not only one meeting in which Nathan

0

                UNCERTIFIED ROUGH TRANSCRIPT    69


      Hevrony relayed that to me, it were several meetings
      or phone conversations I had with him, because at
      the time when I was trying to close the sale on the
      rescue company, there was a constant effort on my
5     side to get the closing conditions done, and
      therefore I was contacting him, Nathan Hevrony, and
      I got this information back.

      Q       So other than conversations that you had
      with Mr. Hevrony in which he said something about
10    what Jim Wood had said to him, there is nothing else
      that you claim that interfered at all with your
      Hitachi deal; is that --

            MR. BELLO:  Objection.

      A       The statement is not correct.
15    Q       What else do you claim?

      A       I have to check my files whether there is
      any correspondence directly from myself to Jim Wood.

      Q       All right.  But is it your claim that
      either Mr. Hevrony, Jim Wood or anyone else from
20    Babcock ever said anything to anyone at Babcock
      Hitachi that interfered with your deal?

      A       Whether Hitachi people told me that they
      were told by BPI representatives?

                        Page 59

060117BA.txt

Q        Or in any other way you claim that someone

UNCERTIFIED ROUGH TRANSCRIPT    70

from Babcock Power said something to Babcock Hitachi

people that interfered with your deal.  All you've

described up to now is conversations you had with

Mr. Hevrony about what he said Jim Wood said to him.

5    A        Because he was the guy who we were

negotiating within the course of the acquisition --

or the sale of the rescue company.

Q        I understand, but --

A        So, therefore, he was our natural point of

10    reference when we talk about contract issues.

Q        Please let's be clear before we break for

lunch.  All you have described so far is

conversations that someone had with you --

A        I think.

15    Q        How did those conversations wrongfully

interfere with anything that was happening with

Hitachi?

A        I think I stated already that this

statement is not correct.  I have to look into my

20    correspondence I had directly with Jim Wood or

representatives of BPI in regard to that issue.

So --

Q        Other than communications with Jim Wood or

other representatives asking them to sign a

UNCERTIFIED ROUGH TRANSCRIPT    71

document, do you claim that anyone from Babcock
Page 60

060117BA.txt

Power said anything to Babcock Hitachi people
directly that interfered with your deal?

A        I don't recall.

5    Q        As you sit here today, you have absolutely
no memory of any such statements being made by
anyone from Babcock Power to Babcock Hitachi?

A        I don't recall.  I have to look into my
files.  And it also might very well be that on
10    another communication level or line, actually, this
information was referred to.

Q        What other communication level or line?

A        For example, somebody from Hitachi said
something to Dr. Schmitz or Ludger Kramer or
15    whatever.

Q        Said something to those gentlemen about a
conversation that they may have had with someone
from Babcock Power?

A        Right.  -- no, whether they were informed
20    by Babcock Hitachi representatives about any saying
BPI representatives made to Hitachi representatives.

Q        Okay.

MR. COMEN:  Why don't we break for lunch
and see if your memory is refreshed over lunch and

UNCERTIFIED ROUGH TRANSCRIPT    72

I'll follow upright where we left off.

MR. BELLO:  We want 45 minutes.

MR. COMEN:  20 past 2:00 or a quarter past
2:00.

5        MR. BELLO:  20 past 2:00.

Page 61

# EXHIBIT B

GEORG-PETER KRAENZLIN - JULY 28, 2005

1

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3   _____

    BABCOCK BORSIG POWER GmbH,        *
4                                     *
         Plaintiff,                   *
5                                     *
    vs.                               *  CA No. 04 CV 10825-RWZ
6                                     *
    BABCOCK POWER, INC.,              *
7                                     *
         Defendant.                   *
8   _____          *

9

10        ORAL DEPOSITION OF DR. GEORG-PETER

11   KRAENZLIN, produced as a witness at the instance of

12   the Defendant, taken in the above-styled cause on

13   the 28th day of July, 2005, from 10:06 a.m. to 3:19

14   p.m., before Candice F. Flowers, a Certified

15   Shorthand Reporter, at the offices of Babcock Borsig

16   AG i.I., Duisburger Strasse 375, in the City of

17   Oberhausen, Country of Germany, pursuant to the

18   agreements as stated on the record and/or the

19   Federal Rules of Civil Procedure.

20                                        **COPY**

21

22                    Reported By:
                 Candice F. Flowers, CSR
23               European Reporting Service
                    Meesmannstr. 52
24                58456 Witten, Germany
              Tel/Fax:  (011) 49 2302 277485
25            www.EuropeanReportingService.com

1          BBP GmbH entered into a contract with

2    Hudson Investment Group, whatever the legal entity

3    is.

