# In The Matter Of:

*Babcock Borsig Power GmbH  v.*
*Babcock Power Inc.  v.  Babcock Borsig AG*

---

*James F. Wood*
*Vol. 1, January 16, 2006*

*VIDEOTAPED*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

Original File WOOD.V1, 236 Pages
Min-U-Script® File ID: 1017850942

**Word Index included with this Min-U-Script®**

Page 1

Volume I
Pages 1 to 236
Exhibits 1 to 21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BABCOCK BORSIG POWER GmbH, :
    Plaintiff, :
vs. : Civil Action
    : No. 04 CV
BABCOCK POWER INC., : 01825-RWZ
    Defendant and :
    Third-Party Plaintiff, :
vs. :
BABCOCK BORSIG AG, :
    Third-Party Defendant. :

VIDEOTAPED DEPOSITION OF JAMES F. WOOD, a witness called on behalf of the Plaintiff and Third-Party Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Bello Black & Welsh LLP, 535 Boylston Street, Suite 1102, Boston, Massachusetts, on Monday, January 16, 2006, commencing at 11:15 a.m.

PRESENT:
Bello Black & Welsh LLP (by Kenneth M. Bello, Esq., and John F. Welsh, Esq.) 535 Boylston Street, Suite 1102, Boston, MA 02116, for the Plaintiff and Third-Party Defendant.
(Continued on Page 2)

Page 2

PRESENT (Continued):
Goodwin Procter LLP (by Steven J. Comen, Esq., and James O. Fleckner, Esq.) Exchange Place, Boston, MA 02109, for the Defendant and Third-Party Plaintiff.
Also Present: Wayne Martin, Videographer
    Jason Moschella, Videographer
    Georg-Peter Kraenzlin

Page 3

INDEX
| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JAMES F. WOOD | | | | |
| BY MR. BELLO | 7 | | | |

EXHIBITS
| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Document entitled "Plaintiff Babcock Borsig Power GmbH's First Request to Defendant Babcock Power Inc. For Production of Documents," dated June 8, 2005 | 19 |
| 2 | Termination letter from Babcock Borsig AG to James F. Wood dated August 29, 2002 | 53 |
| 3 | Two-page letter from Babcock Borsig Power GmbH to James F. Wood dated September 2, 2002 | 56 |
| 4 | Memo from Ludger Kramer to Senior Management of Babcock Borsig Capital Corporation dated September 25, 2002, Bates No. BPI 01218 | 83 |
| 5 | Printout of e-mail from Lorraine Wile to B. Crush, et al., dated 10/4/02, with attached memo from Jim Brantl to Brian Crush and Jeff Stoler of the same date, Bates Nos. BPI 09882 and 07714-716 | 114 |
| 6 | Printout of e-mail from Lorraine Wile to B. Crush, et al., dated 10/8/02, with attached memo from Jim Brantl to Brian Crush and Jeff Stoler of the same date, Bates Nos. BPI 09886-887 | 114 |

Case 1:04-cv-10825-RWZ   Document 43-3   Filed 02/10/2006   Page 3 of 7

James F. Wood
Vol. 1, January 16, 2006
VIDEOTAPED
Babcock Borsig Power GmbH v.
Babcock Power Inc. v. Babcock Borsig AG

Page 60

...to Germany.
[2] Q: Where in this memo does it —
[3] A: It doesn't.
[4] Q: It does not say that. So was this — was
[5] the top of Page 2 just simply made up, in your view,
[6] sir?
[7] A: The top of Page 2 is not an accurate
[8] reflection of the meeting that we had in Oberhausen.
[9] Q: Is there anything in this document that
[10] says this is a summary of the action items in
[11] Oberhausen?
[12] A: I didn't read anything that said that.
[13] Q: What did you understand your role to be,
[14] sir, in connection with effecting the sale of BBCC
[15] to a prospective buyer?
[16] A: I think I — I reflected that my role
[17] changed.
[18] Q: Well, let's start — when did it — if it
[19] changed, let's start from the beginning and move to
[20] when it changed. What was your initial role? What
[21] did you understand your initial role to be in
[22] connection with the potential sale of BBCC?
[23] A: My initial role was in connection with the
[24] sale of all of BBCC to an interested buyer.

