# In The Matter Of:

*Babcock Borsig Power GmbH   v.*
*Babcock Power Inc.   v.   Babcock Borsig AG*

---

*Anthony A. Brandano*
*Vol. 1, December 22, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

Original File BRANDANO.V1, 169 Pages
Min-U-Script® File ID: 4223633693

**Word Index included with this Min-U-Script®**

Page 1

Volume I
Pages 1 to 169
Exhibits: See Index
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BABCOCK BORSIG POWER GmbH, :
   Plaintiff, :
vs. : Civil Action No.
 : 04 CV 01825-RWZ
BABCOCK POWER INC., :
   Defendant and :
   Third-Party Plaintiff, :
vs. :
BABCOCK BORSIG AG, :
   Third-Party Defendant. :

DEPOSITION OF ANTHONY A. BRANDANO, individually and as designee of BABCOCK POWER INC., a witness called on behalf of the Plaintiff and Third-Party Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Bello Black & Welsh LLP, 535 Boylston Street, Suite 1102, Boston, Massachusetts, on Thursday, December 22, 2005, commencing at 10:15 a.m.

PRESENT:
Bello Black & Welsh LLP (by John F. Welsh, Esq., and Kevin Powers, Esq.) 535 Boylston Street, Suite 1102, Boston, MA 02116, for the Plaintiff and Third-Party Defendant.
(Continued on Page 2)

Page 2

PRESENT (Continued):
Goodwin Procter LLP (by Steven J. Comen, Esq., and Peter Simons, Esq.) Exchange Place, Boston, MA 02109, for the Defendant and Third-Party Plaintiff.

Page 3

[1] INDEX
[2]
   WITNESS   DIRECT  CROSS  REDIRECT  RECROSS
[3]
[4] ANTHONY J. BRANDANO
[5] BY MR. WELSH    5
[6]
[7]
   EXHIBITS
[8]
   NO.   DESCRIPTION   PAGE
[9]
   1   Notice of Rule 30(b)(6) deposition  5
[10]    of Defendant Babcock Power Inc.,
    with Attachment A
[11]
   2   Stock Purchase Agreement between  5
[12]    Babcock Borsig Power GmbH and Hudson
    Investment Group, Inc., dated
[13]    November 13, 2002
[14] 3  First Amendment to Stock Purchase  5
    Agreement dated November 29, 2002
[15]
   6   Promissory note from Babcock Power  5
[16]    Inc. to Babcock Borsig Power GmbH
    dated November 29, 2002, in the
[17]    amount of $1,900,000
[18] 7  Promissory Note from Babcock Power  5
    Inc. to Babcock Borsig Power GmbH
[19]    dated November 29, 2002, in the
    amount of $5,000,000
[20]
   9  One-page letter from James S. Brantl  5
[21]   to Dr. Kranzlin dated July 8, 2003,
    with attached Exhibits A and B
[22]
   11  Two-page letter from Steven J. Comen  5
[23]   to Kenneth M. Bello dated October
    19, 2004
[24]

Page 75

A: No. I don't recall Mr. Comen being present. There was one other girl — gal too. I can't recall her name. There was one another associate from — Michelle or Abigail or Abi something, Michelle.
   Q: Did you guys have a retention letter with Goodwin Procter outlining the scope of this assignment?
   A: I don't know. I don't recall.
   Q: Now, do you recall meeting with Mr. Comen at any time in October through November 2002?
   A: Not specifically, but we were having conversations with other attorneys —
   * Q. I understand there are other attorneys. And I want to be very clear, I'm not asking you about the content of the communications, just the fact of the communications.
   So you remember talking with other attorneys. Is it fair to say the attorneys from Goodwin Procter, to your knowledge, were representing the company in negotiating the various documents listed on 11323 with Mr. Hevrony's group?
   A: Can you rephrase the question.
   Q: Yes. Who —

Page 76

   MR. WELSH: Would you please read the question back.
   (* Question read)
   MR. COMEN: I'm sorry, is there a context about "the company"? Is there a question that identifies the company?
   MR. WELSH: I was just following up the witness's answer when he referred to the company.
   MR. COMEN: I understand.
   Q: Can you answer the question. Do you want to have it reread again?
   A: Yes. Can we have it reread?
   Q: Of course we can.
   (* Question read)
   MR. COMEN: I'll object. I think it's important to identify — well, I'll object, without a speaking objection.
   Q: Okay. Would you please answer the question.
   THE WITNESS: Can I answer it now?
   MR. COMEN: If you understand it.
   A: Which company are we talking about?
   Q: Well, did you indicate that Goodwin Procter represented the company? Was that part of an

