UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BABCOCK BORSIG POWER GmbH,<br>　　Plaintiff,<br><br>　　v.<br><br>BABCOCK POWER, INC.,<br>　　Defendant and Third-Party Plaintiff,<br><br>　　v.<br><br>BABCOCK BORSIG, AG,<br>　　Third-Party Defendant. | Civil Action No.: 04 CV 10825-RWZ |

**PLAINTIFF'S OPPOSITION TO DEFENDANT BABCOCK POWER, INC.'S MOTION FOR PROTECTIVE ORDER**

Having used every other tactic in its arsenal to delay and evade discovery, Defendant Babcock Power, Inc. ("BPI"), now swings for the fence and tries to opt out of discovery altogether. BPI's tactic: deny liability based on inaccurate and incomplete facts, and then posit that it should be immune from further inquiry. Discovery ends on March 31, 2006. BPI simply is trying to run out the clock; just 60 more days of delay -- BPI appear to reason -- and they escape scrutiny of their misconduct.

For the reasons set forth below, Plaintiff Babcock Borsig Power, Gmb ("Babcock GmbH") opposes BPI's Motion for Protective Order.

I. **SUMMARY OF DISCOVERY EFFORTS**

Babcock GmbH's Emergency Motion to Compel Depositions presented a detailed chronology of its efforts over many months to schedule and take the depositions now subject to BPI's Motion for Protective Order. That chronology, supplemented by more recent events, is replicated here.[1]

1. May 26, 2004: Plaintiff's Complaint for Declaratory Judgment filed; BPI's answer is filed in July 2004, and BPI's counterclaims and Third Party Complaint filed on September 15, 2004.

2. On August 9, 2004, the court issued its Scheduling Order.

3. June 2, 2005: The parties filed their Joint Discovery Plan.

4. June 6, 2005: Babcock GmbH files for partial summary judgment on the $1.9 million note.

5. June 7, 2005: Babcock GmbH served its request for production of Documents on BPI.

6. June 13, 2005: BPI files a notice of Rule 30 (b)(6) deposition on Babcock Borsig AG ("BBX") concerning location of documents and witnesses.

7. June 16, 2005: Babcock GmbH noticed the depositions of James Brantl (BPI General Counsel), Jim Woods (BPI Chief Executive Officer), Anthony Brandano (BPI Chief Financial Officer), and a Rule 30(b)(6) witness. Rather than unilaterally setting dates, counsel offered to "work together to find mutually acceptable dates for these and any other depositions."

8. By letter dated July 6, 2005, counsel for BPI stated: "as we discussed, we will schedule the [BPI] 30(b)(6) deposition you noticed for a date no later than 10 days after we have all returned from Germany," which was on July 28, 2005.

9. The BPI Rule 30(b)(6) was scheduled for August 12, but could not proceed forward because BPI had failed to produce *any* documents

---

[1] Babcock GmbH believes that the Discovery Master has the exhibits referenced in the Emergency Motion to Compel, but if he does not, will supply an additional copy of the same.

pursuant to Babcock GmbH's document request served in June. (e-mails dated August 2, 2004 and August 10, 2004).[2]

10. On August 29, 2005, Babcock GmbH noticed the depositions of the Rule 30(b)(6) deposition (for September 19), James Brantl (for October 3), Anthony Brandano (for September 30) and Jim Woods (for October 6). Ignoring entirely the noticed deposition dates, by letter dated September 7, 2005, counsel for BPI responded that he "is checking with Messrs. Brandano, Brantl and Woods to confirm their schedules and will inform you shortly as to the dates they may be available, and a date for the 30(b)(6) deposition." Notice was given by Babcock GmbH of the intent to take depositions in Germany.

11. Consequently, by letters dated September 9, Babcock counsel reiterated it intent to proceed with the noticed depositions. Once again ignoring the dates noticed, counsel for BPI, by letter dated September 12, unilaterally changing the order and dates of the noticed depositions, and then stating (yet again): "I am also coordinating with Messrs. Brandano and Woods as to dates they are available for their depositions".

12. By letter dated September 19, counsel for Babcock GmbH requested that BPI "provide all available dates during the next six weeks for the depositions of the previously noticed BPI witnesses, including the Rule 30(b)(6) witness."

    By response dated September 19, BPI counsel stated that he would "speak with Messeurs. Wood, Brantl and Brandano regarding their availability for depositions over the next six weeks." No dates thereafter were provided by BPI.