4          Q     Now known as Babcock Power, Inc.

5          A     BPI.  Add an SPA, share purchase

6    agreement, on the BBCC shares, right?  In this

7    contract I have a noncompete provision -- or we had

8    a noncompete provision at the beginning, which

9    covered only any kind of competition coming out of

10   the former Babcock Borsig Power group, not only

11   comprising BBCC, but many other companies as well.

12          In the first draft -- or in one of the

13   first drafts, pretty much to the end actually, this

14   was our perception that the noncompete would cover

15   only the business below BBP GmbH.  Then BPI learned

16   about BBP Systems GmbH.  And I actually had a

17   conversation with Jim Wood on that; that this rescue

18   company will comprise the core businesses of the

19   former Babcock Borsig AG group.

20          I said, hey, wait a minute.  This cannot

21   be that we limit noncompete provision only to this

22   substructure, so to say, below BBP.  And then,

23   although it was not our agenda, we ultimately gave

24   in and said, okay, this business which will be

25   allocated within Babcock Borsig Power Systems GmbH,

1  we put as well under this noncompete agreement which

2  we entered into in the SPA on BBX.

3          Understood so far?

4      Q    Uh-huh.

5      A    In order to get there, we have to -- or we

6  had to accept the bridge to get BBPS, Incorporated

7  in the noncompete.  And then this creature here was

8  enlarged in order to get this involved.

9      Q    When you say "this creature here was

10 enlarged," since you are drawing on a board, you

11 drew a circle around "Holding" -- what's that?

12     A    That's nothing.  That's a one-man show.

13     Q    Okay.  You have a holding entity --

14     A    Right.

15     Q    -- above BBP GmbH --

16     A    Yeah, I don't recall --

17     Q    -- and then that goes to BBX.

18     A    AG, right.

19     Q    BBX is Babcock Borsig AG.

20     A    A simple holding company.

21              THE REPORTER:  Wait.  This is going

22 to get lost.  I need one person speaking at a time,

23 please.

24              MR. COMEN:  Okay.

25              THE REPORTER:  It's not going to come

1 out right in the transcript, because you're talking

2 over each other and I'll lose it.

3            MR. COMEN:  I understand.

4       A    Again, originally, the noncompete covered

5 the substructure of BBP GmbH in the course of the

6 negotiations.  Then Hudson Investment learned about

7 rescue company, which was in the process of being

8 developed over the following months.

9       Q    And the rescue company your hand is on is

10 Babcock Borsig Power Systems GmbH.

11      A    Called now Babcock Hitachi Europe GmbH.

12      Q    Okay.

13      A    So, finally, we made a concession, okay?

14 We broaden the scope of the noncompete from BBP

15 group structure in a way so that BBP Systems GmbH

16 will be also bound by the noncompete.

17      Q    And you drew this circle -- your blue

18 circle goes all the way above and around BBX.

19      A    Right.  Why?  We had to go to the legal

20 structure in order to get there, because this is 100

21 percent, this is 100 percent, and this is 100

22 percent.

23      Q    And when you say "this" and "this" and

24 "this," the court reporter won't be able to take

25 that down.  You are drawing that BBX owns 100

# EXHIBIT C

## APPROVAL OF BANKRUPTCY CUSTODIAN

The undersigned, being duly authorized to act on behalf of Dr. Helmut Schmitz, the court-appointed Custodian of Babcock Borsig Power GmbH, a German company, pursuant to that certain Delegation of Authority dated November 30, 2002, in such capacity, and not individually, hereby approve the Non-Competition Agreement dated as of November 29, 2002, by and between Babcock Borsig Power GmbH and Hudson Investments Group, Inc. n/k/a Babcock Power Inc., a Delaware corporation, attached hereto, in accordance with the applicable laws of Germany as of this 29th day of November, 2002.

_____
Claus Brinkmann

_____
Bernhard Hampen

B646875.2

## NON-COMPETITION AGREEMENT

This NON-COMPETITION AGREEMENT (the "*Agreement*") is made as of November 29, 2002, by and among Babcock Power, Inc., a Delaware corporation ("*Purchaser*"), and Babcock Borsig Power GmbH, a German corporation ("*Seller*"). For the purposes of this Agreement, the term "*Seller*" shall mean Babcock Borsig Power GmbH, any of its direct or indirect Subsidiaries, Affiliates or successors or assigns, excluding for all purposes hereof the Seller's subsidiary NEM b.v., a Netherlands corporation and its subsidiaries, successors and assigns; provided, however, that this exclusion shall not apply to any business or operations acquired from and after the date hereof by NEM b.v. or any of its subsidiaries, successors or assigns, from Babcock Borsig AG, its subsidiaries, successors or assigns.