Page 61

[1] Q: And what was your role to be, sir, in doing
[2] that?
[3] A: That I would be the representative of BBCC
[4] and BBCC management, that I would make the
[5] presentations to interested parties, and that I
[6] would represent that the material that BBCC put
[7] forward as part of the sale was accurate material.
[8] Q: Was there a period of time that you
[9] maintained — you understood that that was your
[10] role?
[11] A: Yes.
[12] Q: From when to when?
[13] A: From the beginning that I — well, from
[14] September of 2001, when I joined the company, until
[15] July of 2002, when the parent filed for insolvency.
[16] Q: And did someone communicate a change in
[17] role to you following July of 2002?
[18] A: In fact — in fact, the reason we went to
[19] the meeting in Frankfurt was to try and find out
[20] what our role was. There was little communication
[21] at all with the new management.
[22] Q: Did someone at some point communicate to
[23] you what your role was to be?
[24] A: No.

Page 62

[1] Q: Never?
[2] A: No.
[3] Q: So is it fair to say from July 2002 to
[4] November 29, 2002, you had no understanding of your
[5] role? Is that your testimony?
[6] MR. COMEN: I'm sorry. I object.
[7] MR. BELLO: That's okay.
[8] MR. COMEN: No understanding — did you
[9] finish the question?
[10] MR. BELLO: Well, you objected before I
[11] could even think whether I finished the question.
[12] MR. COMEN: Could you read the question
[13] before that —
[14] MR. BELLO: I'll just ask him the question.
[15] Q: I'll ask it again, sir.
[16] Is it fair to say that it's your testimony
[17] that between July 2002 and November 29, 2002, you
[18] had no understanding of your role in connection with
[19] the sale of BBCC?
[20] MR. COMEN: I object.
[21] A: No.
[22] Q: Did you have any understanding of your role
[23] in connection with the sale between those two dates?
[24] A: Yes.

Page 63

[1] Q: What was the basis of your understanding?
[2] A: My experience in operation of businesses of
[3] this type and my ability to represent these
[4] businesses as solvent and profitable businesses.
[5] Q: Other than — other than your experience
[6] and ability — did you have any communication with
[7] anyone reflecting the nature of your role in
[8] connection with the sale between July 2002 and
[9] November 29, 2002?
[10] A: Could you restate that question, please.
[11] Q: Sure. You've identified your experience
[12] and your ability. What I'm asking you is, did you
[13] have communication with anyone in management of the
[14] owner or otherwise responsible for the disposition
[15] of BBCC regarding your role and responsibilities in
[16] connection with the potential sale between July 2002
[17] and November 29, 2002.
[18] A: Two thousand —
[19] Q: — two.
[20] A: — two. I can't recall any specific, no.
[21] Q: How about anything general, sir?
[22] A: I can't recall anything general.
[23] Q: So you can't recall any conversation with
[24] Mr. Hampen as to what they expected you to do?

Page 92

and conditions of any deal other than it would
[2] involve all the companies?
[3]   A: I think — the only recollection I have of
[4] conditions were questions from Hevrony as to whether
[5] or not the management was committed to stay with the
[6] company.
[7]   Q: What was the answer to that?
[8]   A: The management that was present was
[9] committed. We weren't speaking for anybody else.
[10]   Q: And present, you believe, was Brandano,
[11] Brantl and you?
[12]   A: As I said, there may have been one or two
[13] others.
[14]   Q: Other than management being committed to
[15] stay, was there any other discussion regarding the
[16] terms and conditions of a potential deal?
[17]   A: I don't recall any.
[18]   Q: Was there any discussion about a
[19] non-compete?
[20]   A: No, I don't believe so.
[21]   Q: Did you provide a written summary of this
[22] meeting to the board of directors of BBCC?
[23]   A: I don't recall.
[24]   Q: If you provided such a written summary, I

Page 93

[1] presume — is it a fair assumption that it would
[2] still exist?
[3]   A: Yes.
[4]   Q: Do you recall providing an oral summary to
[5] the board of directors, again, other than the
[6] persons that were already there?
[7]   A: I don't recall.
[8]   Q: Do you recall providing an oral summary to
[9] Mr. Kramer?
[10]   A: I don't recall.
[11]   Q: Or to Dr. Kraenzlin?
[12]   A: I don't recall.
[13]   Q: Was Mr. Miller present at that meeting?
[14]   A: Excuse me?
[15]   Q: Mr. Miller, Dale Miller.
[16]   A: No.
[17]   Q: Was there anyone else present connected to
[18] Hudson Investments?
[19]   A: No.
[20]   Q: Did Mr. Hevrony identify any other — or
[21] did he identify himself as an owner of Hudson
[22] Investments?
[23]   A: I don't recall.
[24]   Q: Did you ever gain an understanding, prior