Page 77

earlier answer of yours?
   A: I can't recall.
   Q: You don't remember?
   A: No. Let's go —
   Q: What was Goodwin Procter's role with respect to the matters listed on BPI 11323?
   A: What was that page again?
   Q: 11323.
   A: Goodwin Procter and various associates was assisting management in the negotiations of these agreements to set up the new company, Babcock Power Inc.
   Q: They were assisting. Were they negotiating on management's behalf or the company's behalf?
   MR. COMEN: I object. You said "or," I object.
   Q: Were they negotiating on behalf of senior managers?
   A: They were providing advice to the senior managers in those documents.
   Q: Are you aware whether or not Goodwin Procter had any communications with other attorneys pertaining to those documents?
   A: They may have had communications with

Page 78

Gadsby & Hannah and their attorneys in those documentation.
   Q: To your knowledge, what was the nature of the communication that the attorneys from Goodwin Procter had with the attorneys of Gadsby & Hannah?
   A: I can't — I don't recall, you know, the exact instances —
   Q: Can you tell me what your understanding generally was of the nature of those communications?
   MR. COMEN: I'm sorry. The nature? He said "may." Now you're asking him —
   MR. WELSH: Yes.
   MR. COMEN: — what may they have been talking about?
   MR. WELSH: I'm asking what his understanding is as to what was discussed between the attorneys of Goodwin Procter and the attorneys of Gadsby & Hannah.
   MR. COMEN: If any.
   MR. WELSH: If any.
   A: I don't recall in terms of the exact specifics.
   Q: Did Babcock Power Inc. pay Goodwin Procter's bill?

Page 71

[1] Q: The N slash whatever, is that net cash?
[2] A: Well, let's focus on what I do know.
[3] Q: I'm sorry. Okay. We'll start with that.
[4] A: The 12.6 represents the 9.5 million cash
[5] payment to Germany, the 2.8 million payment under
[6] the non-compete, and, I want to say, the $300,000
[7] payment of the 2.2 consulting agreement to get you a
[8] total cash to Germany on the date the transaction
[9] closed of 12.6 million.
[10] Q: Okay.
[11] A: And I think there were just sort of some
[12] hen scratches as we were looking at the $1.9 million
[13] note to the bottom of that.
[14] Q: Above it, is that 12.3 in the circle?
[15] A: Yes. It was 12.3, and I think we agreed to
[16] pay — we were still negotiating the actual final
[17] purchase price, and we actually at the time agreed
[18] to pay them another $300,000.
[19] Q: Now, right under the 12.3 in the circle,
[20] what's that entry? It looks like — the first thing
[21] seems to be an "N."
[22] A: That was the $5 million —
[23] Q: Right there (indicating).
[24] A: That was just the note payable. I was just

Page 72

[1] making notes of what we were going to have. We were
[2] going to have the $5 million note payable and then
[3] the $1.9 million note payable at the end.
[4] Q: Down where it says "5.0," the abbreviation
[5] that immediately follow it?
[6] A: I think it's just "NP."
[7] Q: "P" as in Peter?
[8] A: Yes.
[9] Q: Underneath —
[10] A: Oh, no. It's non-compete. That's what
[11] it stands for, $5 million non-compete.
[12] Q: Below that there are some scratch-outs, but
[13] can you tell me what they said or what they referred
[14] to?
[15] A: I think it is just the $1.9 million
[16] consulting agreement.
[17] Q: All right. We're done with that. Let me
[18] see — I don't know if there is anything else I want
[19] to ask you about.
[20] If you would please go to 11314. Down in
[21] the lower right-hand column, is that your signature?
[22] A: No.
[23] Q: Do you know whose it is?
[24] A: I think this belongs to — I think it's the

Page 73

[1] managing director Premel. If you look on — if you
[2] look on Page — why isn't this marked?
[3] Q: Is that the head of agreement?
[4] A: Yes. If you look on — I think it's
[5] 11313 —
[6] Q: Yes, the Bates stamp didn't come out on
[7] this one.
[8] A: That's Premel. That's the managing
[9] director of NEM.
[10] MR. COMEN: It's right there. My brain
[11] trust says the Bates stamp is there.
[12] THE WITNESS: It is there, but I don't know
[13] if it came out on the copy. It's cut off on mine.
[14] MR. SIMONS: We can make another copy.
[15] MR. WELSH: Don't worry about that. I can
[16] figure my way through that.
[17] Q: Let me see if there is anything else on
[18] this document. If you go to the next-to-the-last
[19] page on this — of these documents, Exhibit 13,
[20] 11323, what is this?
[21] A: That's just the close — that's the
[22] checklist of the closing that we had for actually
[23] raising the preferred and common stock in Babcock
[24] Power Inc.