13. By e-mails dated October 27, November 1, November 3, and November 9, Babcock counsel reiterated its request for deposition dates. No response was provided by BPI.

14. By letter dated November 18, 2005, Babcock counsel wrote yet again for deposition dates. Yet again, no dates were offered by BPI.

15. By letter dated November 28, 2005, Babcock counsel re-noticed the Rule 30(b)(6) Notice and Brandano depositions to December 13 and 14, respectively.

---

[2] Despite an Order (dated September 19, 2005) granting Babcock's Motion to Compel documents, it was until mid-October before he produced documents. To this date, BPI has refused repeated requests to confer regarding the sufficiency of its production and its designation of "all produced documents as confidential".

3

16. By letter dated December 1, 2005, BPI counsel stated that he would be unavailable for depositions on December 13 and 14, as he "must be in Houston" for another matter.

17. By letter dated December 5, 2004, Babcock counsel agreed to accommodate this scheduling conflict, rescheduling the Rule 30(b)(6) deposition for December 19, and the Brandano deposition for December 20, and further re-noticing the deposition of Jim Woods for January 10, 2006.

18. Following receipt of this notice, BPI counsel began a series of communications, posturing that the depositions should be delayed pending appointment of a Discovery Master.

More Recent Events

19. As the result of the Discovery Master's Intervention, and in resolution of Babcock GmbH's Motion to Compel, the first days of deposition were taken of BPI's Rule 30 (b)(6) Witness (Mr. Brantl) on December 20, 2005, of Mr. Wood on January 16, 2006, and Mr. Brandano on December 22, 2005. Two days of Dr. Kraenzlin's deposition were taken on January 17-18, 2006. Even that scheduling was not done without great difficulty, and intervention by the Discovery Master.

20. On January 6, 2006, Plaintiff Babcock GmbH filed its Motion to Compel Testimony of Rule 30(b)(6) Witness. Discovery concludes by Court Order as of March 31, 2006. Defendant BPI has no further depositions noticed. Plaintiff Babcock GmbH has noticed depositions of Mr. Hevrony, Mr. Kramer, Mr. Kuna, Mr. Freitag, Mr. Baltizar, Mr. Stoler/Gadsby Hannah LLP, Freshfields and Hitachi.

21. A series of letters among counsel, beginning on December 30, 2005 and followed by letters on January 10, 2006 (two), January 13, and January 19, reflects the continuing pattern of injecting roadblocks into the discovery process. Copies of these letters are attached hereto respectively as Exhibits A – E

II. **BPI HAS GROSSLY EXAGGERATED THE SCOPE OF DISCOVERY SOUGHT BY BABCOCK.**

There is no merit whatsoever to BPI's hysterical claim that Babcock GmbH seeks "endless depositions across the world" as part of a purported "world–wide fishing expedition." Rather, Babcock GmbH merely seeks deposition testimony from individuals

4

whom the parties identified at the outset of this case as having material and relevant information.

Contrary to BPI's claim, Babcock GmbH counsel is not seeking to travel to Japan. Counsel does plan on traveling to Germany (where both Babcock GmbH and Babcock Borsig AG are headquartered) to take the depositions of four individuals – Mr. Ludgar Kramer, Mr. Sebastian Freitag, Mr. Helmut Balthazar and Mr. Walter Kuna. Babcock GmbH also expects that BPI would finally conclude its depositions of Dr. Kraenzlin during the same trip.[3] Babcock GmbH has no alternative; these witnesses have material, relevant testimony to provide. Since they are not employed by Babcock GmbH or BBX, the witnesses cannot be compelled to travel to the United States for deposition or trial.[4] In all, these depositions should require 3-5 days.

BPI's current protest that too great expense is involved in conducting depositions in Germany is both false and hypocritical. Babcock GmbH has offered to permit BPI to participate in the depositions by telephone (or even video, if it can be arranged) pursuant to Federal Rules of Civil Procedure Rule 30(b)(7) if cost is truly an issue; predictably, BPI has declined.

Moreover, at the outset of this case, BPI insisted, over Babcock GmbH's repeated objections, that the parties travel to Germany to take Dr. Kraenzlin's deposition as Rule 30(b)(6) witness ostensibly on the narrow issue of the location of documents and witnesses. Repeatedly, both in correspondence and before the Court, Babcock GmbH

---

[3] Despite three days spent questioning Dr. Kraenzlin in deposition (one as Rule 30(b)(6) witness and two in his individual capacity), BPI's counsel has yet to conclude Dr. Kraenzlin's deposition. Completing Dr. Kraenzlin's office in Germany during this trip will minimize further expense.