WHEREAS, Purchaser and Babcock Borsig Power GmbH have entered into a Stock Purchase Agreement dated as of November 13, 2002 (the "*Purchase Agreement*") which provides for the purchase by Purchase of all of the outstanding capital stock of BBCC Holding Co., Inc. (the "*Company*"). Capitalized terms used in this Agreement shall have the meaning of such terms as used in the Purchase Agreement, unless otherwise defined herein.

WHEREAS, prior to the consummation of the transactions contemplated in the Purchase Agreement (the "*Sale*"), Seller is the sole owner of the Company, and as a result of the Sale, Seller shall receive from Purchaser significant consideration in exchange for all the Shares of the Company's Common Stock held by Seller pursuant to the terms of the Purchase Agreement.

WHEREAS, as a condition to the Sale, and to preserve the value of the business being acquired by Purchaser after the Sale, the Purchase Agreement contemplates, among other things, that in consideration of the Non-Compete Payment (as defined herein), the Seller shall enter into this Agreement as of the date hereof.

NOW, THEREFORE, in consideration of the mutual promises and covenants made herein, Purchaser and the Seller hereby agree as follows:

Section 1.     <u>Covenant Not to Compete or Solicit</u>.

(a)     Beginning on the date hereof and ending on the third (3rd) anniversary of the Closing Date (the "*Non-Competition Period*"), Seller shall not directly or indirectly, without the prior written consent of Purchaser, Engage in a Competitive Business Activity anywhere in the Restricted Territory.

For all purposes hereof, the following terms shall be defined as follows:

B644654.2
B0280695v4

-1-

"*Engage*" (including with correlative meanings the terms "Engages", "Engaging" and "Engaged") shall mean engaging, operating, managing, working, consulting and/or participating (whether as a partner, shareholder, investor, principal, representative, member, officer, director, agent, trustee, consultant, lender, employee, proprietor or in any other relationship or capacity) whether for the Seller's own account or for that of any other Person, either directly or indirectly.

"*Competitive Business Activity*" shall mean Engaging in the Business or having a direct or indirect ownership interest in any business, Person, or other entity which Engages in the Business.

"*Business*" shall mean: (i) within the customer market composed of fossil-fired and waste-to-energy power plants located in the Restricted Territory, all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance and sale of new equipment or replacement parts for selective catalytic reduction and flue gas desulfurization equipment for the reduction of nitrous oxide or sulphur dioxide emissions (the "*Environmental Business*"); (ii) within the customer market composed of fossil-fired (including but not limited to combined cycle) or nuclear power plants located in the Restricted Territory, all activities associated with the provision of the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of boiler components and pressure parts, power plant construction-related services, boiler rebuilds and retrofits, engineered replacement parts or field services (the "*Service Business*"); and (iii) within the customer market composed of fossil-fired (including but not limited to combined cycle) and nuclear power plants located in the Restricted Territory, all activities associated with the design, engineering, manufacture, fabrication, installation, servicing, maintenance or sale of condensers, feedwater heaters and moisture separator reheaters (the "*Heat Exchanger Business*").

"*Restricted Territory*" shall mean, each and every country, province, state, city or other political subdivision of the United States and Canada.

(b)    During the Non-Competition Period, Seller shall not directly or indirectly: solicit, encourage or take any other action which is intended to induce or encourage any employee of Purchaser, the Company or any of their respective Subsidiaries or to terminate his or her employment with Purchaser, the Company or any of their respective Subsidiaries.

(c)    The covenants contained in Section 1(a) hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenants contained in Section 1(a) and Section 1(b) hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In

the event that the provisions of this Section 1 are deemed to exceed the time, geographic or scope limitations permitted by applicable law of any specific jurisdiction, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be permitted by applicable laws of that jurisdiction, but without impact upon the meaning of those provisions in other jurisdictions.

(d)    Seller acknowledges that the goodwill associated with the existing business, customers and assets of the Company and its Subsidiaries prior to the sale are an integral component of the value of the Company to Purchaser and is reflected in the Non-Compete Payment and the consideration in the sale payable to Seller, and Seller's agreement as set forth herein is necessary to preserve the value of the Company and its Subsidiaries for Purchaser following the Sale. Seller also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things, (i) the Company, its Subsidiaries and Purchaser are engaged in a highly competitive industry, and (ii) Seller is receiving significant consideration in connection with the Sale and this Agreement.

Section 2.    Non-Compete Payment.  In consideration of the Seller's covenants contained herein, Purchaser shall deliver upon the execution hereof: (i) a Promissory Note in the face amount of $5,000,000 in the form attached hereto as Exhibit A; and (ii) a payment in cash by wire transfer in the amount of $2,500,000.00 ((i) and (ii), collectively, the "Non-Compete Payment").