Page 94

[1] to November 29, as to who were the owners of Hudson
[2] Investments?
[3]   A: My understanding prior to November 29th was
[4] the owners of Hudson were at least Hevrony and
[5] Miller. Whether or not there was anybody else, I
[6] don't know.
[7]   Q: Fair to say you were never an owner of
[8] Hudson Investments, correct?
[9]   A: No.
[10]   Q: Am I correct?
[11]   A: You're correct.
[12]   Q: Nor was Mr. Brandano?
[13]   A: Correct.
[14]   Q: Nor Mr. Brantl?
[15]   A: Correct.
[16]   Q: Nor anyone else, to your knowledge,
[17] associated with BBCC?
[18]   A: I can't answer that.
[19]   Q: I said "to your knowledge."
[20]   A: To my knowledge, nobody else.
[21]   Q: And you never became an owner in Hudson
[22] Investments; is that correct?
[23]   A: That's correct.
[24]   Q: As I understand it, following the

Page 95

[1] acquisition, you became a shareholder in the entity
[2] now known as BPI; is that correct?
[3]   A: That's correct.
[4]   Q: And that occurred sometime after November
[5] 29, 2002?
[6]   A: That's correct.
[7]   Q: And do you recall when?
[8]   A: Probably December of 2002.
[9]   Q: And what percentage at the time of the
[10] company did you purchase?
[11]   A: Percentage of the time?
[12]   Q: At the time.
[13]   A: Myself?
[14]   Q: Yes.
[15]   A: 6 percent.
[16]   Q: And do you know what percent Mr. Brantl
[17] purchased?
[18]   A: 3 percent.
[19]   Q: How about Mr. Brandano?
[20]   A: I'm sorry, Mr. Brandano is 3 percent.
[21]   Q: Mr. Brantl?
[22]   A: I think 1 1/2 percent.
[23]   Q: And Hudson Investments, do you know what
[24] share of ownership it retained?

James F. Wood — Case 1:04-cv-10825-RWZ   Document 43-3   Filed 02/10/2006   Page 5 of 7
Vol. 1, January 16, 2006
VIDEOTAPED
Babcock Borsig Power GmbH v. Babcock Power Inc. v. Babcock Borsig AG

Page 100

conversations?

Q: That's correct, sir.

A: That's my recollection.

Q: Who did you understand to be negotiating with the parent regarding the sale for Hudson?

A: My understanding was that it was Miller and Hevrony.

Q: And who did you understand to be negotiating the deal on behalf of the seller, the parent?

A: Kramer would have been one, and I couldn't affirm it was Dr. Kraenzlin, but I would imagine Kramer was the point man.

Q: And I take it it's fair to say that neither you, Mr. Brandano, nor Mr. Brantl were negotiating the deal; is that correct?

A: That's right.

Q: You were supporting the deal or you were supposed to support the deal consistent with the September 25, 2002, letter; is that a fair characterization?

A: We were providing HIG answers to their questions on the substances and matters I talked to you about, and Brinkmann and Hampen, answers to

Page 101

questions that they had.

Q: And did you share — take a step back. The information and answers to questions that HIG had — and just for the record, "HIG" we mean as Hudson Investment Group, correct?

A: Correct.

Q: — that HIG had, did you share — was some of that in writing, some of those answers?

A: I don't recall.

Q: Do you recall whether there were any e-mails responding to questions?

A: I don't recall, but it would not have been unreasonable that there were.

Q: Do you recall whether you had any e-mails back and forth with Hevrony regarding questions or information?

A: I don't recall.

Q: Do you know if you did a search in your computer database to see if you had e-mails back and forth to Hevrony?

A: That search was done by our IT department, and those e-mails were produced.

MR. COMEN: I'm hearing someone's stomach growling. Having in mind that it's after 1:30, what

Page 102

is your plan — and we have a court reporter and a videographer. Do you plan to take any break at all —

MR. BELLO: Sure.

MR. COMEN: — for people to eat something? Just tell me when.

MR. BELLO: We can probably break in about 10 or 15 minutes and take a hopefully relatively shorter break, but it's up to you. 45 minutes?

MR. COMEN: A shorter break would be fine.

Q: Did you provide copies of all communications that you had with HIG to someone, Mr. Hampen, Mr. Brinkmann or the parent?

A: My recollection is I copied both sides on every piece of correspondence that I created.

Q: Do you know if Mr. Brantl provided answers to questions by HIG?

A: I don't know.

Q: Do you know, if he did, whether he copied both sides on that information?

A: I don't know.