Page 74

[1] Q: When was that closed?
[2] A: That was done simultaneously with the
[3] purchase and sale of the assets from the Germans.
[4] Q: Were the individuals whose names are listed
[5] here, were they represented by any attorney in the
[6] context of the negotiation of those agreements?
[7] A: The company had sought advice from Goodwin
[8] Procter, and —
[9] Q: Any particular attorney at Goodwin Procter?
[10] MR. COMEN: You didn't let him finish.
[11] Q: Oops. Sorry. I'm sorry if I cut you off.
[12] Would you please finish.
[13] A: The company received advice from Goodwin
[14] Procter in negotiating these — the documents that
[15] are listed on the top of the schedule.
[16] Q: And any particular attorney at Goodwin
[17] Procter who provided that assistance to you?
[18] A: Paul Goren.
[19] Q: Was there anyone else?
[20] A: Yes. There was one other associate that
[21] was on the engagement, Stuart. I can't recall his
[22] last name.
[23] Q: Do you remember Mr. Comen being present at
[24] any meetings on these topics?

Page 79

[1] A: I'm not sure who paid the bill.
[2] Q: Would you be responsible for overseeing
[3] those types of matters?
[4] A: Yes.
[5] Q: Did you ever see a copy of Goodwin's bill?
[6] A: Not necessarily.
[7] Q: "Not necessarily" does not indicate to me
[8] "Yes" or "No" or "I don't know."
[9] A: I don't know if I ever saw the exact bill.
[10] * Q: So what is your best understanding about
[11] what activities, if any, Goodwin Procter engaged in
[12] with respect to the matters listed on BPI 11323?
[13] THE WITNESS: Can you repeat the question
[14] for me, please.
[15] (* Question read)
[16] A: I thought I answered that. Didn't I
[17] already answer that?
[18] Q: I thought you did too, but — your
[19] subsequent answers have left a doubt in my mind, so
[20] I want to be clear.
[21] A: Can we go back to the question before and
[22] let's see —
[23] Q: It's about five questions before.
[24] A: Let's just go back and see —

Page 80

[1] Q: Well, I mean — I'm going to ask you
[2] straight on, instead of looking at past — as you
[3] sit here today, to the best of your knowledge and
[4] memory, what is your understanding concerning the
[5] tasks engaged in by Goodwin Procter with respect to
[6] the matters listed on 11323?
[7] A: Can I go back?
[8] MR. COMEN: I mean — do me a favor. You
[9] stay there. Can we talk for a second?
[10] MR. WELSH: We'll go off the record at Mr.
[11] Comen's request for a minute.
[12] MR. COMEN: But let the record reflect I'm
[13] stepping out alone with Mr. Welsh so it doesn't
[14] appear that I'm coaching the witness.
[15] MR. WELSH: If I thought you were coaching
[16] the witness, I would put it on the record.
[17] (Mr. Welsh and Mr. Comen confer
[18] outside the room)
[19] (* Question read)
[20] Q: Let me ask a question, and I'll move on
[21] from there. Looking at BPI 11323, is it fair to say
[22] that Goodwin Procter provided advice to senior
[23] management concerning the terms of the subscription
[24] agreement and the shareholder — the stockholder

Page 81

[1] agreement?
[2] A: Goodwin Procter provided advice as counsel
[3] for the company on these agreements.
[4] Q: And on those agreements — strike that.
[5] When you say they provided advice to the company, to
[6] the best of your knowledge, to whom did Goodwin
[7] Procter communicate?
[8] A: Goodwin Procter communicated with
[9] principally Jim and myself and Jim Brantl —
[10] Q: "Jim and myself," that would be Jim Wood?
[11] A: Jim Wood, Jim Brantl and myself, related to
[12] these agreements, but they were providing advice as
[13] company counsel.
[14] Q: So prior to the transaction with the Hudson
[15] Group, Goodwin Procter represented the company with
[16] respect to the subscription agreement and the
[17] stockholder agreement; is that your understanding?
[18] A: And the confidential memorandum.
[19] Q: Any others?
[20] A: And — I'm not sure about the cancellation,
[21] the non-disclosure and the confidentiality agreement
[22] and the escrow letter. I think that most of that
[23] was done by Jim Brantl.
[24] Q: The subscription agreement, stockholders'

Page 82

[1] agreement, who prepared the initial drafts of those,
[2] whose counsel?
[3] A: I'm not sure.
[4] Q: Was it Hudson's counsel?
[5] A: I'm not sure, because I don't know. I
[6] mean...
[7] Q: Are you aware of Goodwin Procter having any
[8] communication with Babcock Borsig Power GmbH or any
[9] of its representatives concerning the subscription
[10] agreement or stockholders' agreement?
[11] A: Rephrase the question, or at least repeat
[12] it again, please.
[13] MR. WELSH: Would you read the question
[14] back.
[15] (Question read)
[16] A: I'm not aware. I don't believe so.
[17] Q: You can put those documents aside, sir.
[18] Under the $1.9 million promissory note, is
[19] it your understanding that the parties agreed that
[20] under that note there would be a right of setoff?
[21] A: I'm not sure.
[22] Q: Were you party to any communications with
[23] any representative of Babcock Borsig Power GmbH when
[24] the topic of whether or not the $1.9 million note