[4] As suggested by the Discovery Master, Babcock GmbH contacted Mr. Kramer and the other German witnesses (none of whom currently are Babcock employees.) These witnesses indicated that they did not want to travel to the United States for depositions, apparently due to the inconvenience the excessive travel (at least three days) would place on their schedules.

argued that a trip to Germany for this narrow purpose was unnecessary and that the information could be obtained much less expensively by document requests and/or interrogatories. BPI prevailed by claiming that it had the right to decide unilaterally what discovery it wished to propound, and that given the parties and subject matters involved, trips to Germany were inevitable. Thus, when it was seeking discovery, BPI claimed entitlement to conduct discovery in Germany. Now, BPI has executed a 180 degree turn, and claims that German depositions are burdensome. BPI cannot be allowed to have it both ways.

The discovery sought by Babcock GmbH is reasonable and necessary; BPI's true concern is not burden, but rather the anticipated disclosure of facts damaging to its case.

### III. BPI'S REPRESENTATION THAT THE REMAINING DISCOVERY PERTAINS SOLELY TO THE NON-COMPETITION AGREEMENT/HITACHI DISPUTE IS FALSE.

The claim by BPI that remaining discovery only concerns the Non-Competition Agreement ("NCA") and related Hitachi dispute is not accurate. While this dispute certainly will be the focus of many of the depositions, at least one of the German based witnesses, as well as others noticed here in the United States, will testify to matters outside of the NCA dispute.

### A. German Based Depositions

Babcock GmbH plans to take the deposition of Mr. Ludgar Kramer, one of its principal negotiators. It is noteworthy that BPI itself repeatedly has indicated its intent to depose Mr. Kramer, based on the relevant information he possesses. Indeed, just as BPI repeatedly has identified Dr. Kraenzlin as "the key witness" in the case, Babcock GmbH respectfully submits that Mr. Kramer is an equally key witness. Mr. Kramer has first-

6

hand information and will testify about the parties' express agreement that no set-offs were permitted against the $1.9 million note.  He also will testify concerning his directions to BBCC managers (including Messrs. Wood, Brantl and Brandano) concerning their corporate and fiduciary duties to BBCC during the transaction.  In addition to these topics that are unrelated to the NCA, he will testify in depth as to specific conversations he had with Mr. Hevrony about the NCA, such conversations being contemporaneous to the negotiation of the NCA, and later when the issues with Hitachi arose.  Mr. Kramer's testimony is highly material and relevant to all aspects of this case.

Other German based depositions include Sebastian Frietag, Helmut Balthazar and Walter Kuna, each having first hand information concerning the parties' contemporaneous intent regarding the terms of the NCA.  These individuals have admissible evidence that BPI knowingly was adopting a false interpretation of the NCA to coerce a payoff from Hitachi and/or Babcock.  The relevance of this discovery is manifest.

      B.      <u>Other Noticed Depositions</u>

It is unclear from BPI's Motion for Protective Order whether it also seeks to bar depositions of witnesses located in the United States.  Regardless, the noticed depositions seek facts highly relevant to the *disputes* between the parties.

      1.      <u>Nathan Hevrony</u>:[5]  Mr. Hevrony, as the Hudson partner who acted as the principal negotiator of the Stock Purchase Agreement, is likely the most significant witness in the case.  He is expected to contradict BPI witnesses on the issues involving

---

[5] Babcock GmbH purposefully has not yet noticed the deposition of Dale Miller, another principal of Hudson Investments.  However, depending on testimony presented in the noticed depositions, particularly that of Mr. Hevrony, it may become necessary to depose Mr. Miller.

7

promissory notes, the parties' intent concerning the scope of the NCA, and BPI's improper conduct toward Babcock GmbH.

As to the NCA, Mr. Hevrony is expected to testify that at the time the agreement was negotiated, in specific conversations with Babcock negotiators Dr. Kraenzlin and Mr. Kramer, he agreed that the terms of the NCA would not apply to the pre-existing businesses of a buyer already operating in the Restricted Territory. The parties discussed the "GE" example; specifically, Mr. Hevrony acknowledged and agreed that if General Electric purchased one of the hundreds of BBX subsidiaries that would be sold, the NCA would not bar General Electric from continuing to conduct its pre-existing business within the restricted territory. This understanding and agreement was incorporated into the language of the NCA and was "of the essence." Absent such agreement the transaction would not have closed since a broader scope would have eliminated too many likely purchasers of insolvent BBX's subsidiary businesses.