Section 3.    Choice of Law; Enforcement

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without giving effect to the principles of conflicts of laws.

(b)    Each of the parties hereto acknowledge and agree that the rights acquired by each party hereunder are unique and that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or other interim or conservatory relief (as necessary) to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of the United States located in the Commonwealth of Massachusetts or in a Massachusetts state court, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties:  (i) consents to submit itself to the personal jurisdiction of any Federal court in the Commonwealth of Massachusetts or any Massachusetts state court in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated hereby in any court other than a Federal court sitting in the Commonwealth of Massachusetts or a Massachusetts state court.

(c)    Without limiting any of the rights or remedies of the Purchaser contained herein, the parties hereto agree that the damages recoverable by any party under this Agreement shall be limited to actual damages and shall not include incidental, consequential, indirect or punitive damages whether arising in contract, tort, statute or otherwise.

(d)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUR OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 4.    Miscellaneous.

(a)    Severability.  Without limiting the generality of Section 1 hereof: (i) In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect; and (ii) in the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

(b)    Interpretation.  The parties hereto acknowledge and agree that the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(c)    Headings and Captions.  The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

(d)    No Waiver of Rights, Powers and Remedies.  No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party.

No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

(e)     Attorney Fees.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

(f)     Transfer of Rights.  This Agreement, and the rights and benefits which may inure to the Purchaser hereunder, may be transferred by the Purchaser to any transferee or purchaser of the Purchaser in connection with any transaction in which such transferee or purchaser acquires at least fifty (50%) percent of the stock equity or assets of the Purchaser.  No such transfer shall, however, be effective unless and until the Seller is given written notice of such transfer and the transferee has provided the Seller with its principal business address and has agreed in writing to be bound by the terms and conditions of this Agreement.

(g)     Notices.  All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either:  (i) delivered by hand, (ii) made by facsimile transmission, (iii) sent by overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid.

if to the Seller:

Babcock Borsig Power GmbH
Duisburger Strasse 375
46044 Oberhausen
Germany
Facsimile: 011-49.208.833.4657
    Attention:  General Counsel

with a copy to:

Nixon Peabody LLP
101 Federal Street
Boston, MA 02110
Facsimile: (617) 345-1300
Attention:  Brian J. Crush, P.C.

if to the Purchaser:

B644654.2
B0280695v4

-5-

Babcock Power Inc.
c/oHudson Investment Group, Inc.
200 East 61st Street, Suite 406
New York, NY 10021
Facsimile: (212) 750-5039
Attention: Nathan Hevrony, President

with a copy to:

Gadsby Hannah LLP
225 Franklin Street
Boston, MA 02110
Facsimile: (617) 204-8011
Attention: Jeffrey M. Stoler, Esq.

All notices, requests, consents and other communications hereunder shall be deemed to have been given (a) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (b) if made by facsimile transmission, at the time during business hours that receipt thereof has been acknowledged by electronic confirmation or otherwise and if not, at 10:00 a.m. the following business day, (c) if sent by overnight courier, at the time of receipt thereof on the next business day following the day such notice is delivered to the courier service, or (d) if sent by certified mail, at the time of receipt thereof by the receiving party at the address of such party set forth above.

(h)   Entire Agreement.  This Agreement, together with the Exhibits hereto and the other agreements executed and delivered herewith, embody the entire agreement and understanding between the Purchaser and the Seller , and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

(i)   Modifications and Amendments.  Every amendment, change or modification of this Agreement shall be in writing and signed by the parties hereto.

(j)   Waivers and Consents.  The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

B644654.2
B0280695v4

-6-

(k)     Binding Effect, Assignment. This Agreement shall be binding upon and inure to the benefit of the Seller and the Purchaser and their respective, successors (including, without limitation, by sale or transfer of all or substantially all assets, merger or consolidation) and permitted assigns, except that the Seller shall have no right to delegate its obligations hereunder or to assign its rights hereunder or any interest herein except by a consent complying with the provisions set forth above.

(l)     Counterparts. This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

[ REMAINDER OF PAGE INTENTIONALLY LEFT BLANK ]

B644654.2
B0280695v4

IN WITNESS WHEREOF, the Parties have executed this Non-Competition and Non-Solicitation Agreement as of the date first above written.

**SELLER**

**BABCOCK BORSIG POWER GmbH**

By: _____
     Name: _____
     Its: _____

By: _____
     Name: _____
     Its: _____

**PURCHASER**

**BABCOCK POWER INC.**

By: _____
     Nathan Hevrony, President

-8-

B0280695v4