Q: How about Mr. Brandano; do you know if he provided information to HIG and its representatives?

A: My recollection is he did.

Page 103

Q: Do you know if he provided that same information to Mr. Hampen, Mr. Brinkmann, or represent — other representatives of the parent?

A: My recollection is that he did.

Q: Is there any reason, sitting here, that you don't know whether Mr. Brantl did so?

A: I just can't recollect.

Q: Did you ever tell Mr. Brantl that it's important that you keep Hampen and Brinkmann informed of all information provided?

A: I don't know.

Q: Have you told me everything you can recall regarding the subject matters in the phone calls that you had with Mr. Hevrony?

And that is the reaffirmation of the business plans, the reaffirmation of management to stay with the company, and the discussion of HIG's ability to acquire the company quickly.

A: That's the best of my recollection, yes.

Q: So is it fair to say that you don't recall any discussion with Mr. Hevrony regarding — in these phone conversations — regarding the subject of a non-compete?

A: Correct.

Page 116

...nd Brian Crush?
[2] A: I don't recall it.
[3] Q: And just looking — going back to the cover
[4] page from Ms. Wile, Claus Brinkmann was the — one
[5] of the two individuals in Danvers from the parent
[6] corporation; is that correct?
[7] A: Correct.
[8] Q: Mr. Brandano was your CFO?
[9] A: Correct.
[10] Q: Mr. Hampen was the second individual from
[11] the parent corporation?
[12] A: Correct.
[13] Q: And Mr. Hadar? Who is Mr. Hadar?
[14] A: Mr. Hadar was an attorney with Gadsby &
[15] Hannah.
[16] Q: The lawyers representing Hudson Investment;
[17] is that correct?
[18] A: I believe so.
[19] Q: And Mr. Kraenzlin, Dr. Kraenzlin obviously
[20] is here. Mr. Stoler was the main deal lawyer at
[21] Gadsby & Hannah?
[22] A: He was one of the two lawyers at Gadsby &
[23] Hannah that worked on the deal.
[24] Q: Representing Hudson Investments?

Page 117

[1] MR. COMEN: I object.
[2] Q: You can answer the question.
[3] A: Sorry?
[4] Q: Representing Hudson Investments?
[5] A: I'm not sure. I suppose he did, yes.
[6] Q: And Mr. Crush represented the seller?
[7] A: Yes.
[8] Q: Did you ever have any conversations with
[9] Mr. Stoler?
[10] A: Yes.
[11] Q: When did you have conversations with Mr.
[12] Stoler?
[13] A: I don't recall exactly.
[14] Q: How many conversations did you have with
[15] Mr. Stoler?
[16] A: I'm guessing.
[17] Q: More than two?
[18] A: Maybe not. Maybe three.
[19] Q: Maybe three. Who else was present when
[20] you — this is — let me give a time frame again.
[21] Between the insolvency — well, we can probably even
[22] make it tighter. I assume Mr. Stoler first came on
[23] the scene with Hudson Investments?
[24] A: Subsequent to Hudson Investments, that's

Page 118

[1] right.
[2] Q: So sometime between October, mid-October
[3] when you first came into contact with Hudson
[4] Investments, and November 29th, you had a couple or
[5] three conversations with Mr. Stoler?
[6] A: Correct.
[7] Q: Do you recall who else was party to those
[8] communications?
[9] A: I don't.
[10] Q: Was anybody else party to the
[11] communications?
[12] A: I would imagine, yes.
[13] Q: Well, I don't want you to guess. Do you
[14] have any member generally — specifically or
[15] generally who was party to those communications?
[16] A: Generally, my recollection is that it would
[17] have been Hadar, Stoler, Brantl, Brandano, and
[18] myself, and perhaps Hevrony. I don't remember.
[19] Q: Do you remember the subject matter of any
[20] of those communications?
[21] A: It would have been comments to Stoler on
[22] the agreements that were being drafted.
[23] Q: Okay. Do you remember whether any of those
[24] comments dealt with the non-compete?

Page 119

[1] A: I don't remember.
[2] Q: You have no recollection one way or the
[3] other?
[4] A: That's correct.
[5] Q: Do you remember if any of those comments
[6] related to the promissory notes?
[7] A: I don't recall.
[8] Q: No recollection one way or the other?
[9] A: No recollection.
[10] Q: Did you take any notes during any of those
[11] communications?
[12] A: No.
[13] Q: Were you in a room — was this in person or
[14] by phone?
[15] A: My recollection is meetings with Stoler
[16] were face-to-face.
[17] Q: Do you recall where?
[18] A: I don't recall.
[19] Q: Do you recall whether Mr. Brantl or Mr.
[20] Brandano took notes during those —
[21] A: I don't recall.
[22] Q: Do you know if it's a practice of either of
[23] those individuals to take notes during meetings?
[24] A: Yes.