Mr. Hevrony also will testify as to communications he had with Dr. Kraenzlin at the time of the sale of the Rescue Company to Hitachi. More particularly, in early 2003, certain financial/bonding issues made it imperative that BBX sell the Rescue Company to a more financially sound owner, or risk contract defaults and resulting insolvency of the Rescue Company and mass layoffs of its thousands of employees. In this context, a tentative deal was discussed between BBX and Hitachi for the purpose of selling the Rescue Company to Hitachi.

Hitachi, which has pre-existing North American competitive businesses, asked Babcock GmbH/BBX to obtain written confirmation from BPI that the NCA agreement did not apply to Hitachi's pre-existing North American businesses. BPI refused, opting

instead to adopt a false, expansive interpretation of the NCA, and to shake down Hitachi (and Babcock GmbH/BBX) for "peace payments." Upon information and belief, BPI threatened to sue Hitachi to halt all pre-existing Hitachi competitive businesses in the Restricted Territory unless Hitachi made a multimillion dollar payment to BPI.

To ensure that its scheme to coerce payment under false pretenses was successful, BPI engaged in various deceptive maneuvers. BPI represented that it would deal "in good faith" with Babcock GmbH to resolve the issue while, at the same time, engaged in surreptitious communications and meetings with Hitachi. BPI actively tried to hide the contents of its communications with Hitachi, labeling them as "privileged."

In response to these activities, Dr. Kraenzlin and Ludgar Kramer spoke with Mr. Hevrony regarding the parties' understanding of the NCA. Mr. Hevrony told them that he agreed that the NCA did not apply to the then existing business of Hitachi, but that Jim Wood was asserting a different, more expansive interpretation of the NCA. Mr. Hevrony also told them that he repeatedly told Wood that his expansive interpretation was wrong, but that Wood would not relent.[6]

2.  <u>Attorney Jeffrey Stoler/Gadsby & Hannah:</u> Mr. Stoler/Gadsby Hannah also will testify with respect to multiple matters other than the NCA/Hitachi dispute, including the parties' agreement that no set-off be allowed against the $1.9 million promissory note, the parties' contractual understanding involving post-transaction adjustment on Schedule 3.06 payments, the parties' discussions concerning the

---

[6] In an apparent complete turnaround, BPI President Jim Wood testified that he, in fact, shared Babcock's understanding of the NCA's scope. Wood Tr. O. He also testified that when BPI and Hitachi secretly met to negotiate a resolution, Hitachi expressed that it was looking for a complete release of any obligations under the NCA; that is, it wanted to be able to use assets purchased from BBX and its subsidiary Rescue Company. Wood's deposition testimony completely contradicts prior reports of his actions from Mr. Hevrony.

9

interpretation of the scope of the NCA, and the issue of "attorney client privilege" between Hudson and BBCC management. Mr. Stoler also will provide both relevant testimony and documents that have been wrongfully withheld by BPI based on a frivolous assertion of attorney-client privilege.

       3.    <u>Freshfields (Hitachi's attorneys)/Hitachi</u>:  A document subpoena has been served on Freshfields and Hitachi, which maintain United States offices in Washington DC and Tarrytown, New York, respectively. It is expected that Freshfields and Hitachi will produce non-privileged documents directly relevant to this dispute that BPI has concealed wrongfully in this litigation. Depending on what documents are produced, it is possible (indeed likely) that a deposition of Freshfields's counsel and Hitachi will take place regarding the non-privileged communications between BPI and Hitachi that led to an agreement between those two entities, including execution of a "cooperation agreement"[7] between the two entities, and a $7.5M payment by Hitachi to BPI (of which Babcock GmbH was forced to pay $3.75M).

**IV.**    **BPI'S CLAIM OF "VICTORY" REGARDING THE INTERPRETATION OF THE NCA IS NOT JUST PREMATURE, IT IS WRONG.**

       A.    <u>BPI's Protective Order is Procedurally Flawed</u>.

BPI's effort to further thwart discovery by unilaterally declaring victory on the NCA dispute is nothing less than bizarre. Federal Rule of Civil Procedure 56 and its related Local Rule spell out the appropriate procedure for summary adjudication; BPI's Motion for Protective Order not only fails to approach the requirements of Rule 56, but subverts the purpose and intent Rule 56 by seeking to bar discovery of the facts upon

---

[7] Jim Wood testified that the Cooperation Agreement has the potential to generate $25-30M of revenue for BPI.