Page 124

[1] new. It was the only way I had to get e-mails en
[2] route from place to place when I was traveling. So
[3] we used jwood@enporion.com to receive messages on
[4] the road, although those messages couldn't be opened
[5] with the Blackberry — with the Blackberry that I
[6] had.
[7]    Q: Then there is an address — that's Brantl.
[8]    A: Where are you looking?
[9]    Q: I stand corrected on that. There is a
[10] separate e-mail — it may not be here —
[11] powerjim@ — is it aol.com?
[12]    A: Yes, that's correct.
[13]    Q: And what is that, sir?
[14]    A: That's an e-mail address that I created at
[15] the time that I signed onto the AOL account. Those
[16] days they required you to create an e-mail address
[17] and a password. And the user names "jwood" and
[18] "jimwood" were both taken.
[19]    And, as we've discussed earlier, I've been
[20] in the power business for a lot of years, so I
[21] selected "powerjim" and tried it, and it worked.
[22] And so on my AOL e-mail account, I've been using
[23] powerjim@aol to represent the fact that I'm in the
[24] power business. And it seems that a lot of people

Page 125

[1] that know me know that account and they're easy to
[2] get ahold of me.
[3]    Q: Do you recognize the e-mails that are
[4] reflected in Exhibit 8, sir?
[5]    A: No, I don't.
[6]    Q: Do you recognize, on Page 2, on the face of
[7] the document it appears that you're the author of
[8] that e-mail; is that correct?
[9]    A: It looks that way.
[10]    Q: Do you have any reason to believe that you
[11] weren't the author of that e-mail?
[12]    A: No. I don't have any reason to believe
[13] that.
[14]    Q: Do you know what subject matter is being
[15] addressed by this e-mail?
[16]    A: Apparently acknowledgement of some
[17] document.
[18]    Q: If I suggested that it was the officers'
[19] certificate, would that refresh your recollection?
[20]    A: No.
[21]    Q: It wouldn't refresh it one way or another?
[22]    A: That's right.
[23]    Q: At the top of the first page it says, "What
[24] could Kraenzlin have provided that wasn't provided

Page 126

[1] to him by BBPI or to BBPI by Goodwin Procter?" What
[2] entity is being referenced, to you knowledge, by
[3] "BBPI"?
[4]    A: That would have been what we have called
[5] previously in this deposition Riley.
[6]    Q: And what role did Goodwin Procter have, to
[7] your knowledge, in connection with BBPI?
[8]    A: Well, I'm not sure how to answer that
[9] question, because this is from Crush, so I don't
[10] understand what he means by "by Goodwin Procter to
[11] BBPI." I don't know what he means there.
[12]    Q: What role, if any, did Goodwin Procter have
[13] in connection with this transaction at that time,
[14] sir?
[15]    A: We — we, Babcock Power Capital
[16] Corporation, used Goodwin Procter from time to time
[17] to discuss issues related to the transaction to help
[18] us understand the documents that were being created
[19] by Gadsby & Hannah. And as I stated earlier, we
[20] used Goodwin for business issues preceding this
[21] deal.
[22]    Q: Did Goodwin Procter also provide advice to
[23] the managers about the shareholders' agreement?
[24]    A: They did.

Page 127

[1]    Q: And that was advice in their individual
[2] capacities, correct?
[3]    A: What do you mean by that?
[4]    Q: The individual managers who were about to
[5] sign shareholders' agreements as a result of the
[6] acquisition; is that correct?
[7]    A: I don't know.
[8]    Q: Well, did you understand that Goodwin
[9] Procter was providing advice to the entity, when it
[10] was providing advice on the shareholders' agreement,
[11] or to the individuals?
[12]    A: It's not a question that I thought about.
[13]    Q: Did anyone from Goodwin Procter talk to you
[14] about that distinction?
[15]    A: No, not to my recollection.
[16]    Q: Did anyone suggest that you should get a
[17] waiver letter as to Goodwin Procter's advice on this
[18] subject matter, having previously represented the
[19] company?
[20]    A: A waiver letter how?
[21]    Q: A waiver of conflict letter between the
[22] individuals who were to be party to the
[23] shareholders' agreement and the entity BBCC?
[24]    A: I don't recall that.