10

which such a Motion necessarily would be premised.  BPI's improper tactic should be dismissed out of hand without inquiry as to underlying facts.

If BPI's motion had been brought as a motion for partial summary judgment in accordance with applicable law, and Babcock GmbH would have been allowed to conduct the discovery promised by BPI for over one year, the facts would establish a triable case of whether BPI engaged in unfair and deceptive trade practices by bad faith threats of litigation based on intentionally false and deceptive representations concerning the scope of the NCA.

B.   BPI's Claimed "Victory" on the NCA Interpretation also is Wrong.

The factual context surrounding the negotiation of the NCA and BPI's later conduct relating to the Hitachi transaction will show the following.  At the time Babcock GmbH was selling its North America Environmental, Services and Heat Exchange businesses to Hudson Investment (later BPI), BBX was creating a European Subsidiary (known as the "Rescue Company"), which would preserve in a solvent business various European subsidiaries and their thousands of employees.  In negotiating the terms of the NCA, BPI and Babcock GmbH negotiated the language – through inclusion of the term "Affiliates" – to apply to Babcock Gmbh as seller and to BBX and its subsidiaries, including the rescue Company, as "Affiliates" of Babcock.

The fundamental interpretive issue on the NCA therefore revolves around the scope of the definition of "Seller" in the NCA.  The document defines Seller as: "**'Seller' shall mean Babcock Borsig Power GmbH, any of its direct or indirect Subsidiaries, Affiliates or successors or assigns** . . . ."   There is no dispute about whether the NCA applies to "affiliates" or to "successors," – in this case the Rescue Company and then

11

Hitachi (which is the acknowledged successor of the Rescue Company).  Stated another way, Babcock Borsig GmbH does not dispute: (1) that the Rescue Company was an "Affiliate" of the Seller; (2) that Hitachi was a successor of the Affiliate Rescue Company; and (3) that the NCA prohibited Hitachi from transferring or using assets purchased from an Affiliate Hitachi in the "restricted territory."

BPI somehow believes that this ends the dispute, but that simply is wrong.  The issue *is* whether the NCA applies to Hitachi's then existing businesses already operating in the Restricted Territory, thus requiring a successor such as Hitachi to cease doing business in the restricted territory through its already existing business.  In fact, there is no language in the NCA providing that the definition of Seller is to include already existing "affiliates" (e.g., the already existing Hitachi affiliate operating in the restricted territory).  If that was the intent of Defendant, then the language of the NCA defining Seller should have defined Seller as: *Babcock Borsig Power GmbH, any of its direct or indirect Subsidiaries, Affiliates [**their successors or assigns, and any of the successors' and assigns' affiliates**]*.[8]

The fact is that the parties did not intend to so provide.  Indeed, if the language is not clear on its face in favor of Babcock GmbH's interpretation, then the parties "intent" gleaned by contemporaneous statements and conduct -- including that of Mr. Hevrony as the principal negotiator for the buyer -- is both relevant and ultimately will prove dispositive here.

In short, BPI's present construction of the NCA takes liberties with the express language of the agreement itself, and is at odds with the parties' contemporaneous understanding as to its scope.  Indeed, the integration clause BPI cites to conceal and

---

[8] In other words, the NCA does not reach "affiliates of successors of Babcock affiliates."

12

avoid the parties understanding and agreement as to scope would bar the very contract "interpretation" it seeks to enforce.

## V. CONCLUSION

As shown above, BPI's Motion for Protective Order is nothing more than smokescreen seeking to prohibit damaging testimony concerning BPI's conduct; it must be dismissed with costs taxed against BPI.

          Respectfully submitted,

          BABCOCK BORSIG POWER GmbH

          By its Attorneys,

          /s/ John F. Welsh
          Kenneth M. Bello, BBO # 036630
          John F. Welsh,   BBO #522640
          Kevin R. Powers, BBO # 644635
          Bello Black & Welsh LLP
          535 Boylston Street, Suite 1102
          Boston, MA 02116
          (617) 247-4100

Dated: January 31, 2006